

**UNITED STATES
SECURITIES AND EXCHANGE COMMISSION**
100 F Street, N.E.
Washington, D.C. 20549

OFFICE OF THE
GENERAL COUNSEL

**Emily True Parise**
202-551-5169
PariseE@sec.gov

April 29, 2022

By CM/ECF

Catherine O'Hagan Wolfe
Clerk of Court
U.S. Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

> **Re:** *SEC v. Rio Tinto PLC et al.* **(No. 21-2042)**

Dear Ms. O'Hagan Wolfe:

I write pursuant to Rule 28(j) to inform the Court of several recent decisions supporting the Commission's position (*e.g.* SEC Br. 29-31; Reply 9-11) that the antifraud provisions should be interpreted so that liability may be imposed under Rule 10b-5(a) and (c) and Section 17(a)(1) and (3) for conduct related to misstatements (including, but not limited to, dissemination). *See In re XL Fleet Sec. Litig.*, 2022 WL 493629, *7 (S.D.N.Y. Feb. 17, 2022) (Schofield, J.) (Attachment A) (explaining that while "*Lorenzo [v. SEC*, 139 S. Ct. 1094 (2019)] held that disseminators of misstatements could be liable for violating Rule 10b-5(a) or (c)," "*Lorenzo* does not state that someone must disseminate a misstatement to be liable under those subsections"); *In re Firstenergy Sec. Litig.*, 2022 WL 681320, *7 & n.16 (S.D. Ohio Mar. 7, 2022) (Attachment B) (stating that "[s]cheme liability may rest in part on the same statements or omissions that trigger misstatement liability, or it may embrace separate statements or conduct," and that "[d]efendants' attempt to segregate the allegations supporting the misstatement theory from those supporting the scheme theory is irreconcilable with … *Lorenzo*") (cleaned up); *SEC v. Silea*, 2022 WL 269105, *12 (E.D. Tex. Jan. 27, 2022) (Attachment C) ("Defendants' actions demonstrate a course of conduct designed to deceive and defraud investors" which "included, among other things, making the material misrepresentations set forth above, which, in addition to violating Section 17(a)(2) and Rule 10b-5(b), also constitute violations of Section 17(a)(1) and (3) and Rule 10b-5(a) and (c).").

Clerk of the Court
Page 2

Similarly, in *SEC v. MiMedx Group*, 2022 WL 902784, *11 (S.D.N.Y. Mar. 28, 2022 (Attachment D), Judge Buchwald denied a motion to dismiss arguing that "scheme liability" claims must be based on something beyond misstatements. The court noted the "split in authority regarding *Lorenzo*'s holding" (the defendant had cited the district court's decision in this case and a case that followed it; the Commission had cited "a number of post-*Lorenzo* cases"), but found no need to resolve the "debate," because allegations including engagement in "concealment of material facts from MiMedx's Audit Committee and auditors" were sufficient to support liability. *Id.*

Sincerely,

/s/ *Emily True Parise*
Emily True Parise

Cc: All counsel of record (via ECF) w/ attachments

# ATTACHMENT A

Case 21-2042, Document 139, 04/29/2022, 3306599, Page4 of 106

2022 WL 493629
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

IN RE XL FLEET CORP. SECURITIES LITIGATION

21 Civ. 2002 (LGS)
|
Signed 02/17/2022

## OPINION AND ORDER

LORNA G. SCHOFIELD, District Judge:

**\*1**  Lead Plaintiff Delton Rowe and additional plaintiffs Jeffrey Suh, Carl Enslin, Simone Heridis and Soraya Matamoros (collectively, the "Plaintiffs"), individually and purportedly on behalf of all others similarly situated, bring this securities fraud action against Defendants Jonathan J. Ledecky, James H.R. Brady, Kevin Griffin, Thomas J. Hynes III, Dimitri Kazarinoff, Brian Piern (collectively, the "Individual Defendants") and XL Fleet Corp. The Amended Consolidated Complaint ("Complaint") alleges violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 against all Defendants and § 20(a) of the Exchange Act against the Individual Defendants. Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the motion is denied.

## I. BACKGROUND

The following facts are taken from the Complaint and are assumed to be true for purposes of this motion. *See R.M. Bacon, LLC v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 509, 512 (2d Cir. 2020).

On September 18, 2020, Pivotal Investment Corp. II ("Pivotal"), a special purpose acquisition company, announced a merger agreement with XL Hybrids, Inc. ("Hybrids"). The merger was completed in December 2020, resulting in the formation of Defendant XL Fleet Corp. ("XL Fleet"). (When used in connection with pre-merger activities, "XL Fleet" refers to Pivotal and/or Hybrids, which is similar to the approach in the Complaint.) XL Fleet provides vehicle electrification solutions for commercial and municipal Fleets in North America. Its common stock and warrants trade on the New York Stock Exchange under the symbols "XL" and "XL WS."

In announcing the merger on September 18, 2020, XL Fleet made statements in a joint press release, which was the first of many statements in press releases, SEC filings, and media appearances about XL Fleet's revenues, sales pipeline and technology. Plaintiffs allege that many of these statements were materially false and misleading. The case is brought on behalf of a putative class of persons and entities that purchased or otherwise acquired XL Fleet securities between September 18, 2020, and March 31, 2021 (the "Class Period").

In addition to claims against XL Fleet, the Complaint asserts claims against the Individual Defendants. Jonathan Ledecky was the Chairman and CEO of Pivotal and remained as a director of XL Fleet after the merger. James H.R. Brady served as Pivotal's Chief Financial Officer. Kevin Griffin was a director of Pivotal and later XL Fleet. Ledecky, Brady and Griffin are the "Pivotal Individual Defendants." Thomas J. Hynes founded Hybrids and served as its Chief Strategy Officer until the merger, when he became a director and the President of XL Fleet. Dimitri Kazarinoff was the CEO of Hybrids, and post-merger became CEO and a director of XL Fleet. Brian Piern was XL Fleet's Vice President of Sales and Marketing from January 2019 through May 2021. Hynes, Kazarinoff and Piern are the "XL Individual Defendants."

**\*2** The Complaint alleges facts based in part on confidential witnesses and a third-party research report. The confidential witnesses are all former employees of XL Fleet who reported to Piern and worked in sales. The report was published by Muddy Waters Research ("Muddy Waters"), on March 3, 2021, describing issues at XL Fleet, including that XL Fleet inflated its sales pipeline. A copy of the report is appended to the Complaint. On news of the Muddy Waters report, the XL Fleet share price fell 13%.

## II. STANDARD

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party but does not consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (internal quotation marks omitted). To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *accord Dane v. UnitedHealthcare Ins. Co.*, 974 F3d 183, 189 (2d Cir. 2020). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[ ] [plaintiff's] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (first alteration in original); *accord Bensch v. Est. of Umar*, 2 F.4th 70, 80 (2d Cir. 2021). To survive dismissal, "plaintiffs must provide the grounds upon which [their] claim rests through factual allegations sufficient to raise a right to relief above the speculative level."

*Rich v. Fox News Network, LLC*, 939 F.3d 112, 121 (2d Cir. 2019) (alteration in original) (internal quotation marks omitted).

To state a claim under § 10(b) and Rule 10b-5, "a plaintiff must allege that each defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021).

"A complaint alleging securities fraud must also satisfy heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the [PSLRA]." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 75 (2d Cir. 2021). The heightened pleading standard of Rule 9(b) requires: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

The PSLRA expanded on Rule 9(b)'s pleading standard, requiring that securities fraud complaints "specify" each misleading statement; that they set forth the facts "on which [a] belief" that a statement is misleading was "formed" and that they "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)-(2). "A complaint will survive 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.' " *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).

**\*3** "To establish scienter, a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Set Cap. LLC*, 996 F.3d at 78 (internal quotation marks omitted). The sufficiency of a complaint's allegations of scienter are evaluated " 'holistically' considering 'all of the facts alleged, taken collectively,' rather than 'any individual allegation, scrutinized in isolation.' " *Id.* (quoting *Tellabs, Inc.*, 551 U.S. at 323, 326). "For an inference of scienter to be strong, as required by the PSLRA, a reasonable person must deem it cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Id.* (internal quotation marks omitted). "In the securities fraud context, recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care, not merely a heightened form of negligence." *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (citations and internal quotation marks omitted); *accord Gray v. Alpha & Omega Semiconductor, Ltd.*, No. 20 Civ. 2414, 2021 WL 4429499, at *10 (S.D.N.Y. Sept. 27, 2021).

Case 21-2042, Document 139, 04/29/2022, 3306599, Page7 of 106

In re XL Fleet Corp. Securities Litigation, Slip Copy (2022)
2022 WL 493629

"Where a defendant is a corporation, this requires pleading facts that give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (internal quotation marks omitted). "[M]ost courts look to the discrete roles played by the corporate actors who are connected to the alleged misrepresentation to determine which (if any) fall within the locus of a company's scienter." *Id.* "Under this approach, the most straightforward way to raise a strong inference of corporate scienter is to impute it from an individual defendant who made the challenged misstatement." *Id.* (internal quotation marks omitted). But, "[i]n exceedingly rare instances, a statement may be so dramatic that collective corporate scienter may be inferred." *Id.* (internal quotation marks omitted).

"In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009); *accord In re Wells Fargo & Co. Secs. Litig.*, No. 20 Civ. 4494, 2021 WL 4482102, at *27 (S.D.N.Y. Sept. 30, 2021). "This can consist of allegations as to who possessed ... knowledge of the fraud, when and how they obtained [that] knowledge, or even why they should have known of the fraud." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d at 695 (alteration in original) (internal quotation marks omitted).

To state a claim under § 20(a), a plaintiff must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (internal quotation marks omitted); *accord UA Local 13 Pension Fund v. Sealed Air Corp.*, No. 19 Civ. 10161, 2021 WL 2209921, at *8 (S.D.N.Y. June 1, 2021).

## III. DISCUSSION

### A. Violation of § 10(b) and Rule 10b-5

The Complaint sufficiently alleges a securities fraud claim under § 10(b) and Rule 10b-5. Defendants argue the Complaint fails to allege falsity and scienter. These arguments are unavailing.

### 1. Falsity

The Complaint alleges that five categories of statements by Defendants were false. At least one of these categories -- statements about XL Fleet's sales pipeline and revenue projections -- is sufficiently alleged and warrants denial of the motion to dismiss. That category, but not the others, is discussed below.

Case 21-2042, Document 139, 04/29/2022, 3306599, Page8 of 106

In re XL Fleet Corp. Securities Litigation, Slip Copy (2022)
2022 WL 493629

Under the PSLRA, a plaintiff adequately pleads falsity if he or she "specif[ies] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). "[L]iability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.' " *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Couns. Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)). A reasonable investor, upon hearing a statement of opinion from an issuer, "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at a time." *Omnicare*, 575 U.S. at 188-89.

**\*4** The Complaint alleges that the following statements regarding XL Fleet's sales pipeline and revenue are misleading, as well as other statements on other topics. A September 18, 2020, press release issued by Pivotal and Hybrids, states that "XL has strong demand momentum with a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021." On a September 18, 2020, call to discuss the merger between Pivotal and Hybrids, Kazarinoff stated "[w]e have a 12-month rolling sales pipeline of more than 220 million dollars in potential new business opportunities." The October 2, 2020, Registration Statement, which was signed by Ledecky, Brady and Griffin, and filed with the SEC, includes the $21 million and $75 million expected revenue figures. An October 26, 2020, press release, which was also attached to a Form 8-K signed by Ledecky and filed with the SEC, makes the same claims regarding XL Fleet's sales pipeline and forecasted revenue. On an October 26, 2020, webinar, Kazarinoff announced a sales pipeline of over $240 million. On November 12, 2020, Pivotal filed an amendment to the October 2, 2020, Registration Statement, which states that XL management uses the sales and marketing team's sales tracking data to create "projections about future aggregate sales pipeline opportunities." The amendment also states that "XL management reviews its sales opportunity pipeline data and applies its historic conversion rates of sales pipeline and historical experience with respect to lead time to create revenue projections." On November 12, 2020, XL Fleet issued a press release, which was filed with the SEC by Pivotal, reverting to the $220 million 12-month sales pipeline figure.

The Complaint alleges that these statements were misleading because they failed to disclose that XL Fleet's pipeline was materially overstated due to data manipulation by XL management in the following ways. Piern regularly instructed employees to record sales opportunities without a reasonable basis, record inflated percentage likelihoods of sales and maintain pre-existing entries in the records after customers indicated that they would not order XL Fleet's products. According to one former employee, in late 2019, Piern directed the employee to enter sales opportunities from companies after an initial general conversation that lacked detail to expect any orders, and to

In re XL Fleet Corp. Securities Litigation, Slip Copy (2022)

2022 WL 493629

enter sales opportunities even if the employee had not spoken to anyone at the company recorded and regardless of whether those companies had vehicles compatible with XL Fleet products. The Complaint alleges that another former employee recounted being instructed by Piern in the third quarter of 2020 to record a sales opportunity for a single year, even though the customer had stated that any purchase would be spread out over a multiple year period. The former employee also stated that sales opportunities were recorded with a 25% likelihood merely because XL Fleet transmitted pricing information to a customer, even if that customer had not expressed interest. The former employee believes this and other practices overstated the sales pipeline. The Complaint alleges that a third former employee recounted that Piern artificially inflated the probability of sales figures by altering the employee's judgments of the likelihood of a sale from 25% up to 75%.

The aforementioned allegations sufficiently plead with particularity that the sales pipeline and revenue figures were misleading. First, the Complaint alleges, with particularity, facts showing that the pipeline figures were exaggerated and inflated without sufficient basis. Second, the Complaint alleges that the statement explaining the methodology for the pipeline and revenue forecasting, that it was keyed to historical conversion rates, was misleading. Defendants' arguments to the contrary are unavailing.

First, Defendants argue that the allegations do not support an inference of falsity because the claim of "frequent" and "regular" inflation of sales probabilities are conclusory. This argument is misplaced because the Complaint alleges multiple examples of baseless manipulation of sales probabilities totaling millions of dollars in projected sales, which suffice to allege that the sales pipeline and revenue statements were misleading, independent of the allegation regarding the frequency of the manipulation.

Second, Defendants argue that the only victim of Piern's exaggerations was the Board of Directors of XL Fleet because the Complaint does not suggest the exaggerated figures were used for any purpose other than reports to the Board. Contrary to Defendants' argument, the Complaint alleges that the exaggerations were incorporated into public statements. The Complaint also alleges that the November 12, 2020, Amendment to the Registration Statement states that XL Fleet management uses its sales opportunity pipeline data, including the sales and marketing team's tool for tracking sales opportunities, to create revenue projections.

 *5  Third, Defendants argue that the allegations regarding sales pipeline figures do not support an inference of falsity because the Complaint does not provide context about the adjustments, for example that the probabilities are not in line with other companies' sales probabilities or XL Fleet's own experiences. To the contrary, the Complaint explains that the sales employees found that the probabilities did not align with their experiences. In any event, at least one former employee alleged that sales probabilities were recorded for a potential customer who could not even purchase XL Fleet's product because it was not compatible with the customer's vehicles. Regardless of

Case 21-2042, Document 139, 04/29/2022, 3306599, Page10 of 106

In re XL Fleet Corp. Securities Litigation, Slip Copy (2022)
2022 WL 493629

whether other companies maintained the same practice, that allegation, taken in context with the other allegations, is sufficient to plead an inference of falsity in the sales pipeline and revenue figures.

Defendants' arguments about the unreliability of the confidential witnesses are unavailing. "[W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000); *accord Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 797-98 (S.D.N.Y. 2020). Here, the Complaint alleges facts to corroborate the confidential sources. First, the Complaint alleges the business role of each confidential source, which provides a basis to conclude that the source was aware of the information they discussed. Second, the allegations based on the confidential sources are corroborated by the Muddy Waters report, which is proper for consideration at this stage of the litigation because it is appended to the Complaint and has indicia of reliability. Those indicia include claims in the report that XL Fleet admitted were true or did not deny. For example, XL Fleet admitted the report's disclosure that XL Fleet had lost a certain regulatory approval in California and consequently could not sell in that market; yet according to the Complaint, XL Fleet continued to record California sales opportunities. Another example is that in its response to the report, XL Fleet did not deny that its pipeline numbers were falsely exaggerated. The Muddy Waters report apparently was deemed credible by the market as reflected in the significant drop in XL Fleet's share price on the day the report was published as well as the next trading day. "The majority of courts ... have held that a short-seller report, such as the Muddy Waters Report ... does not implicate the same skepticism as a traditional anonymous source." *McIntire v. China Mediaexpress Holdings*, 927 F. Supp. 2d 105, 123-24 (S.D.N.Y. 2013) (internal quotation marks omitted); *accord In re Hebron Tech. Co.*, No. 20 Civ. 4420, 2021 WL 4341500, at *13 (S.D.N.Y. Sept. 22, 2021). Defendants' concern regarding the temporal disconnect between the Relevant Period and some of the confidential allegations is unwarranted because the temporal difference is minor and "allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period," *Emp.s' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015).

## 2. Scienter

The Complaint alleges facts that give rise to the requisite "strong inference of scienter." To plead scienter, a complaint may either "(1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Set Cap. LLC*, 996 F.3d at 78. "A complaint will survive 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.' " *Setzer v. Omega Healthcare*

Case 21-2042, Document 139, 04/29/2022, 3306599, Page11 of 106

In re XL Fleet Corp. Securities Litigation, Slip Copy (2022)

2022 WL 493629

*Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)). Plausible allegations that a defendant "knew facts or had access to information suggesting that their public statements were not accurate" supports a culpable inference of conscious misbehavior or recklessness. *Set. Cap. LLC*, 996 F.3d at 79.

**\*6** Here, the Complaint alleges facts that, if true, constitute strong circumstantial evidence of conscious misbehavior or recklessness. The Complaint alleges that XL Fleet's vice president of sales and marketing pressured employees to inflate sales probabilities and also exaggerated sales probabilities to inflate XL's pipeline and that those inflated figures were incorporated into XL Fleet's revenue projections. The Complaint also alleges that XL Fleet stated that its revenue projections were based on historical conversion rates, although they were actually based on manipulated data. Further, one former employee states that she disclosed the overstated sales pipeline to Pivotal's attorneys during the diligence process for the merger.

These allegations make the inference that Defendants intentionally or recklessly misled the behavior more compelling than an inference that Defendants acted non-culpably.[1] At the least, the November 12, 2020, statement that XL Fleet's revenue projections were based on historical conversion rates coupled with the multiple alleged instances of projections based on manipulated data and the reporting of manipulation by a former employee to Pivotal lawyers sufficiently alleges that the defendants "knew facts or had access to information suggesting that their public statements were not accurate," *Set. Cap. LLC*, 996 F.3d at 79.

[1]   Defendants do not rely on the safe harbor for forward-looking statements, and do not assert that "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]" were made. 15 U.S.C. § 78u-5(c)(1)(A)(i).

The Complaint's allegations that Pivotal directors, including Ledecky, Griffin and Brady, were substantially involved in conducting due diligence into XL Fleet, including its financial projections, supports a finding of conscious misbehavior or recklessness as to those three individuals. The Complaint's allegations that Piern reported directly to Hynes and Kazarinoff, that they worked directly with Piern on setting sales targets and projecting sales, and had intimate knowledge of XL Fleet's operations, including its sales projections, support a finding of scienter as to Hynes, Kazarinoff and Piern. The scienter of Hynes and Kazarinoff, who served successively as CEO of XL Fleet, can be imputed to XL Fleet. *See Jackson*, 960 F.3d at 98; *Constr. Laborers Pension Trust v. CBS Corp.*, 433 F. Supp. 3d 515, 549 (S.D.N.Y. 2020).

### B. Liability of Piern

Defendants' motion to dismiss the § 10(b) claim against Piern is denied without prejudice. Defendants argue that Piern cannot be directly liable under § 10(b) because the Complaint does not allege that he determined the contents of any SEC filings, participated in drafting the filings, or disseminated or made any of the statements that are the basis of this lawsuit; and so, at most,

he is an aider and abetter not subject to direct liability to investors. This argument is unpersuasive, and Defendants cite no authority that compels a different result.

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security" a "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 proscribes three types of conduct:

> (a) [t]o employ any device, scheme, or artifice to defraud,

> (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

**\*7** in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5. These three subsections "capture a wide range of conduct" and do not govern "different, mutually exclusive spheres of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-02 (2019). For purposes of subsection (b), "the maker of a statement is the person or entity with authority over the content of the statement and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 143-44 (2011). Subsections (a) and (c) "require only deceptive conduct." *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021). To state a scheme liability claim under these subsections, a plaintiff must show: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Id.* (internal quotation marks omitted). "[T]he deceptive or fraudulent scheme or activity must have occurred 'in connection with the purchase or sale of a[ ] security.' " *Id.* (quoting 17 C.F.R. § 240.10b-5) (second alteration in original).

Here, the Complaint alleges facts sufficient to show that Piern employed a scheme to defraud investors and engaged in a practice that operated as a fraud upon persons who purchased XL Fleet securities. Defendants' primary argument is that Piern's conduct is too remote from the fraud alleged. But the Complaint alleges facts from which the inference can be drawn that, at a minimum, Piern must have been aware that his false reports about projected sales would be passed on to investors and materially impact their view of the company and its financial prospects. He reported directly to, and met frequently with, CEO Hynes, and thereafter his successor, CEO Kazarinoff. Piern's team was responsible for preparing the data that XL management used to create XL Fleet's revenue projections. The statements issued to investors directly highlight the role of Piern's team in "track[ing] all sales opportunities to existing and potential customers." Investors relied on that

Case 21-2042, Document 139, 04/29/2022, 3306599, Page13 of 106

In re XL Fleet Corp. Securities Litigation, Slip Copy (2022)
2022 WL 493629

data directly when reviewing XL Fleet's revenue projections and sales pipeline. Based on these facts, the Complaint alleges facts sufficient to satisfy all of the elements of Rule 10b-5 scheme liability against Piern. Nevertheless, because the Second Circuit has not yet addressed the question of whether liability may lie in these circumstances, the denial of the motion to dismiss Piern as a Defendant is without prejudice to renewal should there be a clear and contrary statement of law from the Second Circuit or the Supreme Court before the conclusion of the case.

Defendants' reliance on *Janus* and *Lorenzo* does not change the conclusion that the Complaint sufficiently alleges a claim against Piern. *Janus* addressed the limitations of Rule 10b-5(b), *see Janus*, 546 U.S. at 142-43 (focusing on the meaning of Rule 10b-5(b), not Rule 10b-5(a) or (c), which Plaintiffs rely upon here). *Lorenzo* held that disseminators of misstatements could be liable for violating Rule 10b-5(a) or (c), *Lorenzo*, 139 S. Ct. at 1100-01, but *Lorenzo* does not state that someone must disseminate a misstatement to be liable under those subsections.

**\*8** Defendants' reliance argument is also unpersuasive. Defendants, citing the Supreme Court's opinion in *Stoneridge Investment Partners, LLC, v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008), argue that there is no basis for finding reliance because there is no conduct by Piern that investors were aware of to rely upon. "Reliance in a 10b-5 action ensures 'a proper connection between a defendant's misrepresentation and a plaintiff's injury.' " *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 482 (2d Cir. 2018) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011)). " 'The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was [personally] aware of a company's statement' and purchased shares based on it." *Id.* (quoting *Halliburton Co.*, 563 U.S. at 810) (alteration in original). "[R]eliance is tied to causation, leading to the inquiry whether respondents' acts were immediate or remote to the injury." *Stoneridge Inv. Partners*, 552 U.S. at 160. In *Stoneridge*, the Supreme Court found there was no reliance where investors sought to sue an issuer's suppliers and customers for their role in accepting overpayments from the issuer and returning those overpayments back to the issuer, which the issuer used to manipulate its financial statements. *Id.* at 154, 159. The Supreme Court held that the investors "cannot show reliance upon any of respondents' actions except in an indirect chain that we find too remote for liability." *Id.* at 159. Here, Piern's alleged conduct is not indirect or remote as was the conduct of the suppliers and customers in *Stoneridge*. To the contrary, Piern's role in generating the underlying pipeline and revenue projection data for XL Fleet was directly communicated to investors in the November 12, 2020, Amendment. That Amendment highlighted the contribution of the sales and marketing team, which Piern led, to the creation of "sales opportunity pipeline data." The scheme orchestrated or overseen by Piern is the scheme that directly misled investors about XL Fleet's sales pipeline and revenue prospects and Piern is alleged to have had a central role in the scheme.

## C. Violation of § 20(a)

2022 WL 493629

The Complaint pleads a § 20(a) claim. The sole argument Defendants advance in opposition to Plaintiffs' § 20(a) claim is that there is no viable claim for a primary violation. Because the Complaint pleads a primary violation under § 10(b), there is no reason to dismiss the § 20(a) claim.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED. Defendants' request for oral argument is DENIED as moot.

**All Citations**

Slip Copy, 2022 WL 493629

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# ATTACHMENT B

2022 WL 681320
United States District Court, S.D. Ohio, Eastern Division.

IN RE FIRSTENERGY CORP. Securities Litigation

Case Nos. 2:20-cv-3785 & 2:20-cv-4287
|
Signed 03/07/2022

**Attorneys and Law Firms**

Daniel Richard Karon, Karon LLC, Cleveland, OH, Brian E. Cochran, Pro Hac Vice, Robbins Geller Rudman Dowd LLP, San Diego, CA, Joseph F. Murray, Murray Murphy Moul Basil LLP, Columbus, OH, for Plaintiff.

Geoffrey J. Ritts, Robert Stephen Faxon, Jones Day, Cleveland, OH, Jordan M. Baumann, Jones Day, Marjorie P. Duffy, Columbus, OH, for Defendant.

**OPINION & ORDER**

ALGENON L. MARBLEY, CHIEF UNITED STATES DISTRICT JUDGE

**\*1** This case is a consolidated action[1] for securities fraud brought by Lead Plaintiff Los Angeles County Employees Retirement Association ("LACERA") on behalf of a putative class of investors in the Ohio-based electrical utility company FirstEnergy Corp. ("FirstEnergy" or the "Company"). Plaintiffs allege violations of the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act") by FirstEnergy, 25 named officers and directors, and 16 underwriters, in relation to the Ohio House Bill 6 ("HB6") scandal. (ECF No. 72). The case is before the Court on Defendants' 10 separate Motions to Dismiss.[2] The Court determines that Plaintiffs' claims may proceed as pled, with some exceptions in Counts II and IV.

---

1    The cases *Owens, et al. v. FirstEnergy Corp., et al.* (No. 2:20-cv-3785) and *Frand, et al. v. FirstEnergy Corp., et al.* (No. 2:20-cv-4287) were consolidated in November 2020 under the *Owens* case number by order of this Court. (ECF No. 65). All of the Motions to Dismiss were docketed in *Owens*; some also were cross-filed in *Frand*. Throughout this Opinion, ECF numbers refer to the *Owens* docket unless otherwise indicated.

2    The main Motion to Dismiss is brought jointly by FirstEnergy and 17 officers and directors: James Pearson, Steven Strah, K. Jon Taylor, Jason Lisowski, George Smart, Paul Addison, Michael Anderson, Steven Demetriou, Julia Johnson, Donald Misheff, Thomas Mitchell, James O'Neil, Christopher Pappas, Sandra Pianalto, Luis Reyes, Jerry Thornton, and Leslie Turner. (ECF No. 160; *Frand* ECF No. 58). When this Opinion refers to arguments made by FirstEnergy, they are drawn from the brief in support (ECF No. 161). Individual Motions are brought by Robert Reffner (ECF No. 162), John Judge (ECF No. 164; *Frand* ECF No. 60), Michael Dowling

(ECF No. 165; *Frand* ECF No. 61), Ty Pine (ECF No. 166), Dennis Chack (ECF No. 168; *Frand* ECF No. 62), Donald Schneider (ECF No. 170), Leila Vespoli (ECF No. 172), and Charles Jones (ECF No. 174; *Frand* ECF No. 64). A final joint Motion is brought by the 16 underwriters (ECF No. 171). Each of these Defendants also joins in the arguments advanced by FirstEnergy in the main Motion.

## I. BACKGROUND

### A. Factual Allegations

The following is drawn from Plaintiffs' well-pled allegations, which are assumed true at this stage; the Court implies no findings of fact. Plaintiffs' Complaint details a large corruption and bribery scheme perpetrated by FirstEnergy and its senior executives between February 21, 2017, and July 21, 2020, inclusive (the "Class Period"). (ECF No. 72 ¶¶ 1, 3). Specifically, FirstEnergy is alleged to have paid approximately $60 million to Ohio's former Speaker of the House Larry Householder, the former Chairman of the Public Utilities Commission of Ohio ("PUCO") Sam Randazzo, and others, via a web of lobbyists, shell companies, and political action committees. (*Id.* ¶¶ 3–5, 8). In exchange, FirstEnergy received a bailout of its failing nuclear power plants, in the form of HB6. (*Id.* ¶ 5). HB6 delivered approximately $2 billion to FirstEnergy: $1.3 billion in a ratepayer-funded subsidy and $700 million in a "decoupling" provision that would allow FirstEnergy to charge artificially high rates. (*Id.*). The scheme unraveled on July 21, 2020, when Householder and his associates were arrested and charged in connection with the bribery scheme. (*Id.* ¶ 8).

**\*2** According to Plaintiffs, HB6 was the culmination of a years-long effort to solve FirstEnergy's "nuclear problems." The Company's two aging nuclear plants had incurred climbing maintenance and repair costs since at least the early 2000s, and the lost profits only grew as nuclear power became less cost competitive. (*Id.* ¶¶ 42–43). By 2016, forecasts projected losses in the hundreds of millions of dollars, which stood in the way of FirstEnergy's strategic decision to exit the competitive energy-generation market and focus solely on transmission. (*Id.* ¶ 44). Investors grew increasingly concerned about FirstEnergy's nuclear liabilities, and the topic came to "dominate" earnings calls and analyst coverage. (*Id.*).

In 2018, FirstEnergy announced plans to decommission the two nuclear power plants—which would entail billions of dollars in direct expenses and future environmental liabilities. (*Id.* ¶¶ 45, 50). In an effort to shed these costs, FirstEnergy Solutions ("FES," now Energy Harbor LLC) and FirstEnergy Nuclear Operating Company ("FENOC," now Energy Harbor Nuclear Corp.), the two subsidiaries through which FirstEnergy operated the nuclear plants, filed for bankruptcy. (*Id.* ¶¶ 42, 45).[3] FirstEnergy proposed a "settlement" to the bankruptcy court, whereby FirstEnergy would gain "sweeping releases" from future claims against FES and FENOC. (*Id.* ¶ 51). After the Department of Justice, the Ohio Consumer Council, and others objected to the plan, the bankruptcy court halted the case. (*Id.* ¶¶ 52–57, 62).[4]

3    FES and FENOC were renamed and reorganized as part of the bankruptcy proceedings. The Complaint at times refers to them, together, as "Energy Harbor." (*Id.* ¶¶ 17, 42 n.1).

4    Less than one week after HB6 was introduced, FirstEnergy would file an amended plan that jettisoned the sweeping releases. (*Id.* ¶ 88). The bankruptcy court then approved the amended plan. (*Id.* ¶ 92). Plaintiffs allege that the success of FirstEnergy's legislative tactics obviated its earlier strategy of obtaining releases via bankruptcy. (*Id.* ¶ 88).

All the while, Plaintiffs allege that FirstEnergy "had been laying the groundwork for [a] backup plan" to delay decommissioning of the nuclear plants and seek "legislative or regulatory solutions"—ultimately in the form of HB6. (*Id.* ¶¶ 44, 63). Early in 2017, FirstEnergy began courting State Representative and Speaker-hopeful Larry Householder by flying him and his sons aboard the corporate jet to former President Trump's inauguration. (*Id.* ¶ 65). Shortly thereafter, FirstEnergy established two 501(c)(4) organizations, Partners for Progress and Generation Now, that would serve as the covert vehicles for funneling money to Householder and affiliates. (*Id.*). FirstEnergy made sizable contributions to Householder in 2017 and 2018 but concealed the true magnitude of its spending ($2.9 million). (*Id.* ¶ 67).

While FirstEnergy was making these clandestine contributions, it allegedly misled its shareholders about the nature of its political activity. One of the more notable instances involved the Company's proxy statements issued in connection with a May 16, 2017 shareholder meeting, where one item of business was a shareholder proposal to require an annual report on lobbying policies and payments. (*Id.* ¶ 110). In urging shareholders to vote against the proposal, FirstEnergy referred shareholders to its Political Activity Policy, which represented that the Company "complies with all federal and state lobbying registration and disclosure requirements" and "has decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are legally permissible and in the best interests of FirstEnergy." (*Id.* ¶¶ 110– 11). Additionally, FirstEnergy's SEC filings disclosed the Company's pursuit of "[l]egislative or regulatory solutions," but made no mention of the legal, financial, and reputational risks involved in *how* the Company was pursuing those solutions. (*Id.* ¶¶ 95–102).[5]

5    Similar statements and omissions throughout the Class Period are discussed more fully at Section III.A.1.a, *infra*.

**\*3**  Householder, bolstered by the election of FirstEnergy-funded supporters, became Speaker of the Ohio House of Representatives in January 2019. (*Id.* ¶¶ 70–71). Having secured one powerful ally, FirstEnergy expanded its scheme with a $4.3 million payment to incoming PUCO Chairman Sam Randazzo, who in turn helped to write and support HB6. (*Id.* ¶ 72). Householder introduced the bill in April 2019, and it passed the House of Representatives in May. (*Id.* ¶¶ 73–74). In these two months alone, FirstEnergy contributed at least $9.5 million to the scheme in concealed payments. (*Id.* ¶ 67). The Senate added the valuable decoupling provision and passed the bill, after FirstEnergy contributed another $7 million. (*Id.* ¶¶ 75, 78). Ohio's Governor signed HB6 into law on July 23, 2019. (*Id.*).

Public opposition to HB6 quickly arose in the form of a referendum movement, and the scheme shifted to defending the new law. (*Id.* ¶ 81). FirstEnergy funneled over $38 million through groups such as Ohioans for Energy Security (funded by Generation Now) and Partners for Progress in defense of HB6. (*Id.* ¶ 82). The funds were spent on an advertising campaign urging Ohioans not to sign the referendum petition—which the groups baselessly linked to the Chinese government—and also to bribe, disrupt, or disqualify signature collectors. (*Id.* ¶¶ 83–85). The referendum effort failed when its organizers could not produce the required number of signatures by the deadline. (*Id.* ¶ 86). The next day, FirstEnergy sent $3 million to Generation Now through an affiliate. (*Id.*).

Buoyed by the concealment of risk and by the seemingly guaranteed revenue from HB6, FirstEnergy stock traded at artificially high prices, and its credit ratings improved with S&P, Moody's, and Fitch. (*Id.* ¶¶ 242–46). FirstEnergy used the inflated prices to issue $2.5 billion in stock and $2.5 billion in debt securities. (*Id.* ¶ 241). FirstEnergy officers prospered as well: Defendants Jones, Pearson, Strah, Reffner, and Vespoli earned between 78% and 98% of their total compensation as performance-based pay. (*Id.* ¶ 248). Defendants Jones, Pearson, Chack, and Vespoli all sold a combined $14 million of FirstEnergy stock at the inflated prices. (*Id.* ¶ 250).

The scheme crumbled, however, when criminal charges were brought on July 21, 2020, against Householder, his political strategist Jeffrey Longstreth, three lobbyists (Mathew Borges, Neil Clark, and Juan Cespedes), and Generation Now. (*Id.* ¶ 143).[6] The criminal complaint alleged a federal racketeering conspiracy involving honest services wire fraud, receipt of bribes, and money laundering. (*Id.*). The criminal complaint did not identify FirstEnergy by name—it referred to the financier as "Company A"—but prosecutors announced that "[e]veryone in this room knows who Company A is." (*Id.* ¶ 234). While Defendant Jones was claiming ignorance and denying wrongdoing (*Id.* ¶¶ 234–35), FirstEnergy stock plunged almost 35% on July 21 and 22, 2020, representing a loss of over $7.68 billion in market value. (*Id.* ¶¶ 258–59). As further developments became known, FirstEnergy stock fell again: by $1.1 billion on October 29, 2020, and by $1.3 billion between November 19 and 24, 2020. (*Id.* ¶¶ 261, 264). In each of these windows, the price of debt securities declined as well. (*Id.* ¶¶ 260, 263, 266). By November 2020, the major ratings agencies had downgraded FirstEnergy's credit ratings to "junk status." (*Id.* ¶ 247). Investors, including Plaintiffs, lost billions of dollars collectively. (*Id.* ¶ 13).

6  The criminal case is *United States v. Householder*, No. 1:20-cr-0077-TSB (S.D. Ohio).

Longstreth and Cespedes each pleaded guilty to the racketeering conspiracy, admitting that they committed criminal acts to conceal the nature and source of payments that were made to Generation Now in return for specific official action by Householder. (*Id.* ¶ 171). Generation Now later followed suit and admitted to receiving money from "Company A" to be used in return for specific official action by Householder, and to concealing the nature and source of the payments. (*Id.* ¶ 205). On the same day that Longstreth and Cespedes pled guilty, FirstEnergy announced the firing of Defendants Jones, Chack, and Dowling for having "violated certain Company policies and its

code of conduct." (*Id.* ¶ 172). Shortly thereafter, FirstEnergy terminated Defendant Reffner and another legal officer for "inaction and conduct that the Board determined was influenced by the improper tone at the top." (*Id.* ¶¶ 184, 191). FirstEnergy's SEC filings following the terminations admitted to "material weakness in [its] internal control over financial reporting" that "could have resulted in material misstatements" in its financial statements. (*Id.* ¶ 192).

## B. Subsequent Developments

**\*4** Other fallout of the criminal complaint included lawsuits by the Ohio Attorney General and the Cities of Cincinnati and Columbus against FirstEnergy and others, seeking to enjoin implementation of HB6 (*Id.* ¶¶ 164, 170, 185); a PUCO audit (*Id.* ¶ 182); a ratepayer class action filed in this District, alleging racketeering;[7] shareholder derivative actions before this Court[8] and the Northern District of Ohio;[9] and a federal criminal case against FirstEnergy.[10] That criminal case ended with a deferred prosecution agreement in July 2021, under which FirstEnergy paid a $230 million penalty and "admit[ted], accept[ed], and acknowledge[d] that it is responsible under United States law for the acts as charged in the Information and as set forth in the Statement of Facts"—including that it "conspired with public officials and other individuals and entities to pay millions of dollars to and for the benefit of public officials in exchange for specific official action for FirstEnergy Corp.'s benefit."[11] *See* DPA at 1, 4, 17.

---

7    *Smith v. FirstEnergy Corp.*, No. 2:20-cv-3755-EAS-KAJ (S.D. Ohio). The Court takes judicial notice of this case and those mentioned next, as "such materials are public records [and] are otherwise appropriate for the taking of judicial notice." *New Eng. Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003).

8    *Emps. Ret. Sys. of City of St. Louis v. Jones*, No. 2:20-cv-4813-ALM-KAJ (S.D. Ohio).

9    *Miller v. Anderson*, No. 5:20-cv-1743-JRA (N.D. Ohio).

10   *United States v. FirstEnergy Corp.*, No. 1:21-cr-0086-TSB (S.D. Ohio).

11   The deferred prosecution agreement, hereinafter the "DPA," is ECF No. 3 in *United States v. FirstEnergy Corp.* The Statement of Facts is Attachment A to the DPA. The Court takes judicial notice of the DPA, as it is "public record[ ]" and its contents are not subject to reasonable dispute. *New Eng. Health Care Emps. Pension Fund*, 336 F.3d at 501; Fed. R. Evid. 201. It appropriately may be considered at this stage without converting the Motions to Dismiss into ones for summary judgment. *SeeNieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir. 1997) (" 'In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although *matters of public record*, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account.' " (emphasis added) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990))). The Court is cautious not to use the DPA for broad truths. Of the Defendants in this matter, only FirstEnergy was a party to the DPA, so the admissions therein are of lesser value against the Individual Defendants. Moreover, the DPA postdates the Complaint, so Plaintiffs have not rested their allegations on it. Though the DPA (or FirstEnergy's pursuit thereof) is discussed in the briefing (ECF No. 176 at 15; No. 193 at 1–2), it does not relieve the necessity of a well-pled Complaint. Yet, to ignore the DPA when it is so plainly relevant to the claims and arguments at issue would be an exercise in artificial blindness. Accordingly, the Court views FirstEnergy's willingness to sign the DPA as reinforcing allegations and inferences in the Complaint that were compelling even without it.

## C. Procedural History

Plaintiff Owens filed her original Complaint on July 28, 2020. (ECF No. 1). On October 23, 2020, the Court ordered Owens's case consolidated with other related class actions (including that by Plaintiff Frand) and appointed LACERA as Lead Plaintiff. (ECF No. 65). LACERA filed its Amended Consolidated Complaint (hereinafter, the "Complaint") on February 26, 2021. (ECF No. 72). The Complaint contains five counts:

- Count I for violation of Section 10(b) of the Exchange Act and SEC Rule 10b–5 thereunder, against FirstEnergy and the "Officer Defendants"[12] (together, the "Exchange Act Defendants");

- Count II for violation of Section 20(a) of the Exchange Act, against the Exchange Act Defendants;

- *5 • Count III for violation of Section 11 of the Securities Act, against FirstEnergy; Defendants Jones, Strah, and Lisowski; the "Director Defendants";[13] and the "Underwriter Defendants"[14] (together, the "Securities Act Defendants");

- Count IV for violation of Section 12(a)(2) of the Securities Act, against the Securities Act Defendants; and

- Count V for violation of Section 15 of the Securities Act, against the Securities Act Defendants other than the Underwriter Defendants.

[12]  The "Officer Defendants" are Jones, Pearson, Strah, Taylor, Dowling, Chack, Pine, Reffner, Vespoli, Judge, and Schneider. (*Id.* ¶¶ 28–39). Plaintiffs clarify in their response brief that Defendant Pine, a FirstEnergy lobbyist, was not in fact an "officer" of the Company but was included in this definition "for ease of reference." (ECF No. 176 at 71 n.23).

[13]  The "Director Defendants" are Addison, Anderson, Demetriou, Johnson, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, Smart, Thornton, and Turner. (ECF No. 72 ¶ 281).

[14]  The "Underwriter Defendants" are Barclays Capital Inc., BofA Securities, Inc., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Mizuho Securities USA LLC, PNC Capital Markets LLC, RBC Capital Markets, LLC, Santander Investment Securities Inc., Scotia Capital (USA) Inc., SMBC Nikko Securities America, Inc., CIBC World Markets Corp., KeyBanc Capital Markets Inc., TD Securities (USA) LLC, U.S. Bancorp Investments, Inc., and MUFG Securities Americas Inc. (*Id.* ¶ 283).

All Defendants moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). *See supra* note 2.

## II. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus,* 404 F.3d 950, 958–59 (6th Cir. 2005). When evaluating a motion to dismiss under Rule 12(b)(6), "[a]ll factual allegations in the complaint must be presumed to be true, and reasonable inferences must be made in favor of the non-moving party." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield,* 552 F.3d 430, 434 (6th Cir. 2008). But the court "need not ... accept unwarranted factual inferences." *Id.* Complaints must state "more than a bare assertion of legal conclusions to survive a motion to dismiss." *Horn v. Husqvarna Consumer Outdoor Products N.A., Inc.,* 2013 WL 693119, at *1 (S.D. Ohio Feb. 26, 2013) (citing *Allard v. Weitzman,* 991 F.2d 1236, 1240 (6th Cir. 1993)). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). The claim to relief must be " 'plausible on its face,' " with "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570).

When a plaintiff's claim sounds in fraud, the plaintiff also must satisfy Federal Rule of Civil Procedure 9(b). Rule 9(b) reads: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The requirement "reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.,* 532 F.3d 496, 504 (6th Cir. 2008) (internal quotation marks omitted). The Sixth Circuit has explained that to satisfy Rule 9(b), a plaintiff must at a minimum "allege the time, place, and content of the alleged misrepresentation," as well as "the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Bennett v. MIS Corp.,* 607 F.3d 1076, 1100 (6th Cir. 2010) (internal quotation marks omitted). In the analysis that follows, the Court will specify which claims sound in fraud and thus are subject to the more stringent pleading requirements of Rule 9(b).

**\*6** In a securities fraud case, the Private Securities Litigation Reform Act ("PSLRA") also requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if any allegation regarding the statement or omission is made on information and belief, ... [to] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Additionally, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2). In other words, the PSLRA requires plaintiffs "to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.,* the defendant's intention to deceive, manipulate or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313 (2007) (internal quotation marks omitted). Failure to meet these pleading requirements subjects

the case to dismissal upon a defendant's motion. 15 U.S.C. § 78u–4(b)(3)(A). Here too, the Court will specify which claims are subject to the PSLRA requirements.

For claims to which heightened pleading requirements (Rule 9(b) and/or the PSLRA) do not apply, the pleading standard defaults to that of Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

## III. LAW AND ANALYSIS

Before delving into the Motions to Dismiss, it is worth setting forth several recurrent principles and themes in the Court's analysis. First, heightened pleading requirements exist for specific policy reasons, and overextending them to filter meritorious lawsuits would frustrate, not further, the purposes of federal securities laws. "Rule 9(b) does not require omniscience; rather, the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim," *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (internal quotation marks omitted), such that they may "draft a responsive pleading." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (internal quotation marks omitted).

The PSLRA, meanwhile, is intended "to deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries."*Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019) (internal quotation marks omitted) (citing H.R. Conf. Rep. No. 104-369, at 31 (1995)). The statute was Congress's response to "abuse of the securities laws by private litigants," *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 682 (6th Cir. 2005) (internal quotation marks omitted), which " 'presents a danger of vexatiousness different in degree and kind from that which accompanies litigation in general.' " *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739 (1975)). However, the PSLRA "would hardly serve its purpose to protect investors and to maintain confidence in the securities markets, were it to become a choke-point for meritorious claims." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001) (internal quotation marks and citation omitted), *abrogated in part on other grounds byTellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). As stated in *Tellabs*, the PSLRA contains "twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." 551 U.S. at 322.

Second, context matters to Plaintiffs' narrative and is critical to understanding the alleged fraud. Plaintiffs emphasize that nuclear decommissioning was a matter of great importance to the Company, closely monitored by its shareholders. "The Nuclear Plants grew to dominate FirstEnergy earnings calls and analyst coverage, as investors grew increasingly concerned

about the potential liabilities stemming from the Nuclear Plants." (ECF No. 72 ¶ 44). As will be discussed, this fact bolsters a fraudulent motive and blunts the plausibility of unwitting participation. Shareholders also were attuned to the Company's political spending. They brought to the May 2017 shareholder meeting a proposal for increased oversight of lobbying policies and payments, which the Company's leadership recommended against. (*Id.* ¶¶ 110–11). Representations about the Company's lobbying activities and legal compliance—which in other cases might be bland and innocuous—take on a different character when, as alleged, they were proffered in response to specific shareholder concerns and served to further the scheme through distraction and concealment.

**\*7** Third, as detailed above in Section I.B, the HB6 scandal has prompted a deluge of lawsuits, including shareholder derivative actions, criminal prosecutions, a racketeering case, and more. That this Court and others have sustained similar allegations adds to the cogency of Plaintiffs' narrative—and dulls the competing theory that Defendants "believed they were engaging in the political process by legal means." (ECF No. 161 at 2). But nor does it displace Plaintiffs' obligation to demonstrate that the federal securities laws, specifically, are an appropriate avenue of redress. With these ideas in mind, the Court turns to Count I.

### A. Exchange Act Section 10(b) and Rule 10b–5 (Count I)

Section 10(b) of the Exchange Act prohibits "directly or indirectly ... us[ing] or employ[ing], in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe ...." 15 U.S.C. § 78j(b). The Supreme Court "has found a [private] right of action implied in the words of the statute and its implementing regulation," Rule 10b–5. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008). Rule 10b–5 gives three categories of prohibited conduct:

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person ....

17 C.F.R. § 240.10b–5.

Plaintiffs advance theories under each of the three subparts. The Court will follow FirstEnergy's brief in denoting subpart (b) "misstatement liability" and subparts (a) and (c), together, "scheme liability." (ECF No. 161 at 9 nn. 4, 5). The categories are not mutually exclusive, and Plaintiffs' decision to plead both theories under the same Count is consistent with a complementary view.[15] Scheme liability may rest in part on the same statements or omissions that trigger misstatement

liability, or it may embrace separate statements or conduct. *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1102 (2019) ("[T]his Court and the Commission have long recognized considerable overlap among the subsections of the Rule and related provisions of the securities laws.").[16] Though misstatement liability is more defined, the "expansive language" of subsections (a) and (c) "capture[s] a wide range of conduct." *Id.* at 1101–02.

[15]     *See also* ECF No. 72 ¶ 94 ("[D]efendants also executed the Bailout Scheme through a series of materially false and misleading public statements"); *Id.* ¶¶ 135–36 (alleged misstatements "were materially false and misleading when made" because "defendants knew or recklessly disregarded ... that FirstEnergy, its officers, employees, and other representatives and affiliates had launched [or "had executed"] an elaborate campaign to corrupt the political process in order to secure the passage of legislation and regulatory action favoring the Company and its affiliates"); No. 176 at 22 ("None of these statements so much as suggested that the most important aspect of Defendants' pursuit of legislative solutions depended on (or had been achieved by), a scheme to corrupt the political process and suborn the regulatory framework into which FirstEnergy had poured tens of millions of dollars." (internal quotation marks and citation omitted)).

[16]     Defendants' attempt to segregate the allegations supporting the misstatement theory from those supporting the scheme theory (ECF No. 161 at 57–58) is irreconcilable with this passage of *Lorenzo*. For instance, the passage Defendants cite from *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 360–61 (D.N.J. 2009) has been acknowledged by another court as "no longer viable following the Supreme Court's decision in *Lorenzo*." *SEC v. Winemaster*, 529 F. Supp. 3d 880, 919 (N.D. Ill. 2021). In another case cited by Defendants, the court distinguished *Lorenzo* on the grounds that—unlike here—all misstatements were alleged to have occurred *after*, and not in connection with, the sale of securities. *Gordon v. Royal Palm Real Est. Inv. Fund I, LLLP*, 2020 WL 2836312, at *5 (E.D. Mich. May 31, 2020).

**\*8**  As interpreted by the courts, the required elements for a claim under Section 10(b) and Rule 10b–5 are:

> (1) a material misrepresentation or omission [or, in the case of scheme liability, a "deceptive or manipulative act"]; (2) scienter, that is, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation, a causal connection between the misrepresentation and the loss.

*In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 851 (S.D. Ohio 2016) (Marbley, J.) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)); *see also Gordon v. Royal Palm Real Est. Inv. Fund I, LLLP*, 320 F. Supp. 3d 910, 923 (E.D. Mich. 2018) (adapting misstatement test to scheme liability). Defendants challenge every element of this test except the fifth (economic loss).

As a threshold matter, Plaintiffs' claims under Section 10(b) are subject to the heightened pleading standards of the PSLRA. The misstatement liability theory rests on statements and omissions alleged to be misleading, and the scheme liability theory embraces these statements and omissions as part of the fraudulent scheme. *See* 15 U.S.C. § 78u–4(b)(1). Both theories also demand a "particular state of mind," *i.e.*, scienter. *See id.* § 78u–4(b)(2). Rule 9(b) applies as well because the statements and omissions are alleged to be fraudulent, as is the overarching scheme. Even against these heightened standards, however, Plaintiffs have established the necessary elements for their Section 10(b) claims, which the Court now will analyze in turn.

2022 WL 681320, Fed. Sec. L. Rep. P 101,335

### 1. Misrepresentation or Deceptive Act

All Defendants contend that Plaintiffs have not pled false statements or omissions, or deceptive or manipulative acts, with the requisite particularity. (ECF No. 161 at 9). The Court will consider first the false statements or omissions necessary for Plaintiffs' misstatement theory, then the deceptive or manipulative acts necessary for Plaintiffs' scheme theory.

### a. Misstatement Liability

Under the heightened pleading standards of the PSLRA, Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if any allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Similarly, because the statements and omissions are alleged to be fraudulent, Rule 9(b) demands that Plaintiffs "allege the time, place, and content of the alleged misrepresentation." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010) (internal quotation marks omitted).

"A misrepresentation is an affirmative statement that is misleading or false." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014) ("*Omnicare II*"). "When an alleged misrepresentation concerns hard information—typically historical information or other factual information that is objectively verifiable—it is actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading." *Id.* (internal quotation marks and citations omitted). "When an alleged misrepresentation concerns soft information, which includes predictions and matters of opinion, a plaintiff must additionally plead facts showing that the statement was made with knowledge of its falsity." *Id.* (internal quotation marks and citations omitted).

**\*9** An omission, on the other hand, is a "failure to disclose information when [the defendant] had a duty to do so." *Id.* at 471. As relevant here, there is an important distinction between total and partial silence. Once a company "chooses to speak on a subject," the company is "obligated ... to do so fairly and fully." *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 700 (E.D. Mich. 2010); *see also City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 670 (6th Cir. 2005) ("Our securities laws therefore require an actor to provide complete and non-misleading information with respect to the subjects on which he undertakes to speak." (internal quotation marks omitted)). Stated differently, "a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001).

In either case—misrepresentation or omission—the information must be material. A "fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote," or as "having significantly altered the total mix of information made available." *Basic, Inc. v. Levinson,* 485 U.S. 224, 231–32 (1988) (internal quotation marks omitted). "Immaterial statements include vague, soft, puffing statements or obvious hyperbole upon which a reasonable investor would not rely." *Omnicare II,* 769 F.3d at 472 (internal quotation marks omitted).

Plaintiffs raise the following statements and omissions in their Complaint:

- Statements in the quarterly ("Form 10-Q") and annual ("Form 10-K") reports filed with the SEC in which the Company indicated it was pursuing "legislative or regulatory solutions" and represented that its internal controls were "effective," but omitted the bribery scheme from that discussion and from the lengthy disclosure of "risk factors" facing the Company. (ECF No. 72 ¶¶ 95–101, 131).

- Defendants Jones's, Pearson's, and Schneider's certifications of one or more of these SEC reports, in which they attested that the form "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." (*Id.* ¶ 102).

- Statements on investor calls describing the Company's pursuit of legislative or regulatory solutions but omitting or misrepresenting the corrupt means of that pursuit. (*Id.* ¶¶ 103, 113, 115, 117–18, 121, 124, 127, 129, 132, 134).

- Proxy statements representing that the Company was committed to "good corporate governance," "integrity," "openness," and "trust." (*Id.* ¶¶ 104–105)

- The Political Activity Policy—which the 2017 proxy statements cited as its rationale to vote against the shareholders' lobbying transparency proposal—representing that the Company "has decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are legally permissible and in the best interests of FirstEnergy." (*Id.* ¶¶ 110–11).

- The Company's Code of Conduct and Director Code of Conduct, espousing "high ethical standards," "fair dealing," and "compliance with the law." (*Id.* ¶¶ 106–09).

- A statement by Defendant Pearson at an energy conference, concerning the Company's pursuit of nuclear subsidy legislation. (*Id.* ¶ 116).

- Statements in a 2019 "current report" ("Form 8-K"), filed with the SEC, reporting the passage of HB6 and hailing its benefits. (*Id.* ¶ 128).

- Newspaper quotes of senior FirstEnergy executives that gave incomplete accounts of HB6 and misrepresented the risk associated with those ill-gotten gains. (*Id.* ¶¶ 112, 114, 119–20, 122–23, 125–26, 130, 133).

**\*10**  The Court will begin by addressing Defendants' overarching objections, then it will analyze the specific misstatements. *See* *Bondali v. YumA Brands, Inc.,* 620 F. App'x 483, 491 (6th Cir. 2015) (directing "a statement-by-statement analysis").

Defendants first contend that these statements are unactionable opinions. (ECF No. 161 at 59–62; No. 174 at 22–25). In *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund* ("*Omnicare III*"), the Supreme Court instructed that opinion statements—those expressing a "belief" or "view," as opposed to "certainty about a thing"—generally will not count as an "untrue statement of material fact," unless the statement (a) expresses an opinion the speaker did not "actually hold[ ]," (b) contains "embedded statements of fact" that are untrue, or (c) "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion" such that the statement as a whole is misleading to a reasonable investor. 575 U.S. 175, 183–86, 189 (2015) (internal quotation marks omitted).[17]

---

[17]  Though *Omnicare III* concerned liability under Section 11 of the Securities Act, many courts have extended its reasoning to Section 10(b) of the Exchange Act. *See, e.g., City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,* 856 F.3d 605, 616 (9th Cir. 2017); *Tongue v. Sanofi,* 816 F.3d 199, 209–10 (2d Cir. 2016); *EveryWare,* 175 F. Supp. 3d at 852 (Marbley, J.).

In addressing the *Omnicare* argument, this Court is not writing on a blank slate. In the shareholder derivative action, this Court sustained allegations that the same proxy solicitation statements at issue here contained material misrepresentations or omissions. It deemed FirstEnergy's *Omnicare* argument "inapposite" for two reasons: "First, Plaintiffs allege that the Director Defendants made numerous specific statements about their legal compliance and risk management actions with respect to lobbying and political spending. Second ... Plaintiffs make extensive allegations about the FirstEnergy Defendants' state of mind." *Emps. Ret. Sys. of City of St. Louis v. Jones,* 2021 WL 1890490, at \*9 (S.D. Ohio May 11, 2021).

Here too, the Court is not persuaded that *Omnicare* bars any of the statements to which Defendants object. The statements comprising "[a]ssessments of compliance efforts" and of "the efficacy of internal controls" (ECF No. 161 at 61; No. 174 at 24) are irreconcilable with the Complaint's well-pled allegations of a fraudulent scheme, which notably were absent in *Omnicare III. See* 575 U.S. at 186 ("their complaint explicitly 'exclude[s] and disclaim[s]' any allegation sounding in fraud or deception"). If Defendants in fact made "[c]orruption ... a fundamental aspect of the Company's business model" (ECF No. 72 ¶ 4), then their assessments of internal controls either

were not honestly held or were not based on the diligence a reasonable investor would expect them to convey. So too with "[s]tatements about the merits of HB6." (ECF No. 161 at 61; No. 174 at 22–23). If HB6 was the ill-gotten gain of an intentional corrupt scheme, then Defendants had no honest basis to hail the benefits of the legislation; on net, it was a grave risk to the Company. Moreover, the omission of that risk from otherwise thorough disclosures (*Id.* at 24–25) was misleading if the risk was known, or if it would have been known through the reasonable diligence that such disclosures imply.[18]

18      Defendants argue that Plaintiffs could not reasonably have interpreted their compliance statements and risk disclosures as "guarantees." (ECF No. 161 at 63–64; No. 174 at 24–25). This is precisely the argument that the Supreme Court rejected as "too far" in *Omnicare III.* 575 U.S. at 188. "Reasonable investors do not understand such statements as guarantees," but they *do* expect opinion statements to convey "that the issuer believes the opinion" and that "it fairly aligns with the information in the issuer's possession at the time." *Id.* at 188–89. Plaintiffs' well-pled scheme liability claims and scienter allegations, discussed in the next Sections, leave this an untenable position.

**\*11** Next, Defendants argue that they were under no legal duty to disclose the purported scheme in statements of "soft information." As discussed above, "rosy affirmation" and "loosely optimistic statements" generally are not actionable. *City of Monroe Emps. Ret. Sys.*, 399 F.3d at 669 (internal quotation marks omitted). "If a company 'chooses to volunteer such information,' though, 'its disclosure must be full and fair' ... [and] 'provide complete and non-misleading information with respect to the subjects on which [it] undertakes to speak.' " *Id.* at 670 (quoting *Helwig,* 251 F.3d at 561).

The "legal duty" argument likewise failed in the shareholder derivative action, where this Court wrote: "Even absent a per se rule requiring disclosure of unproven criminal conduct, 'corporations are [nevertheless] obligated to disclose facts necessary to ensure that their statements are not misleading. This duty applies to the disclosure of [uncharged, unadjudicated conduct] to the same extent it applies to the disclosure of any other material information.' " *Emps. Ret. Sys. of City of St. Louis*, 2021 WL 1890490, at \*9 (alterations in original) (quoting *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 536 F. Supp. 2d 313, 323 (S.D.N.Y. 2007)). Once again, when the Court accepts Plaintiffs' well-pled scheme liability claims, Defendants' "[a]spirational statements" and "[g]eneric statements of legal compliance" (ECF No. 161 at 62; No. 174 at 25–26) would be less than a full and fair disclosure of the facts actually known to the Company.[19]

19      Defendants' reliance on *Dailey v. Medlock*, 551 F. App'x 841 (6th Cir. 2014), therefore is misplaced. Defendants cite *Dailey* for its proposition that "this Circuit's precedent holds that a generic claim of legal compliance, absent any specifics, does not form the basis for a misrepresentation actionable under Rule 10b–5 and does not require the disclosure of allegedly illegal activities." *Id.* at 849. (citing *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 945–47 (6th Cir. 2009) (*"Omnicare I"*); and *Kushner v. Beverly Enters., Inc.,* 317 F.3d 820, 826–27 (8th Cir. 2003)). In its citation to *Kushner*, the *Dailey* court included this parenthetical: "statement that company was in 'substantial compliance' with Medicare regulations did not support Rule 10b–5 claim *where plaintiffs failed to allege* particular facts demonstrating that defendants *then knew of scheme* which violated those regulations." *Id.* (emphasis added). The Sixth Circuit's *Omnicare I* decision highlighted the same fact: "[T]he Eighth Circuit assumed that liability *could* attach to a company's general assertion of legal compliance, but only where the complaint 'adequately pleaded that the defendants *knew the statements were untruthful*.' " *Omnicare I,* 583 F.3d at 945 (emphasis

added) (quoting *Kushner*, 317 F.3d at 831). Here, Defendants are alleged to have known of a scheme that rendered their compliance statements untruthful, which makes those statements actionable even if they amount to soft information.

Furthermore, several of these compliance statements were offered as reasons to vote against a shareholder proposal for increased oversight of lobbying policies and payments. (ECF No. 72 ¶¶ 110–11). Context changes the meaning of those statements from aspiration to assurance; the speakers are claiming that increased oversight is not necessary *because* the Company is compliant and has effective controls. *Cf. Omnicare III*, 575 U.S. at 190 ("The reasonable investor understands a statement of opinion in its full context"). That assurance—which, importantly, helped to shield the scheme from detection—was misleading and more than mere "puffery" or "corporate cheerleading." (ECF No. 174 at 23, 26).

**\*12** Applying these principles to the specific statements at issue, it is clear that Plaintiffs have alleged actionable misrepresentations and omissions under Count I:

- Statements in the 10-Q and 10-K reports filed with the SEC (ECF No. 72 ¶¶ 95–101, 131), signed by Defendants Jones, Pearson, Strah, Taylor, and Schneider were false or misleading in that they misrepresented the nature of FirstEnergy's pursuit of legislative or regulatory solutions, omitted information about the bribery scheme necessary to give a complete account of the Company's lobbying activity and risk portfolio, falsely claimed the Company was legally compliant, and falsely claimed the Company's internal controls were effective.

- Certifications of these SEC reports by Defendants Jones, Pearson, Strah, and Schneider (*Id.* ¶¶ 98, 102) were false or misleading for the same reasons, and for the additional reason that they are alleged to have known of the scheme but still vouched for the completeness and accuracy of the information contained in the reports.

- Statements on investor calls by Defendants Jones, Pearson, and Strah (*Id.* ¶¶ 103, 113, 115, 117–18, 121, 124, 127, 129, 132, 134) were false or misleading in that they misrepresented the nature of FirstEnergy's pursuit of legislative or regulatory solutions, omitted information about the bribery scheme necessary to give a complete account of the Company's lobbying activity and risk portfolio, and misrepresented the benefits of HB6 to the Company when it was, on net, a grave risk.

- Proxy statements (*Id.* ¶¶ 104–105) were false or misleading in that they staved off shareholder proposals for increased political oversight based on the faulty premise that the Company was responsible and compliant in its contributions and lobbying activity.

- The Political Activity Policy (*Id.* ¶¶ 110–11) similarly was false or misleading in that it was presented as a reason to defeat a shareholder proposal for increased political oversight but was not then being followed by the Company or its senior management.

- The Company's Code of Conduct and Director Code of Conduct (*Id.* ¶¶ 106–09) were false or misleading in that they were presented to shareholders in proxy statements but allegedly were being disregarded intentionally by the Company and its senior management. The Company later would admit to violations of these policies in a series of executive firings. (*Id.* ¶¶ 172, 178, 190–92).

- Defendant Pearson's statement at the energy conference (*Id.* ¶ 116) was false or misleading in that it misrepresented the nature of FirstEnergy's pursuit of legislative or regulatory solutions and omitted information about the bribery scheme necessary to give a complete account of the Company's lobbying activity.

- Statements in the 8-K report (*Id.* ¶ 128) were false or misleading in that they misrepresented the benefits of HB6 to the Company when it was, on net, a grave risk.

- Newspaper quotes of Defendants Jones, Schneider, Judge, and others (*Id.* ¶¶ 112, 114, 119–20, 122–23, 125–26, 130, 133) were false or misleading in that they misrepresented the nature of FirstEnergy's pursuit of legislative or regulatory solutions, omitted information about the bribery scheme necessary to give a complete account of the Company's lobbying activity and risk portfolio, and misrepresented the benefits of HB6 to the Company when it was, on net, a grave risk.

**\*13**  Insofar as any of the above statements were soft information or opinions (*e.g.*, the profession of corporate values and personal assessments of compliance, internal controls, or the merits of HB6), Plaintiffs have alleged actual knowledge of falsity, as will be discussed under the scienter analysis. Moreover, all of the information that was misrepresented or omitted would be considered important to a reasonable investor as they closely monitored the Company's nuclear liabilities and determined how to vote on the shareholder proposal for increased political oversight.

Lastly, Defendants Reffner, Dowling, Pine, Chack, and Vespoli argue that they cannot be held responsible for statements they personally did not make or control. (ECF No. 163 at 5–6, No. 165-1 at 2, No. 167 at 10, No. 169 at 9, No. 173 at 5–6). *see also Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."). In response, Plaintiffs clarify that their Section 10(b) claims against these five Officer Defendants rest *only* on scheme liability, not on misstatement liability. (ECF No. 176 at 65 n.20). That concession does not require the dismissal of any claims, however, since misstatement liability and scheme liability are complementary theories in the same count. These Defendants still are implicated in Count I via scheme liability.

b. Scheme Liability

For Plaintiffs' scheme liability theory, fraud must be alleged with particularity per Rule 9(b). *See, e.g.*, *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 2006 WL 469468, at \*21 (S.D. Ohio Feb. 27, 2006) ("*Nat'l Century I*") (applying Rule 9(b) to scheme liability claims). "Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide [ ] examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 444–45 (6th Cir. 2008) (alteration in original) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 510 (6th Cir. 2007)).

The scheme as alleged by Plaintiffs was "to corrupt legislators and regulators" in order to "generate billions of dollars in illicit proceeds for the Company" while "overcoming the Company's most pressing operational challenges." (ECF No. 72 ¶¶ 3, 4, 6). FirstEnergy allegedly pursued this scheme through a variety of means, including by initiating bankruptcy proceedings "to try to evade liability for the Nuclear Plants," "[p]aying lobbyists to orchestrate and execute the political corruption necessary to pass and preserve HB6," "[m]aking personal payments to corrupt politicians and at least one regulator," "[u]sing" those politicians and regulators to "write" and "advance HB6 for consideration," "[c]orruptly preventing a referendum to repeal HB6," "[c]reating and using a web of pass-through entities to transfer and conceal the money to finance" the scheme, making "materially false and misleading public statements," and "[c]oncealing" the scheme "from the investing public." (*Id.* ¶¶ 93–94).

FirstEnergy vigorously contests the existence of any illegal scheme. It notes specifically that corporations have a First Amendment right to speak on issues of public importance, including anonymously through 501(c)(4) groups. (ECF No. 161 at 13). This argument strains credibility. FirstEnergy is not before this Court simply for having contributed to 501(c)(4) entities; it is here for allegedly having used those entities to facilitate payments in exchange for official government action (*i.e.*, bribery) while deceiving and misleading investors. Bribery is not legal. 18 U.S.C. § 201; O.R.C. § 2921.02. And it is not protected speech. *See, e.g.*, *Smith v. FirstEnergy Corp.*, 518 F. Supp. 3d 1118, 1134–35 (S.D. Ohio Feb. 10, 2021). For essentially the same reasons, FirstEnergy's argument that there were no "inherently deceptive" acts must be rejected. (ECF No. 161 at 55, citing *In re Nat'l Century Fin. Enters., Inc. Fin. Inv. Litig.*, 553 F. Supp. 2d 902, 909 (S.D. Ohio 2008) ("*Nat'l Century III*")). The Complaint alleges that Defendants carried out their scheme by way of bribery, corruption, and concealment. (*See, e.g.*, ECF No. 72 ¶ 93). While it might be true that "there is nothing inherently deceptive about contributing to a 501(c)(4) organization" (ECF No. 161 at 57), this framing by Defendants woefully miscasts the issue. Covertly funneling bribes through a 501(c)(4) organization, as Defendants are alleged to have done, is not an innocent act of political participation. It is illegal, deceptive, and offensive to democracy.

**\*14** Defendants further claim that, insofar as Plaintiffs have alleged any unlawful conduct, they have not pled it with particularity. (ECF No. 161 at 11–12). Yet, Plaintiffs do plead "what, if any, laws or regulations defendants violated," *Dailey*, 551 F. App'x at 849, by referencing specific criminal charges actually brought against Defendants' alleged co-conspirators. The Complaint details the "federal racketeering conspiracy" charged against Householder, Borges, Longstreth, Clark, Cespedes, and Generation Now, which involved "honest services wire fraud, receipt of millions of dollars in bribes and money laundering." (ECF No. 72 ¶ 143). The indictment filed with those charges explicitly acknowledged the role of "Company A," which is alleged without doubt to have been FirstEnergy. (*Id.* ¶ 234). The Court need not "interpolate" (ECF No. 161 at 12) to identify the unlawful conduct alleged against Defendants.

Moreover, as to bribery, the Complaint is replete with allegations of the "explicit *quid pro quo* agreement" Defendants claim is lacking. (ECF No. 161 at 15). The Complaint identifies specific actors, dollar amounts, phone contacts, meetings, and methods of concealment. (*See, e.g.*, ECF No. 72 ¶¶ 3, 4, 8, 67–75, 93, 135–36, 171, 205, 215–16, 221–24, 230). *Cf.Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 198 (S.D.N.Y. 2020) ("In order adequately to allege an underlying illegal act, such as bribery, Plaintiffs must plead the 'who, what, when, where, and how' of the alleged improper transaction."). Defendants' apparent expectation that Plaintiffs should be required, pre-discovery, to plead the "terms" of an agreement and the "contents" of communications to which Plaintiffs were not a party (ECF No. 161 at 16, 18) is an attempt to graft omniscience into Rule 9(b). That is not the standard. *SeeWilliams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012). In combination with the timing of contributions and the guilty pleas of Longstreth, Cespedes, and Generation Now (and later, the admissions of FirstEnergy itself), Plaintiffs' facts as pled are more than sufficient to support a plausible and cogent inference that a bribery scheme occurred. The alternate inference of "innocent parallelism" (ECF No. 161 at 17) would rest on fantastical coincidence.

Next, Defendants attempt to call out the insufficiency of allegations in the first half of the Class Period (2017 to 2018). (*Id.* at 24–30). In so doing, they fail to engage with the scheme *as pled*. During the first half of the Class Period, Plaintiffs allege that FirstEnergy was executing its first-choice plan—jettisoning liability through bankruptcy proceedings—while simultaneously "laying the groundwork for [their] backup plan ... that would ultimately result in the passage of HB6." (ECF No. 72 ¶ 63). The introduction of HB6 marked the transition from planning to execution, not the origin of the alleged scheme. Plaintiffs describe several specific datapoints in the planning process that occurred in the first half of the Class Period: courting Householder at the presidential inauguration (*Id.* ¶ 65), establishing the 501(c)(4) organizations that later would serve as the vehicles for covertly transferring funds to Householder (*Id.*), financing Householder and allies in the spring 2018 primaries while obscuring the scale of contributions (*Id.* ¶¶ 67, 137), and defeating through misleading means a shareholder proposal that likely would have shed light on

the entire operation (*Id.* ¶¶ 110–11). Again, these datapoints are stated with particularity, including specific dates, locations, actors, and dollar amounts. Moreover, Plaintiffs are not required to narrate the planning stages exhaustively before discovery has been exchanged; they need only show "representative samples" of "a complex and far-reaching fraudulent scheme." *Marlar*, 525 F.3d at 445 (internal quotation marks omitted). This is not, as Defendants claim, a case of " 'fraud by hindsight.' " (ECF No. 161 at 24, quoting *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1042 (6th Cir. 1991)). Rather, Defendants' acts and statements in the first half of the Class Period are alleged to have been in furtherance of an intentional and corrupt scheme then underway. In arguing that these earlier acts and statements were neither false nor deceptive at the time, Defendants would have this Court misread the Complaint and ignore the scheme's planning stage.[20]

[20] Defendants' sub-argument about bribery can be dispatched swiftly, as it rests on a nonexistent contemporaneousness element. (ECF No. 161 at 27–29). The crime of bribery is complete when a person "promise[s], offer[s], or give[s] any valuable thing or valuable benefit" "with purpose to corrupt ... or improperly to influence a public servant or party official ... *whether before or after the public servant or party official is elected.*" O.R.C. § 2921.02(A) (emphasis added). The fact that money was exchanged before Householder's election does not prohibit the formation of an explicit *quid pro quo* agreement, and it does not mean that Defendants held "at most, some 'generalized expectation of some future action.' " (ECF No. 161 at 28, quoting *Huff v. FirstEnergy Corp.*, 972 F. Supp. 2d 1018, 1034 (N.D. Ohio 2013)). The other case on which Defendants rely, *McDonnell v. United States*, discusses what constitutes an "official act" under the federal bribery statute, but it does not require or even suggest that the official must have a present ability to deliver that act. 136 S. Ct. 2355, 2372 (2016) ("It must also be something specific and focused that is 'pending' *or 'may by law be brought'* before a public official." (emphasis added) (quoting 18 U.S.C. § 201(a)(3))).

**\*15** Last are the arguments by the Officer Defendants that the Complaint fails to plead with particularity their individual involvement in the scheme. Their protests aside, the Court finds that the scheme allegations are sufficient to implicate each of them:

- Defendant Jones, who served as FirstEnergy's CEO throughout the Class Period, is alleged to have overseen the Company's pursuit of legislative and regulatory solutions, to have spoken many of the misstatements at issue, to have signed and certified FirstEnergy's SEC filings, which served to deceive shareholders about the nature of the Company's political activity and which the Company later had to correct to disclose deficient internal controls, to have participated in in-person meetings regarding the scheme, to have made 84 phone contacts with Householder during the Class Period, and to have been terminated for his involvement in the scheme, including with respect to the $4 million payment to Randazzo. (ECF No. 72 ¶¶ 95–96, 98, 102–104, 106, 112–14, 117–18, 121, 123–24, 127, 129, 132, 189, 220–21).

- Defendant Pearson, who served as FirstEnergy's CFO and later its Vice President of Finance, is alleged to have overseen the Company's approach to its nuclear liabilities through his participation in the "Restructuring Working Group," to have "reviewed and determined the Company's accounting for its payments and political contributions, including FirstEnergy's illicit payments to the Bailout Scheme," to have made false or misleading statements on investor calls and at an energy conference, and to have signed and certified FirstEnergy's SEC filings, which served to deceive shareholders about the nature of the Company's political

activity. (*Id.* ¶¶ 95–96, 102, 113, 115–16, 225). Defendant Pearson's retirement in 2019 does not preclude his involvement during the earlier part of the Class Period, which encompassed the scheme's planning stages.

- Defendant Strah, who served as FirstEnergy's Vice President of Utilities Operations, then its CFO, and later its President, is alleged to have "reviewed and determined the Company's accounting for its payments and political contributions, including FirstEnergy's illicit payments to the Bailout Scheme," to have made false or misleading statements on an investor call, and to have signed and certified FirstEnergy's SEC filings, which served to deceive shareholders about the nature of the Company's political activity and which the Company later had to correct to disclose deficient internal controls. (*Id.* ¶¶ 98, 102, 134, 189, 226).

- Defendant Taylor, who served FirstEnergy in a series of senior financial and operational roles (first as Controller and Chief Accounting Officer, then President of Ohio Operations, then Vice President of Utilities Operations, and finally CFO) (*Id.* ¶ 31), is alleged to have signed FirstEnergy's SEC filings, which served to deceive shareholders about the nature of the Company's political activity. (*Id.* ¶¶ 95–96).

- Defendant Dowling, who served as FirstEnergy's Senior Vice President of External Affairs, is alleged to have overseen the Company's governmental and regulatory affairs, to have made at least 14 phone contacts with Householder and several more with other co-conspirators, many in close conjunction with wire payments, and to have been terminated his involvement in the scheme, including with respect to the $4 million payment to Randazzo. (*Id.* ¶ 222).

**\*16** - Defendant Chack, who served as FirstEnergy's Senior Vice President of Product Development, Marketing and Branding, is alleged to have overseen the Company's "extensive media efforts in support of HB6 and efforts to oppose the repeal of the legislation," to have "worked to obscure the Company's role in funding this media campaign," to have attended at least one in-person meeting regarding the scheme in September 2019, and to have been terminated for his involvement in the scheme, including with respect to the $4 million payment to Randazzo. (*Id.* ¶ 224).

- Defendant Pine, who served as a First Energy lobbyist and its Ohio Director of State Affairs, is alleged to have been "a central liaison between FirstEnergy and corrupt Ohio politicians and regulators," to have made "at least 188 phone contacts with Householder and his co-conspirators," including several in close conjunction with wire payments, and to have worked with state legislators in drafting HB6. (*Id.* ¶ 223).

- Defendant Reffner, who served as a Vice President in FirstEnergy's Legal Department, then its General Counsel, and later its Chief Legal Officer, is alleged to have overseen "the Company's fulfillment of its legal and ethical obligations, internal control policies and procedures and adherence to internal control, risk management and compliance guidelines," and to have been

Case 21-2042, Document 139, 04/29/2022, 3306599, Page36 of 106

terminated for "conduct" in support of the scheme as well as his failure to prevent it. (*Id.* ¶ 227).

- <u>Defendant Vespoli</u>, who served as FirstEnergy's Executive Vice President of Corporate Strategy and Regulatory Affairs and Chief Legal Officer, is alleged to have overseen "the Company's lobbying activities and political contributions, interaction with regulators and state representatives, legal and regulatory compliance activities and efforts to eliminate the Company's liability exposure to the Nuclear Plants," including through her participation in the "Restructuring Working Group." (*Id.* ¶ 228). Defendant Vespoli's retirement in 2019 does not preclude her involvement during the earlier part of the Class Period, which encompassed the scheme's planning stages.

- <u>Defendant Judge</u>, who served as FirstEnergy's Chief Risk Officer and later as Energy Harbor's CEO and President, is alleged to have "facilitated FES's part in the Bailout Scheme through his responsibilities for FES's lobbying and regulatory efforts, separation from FirstEnergy and efforts to find 'solutions' for the Nuclear Plants," to have met in-person with Householder in March 2019 and with other scheme participants in November 2019, to have directed the retention of lobbyist Juan Cespedes "in close consultation with" other scheme participants, to have made false or misleading statements in a July 2019 press release, and to have "directed and overs[een] the use of FES employees in commercials opposing the repeal of HB6, as part of the misleading ad campaign opposing the repeal effort." (*Id.* ¶¶ 79, 130, 230). Defendant Judge's employment by FES (Energy Harbor) during part of the Class Period does not preclude his participation in the scheme, given that FES is alleged to have been "operationally and financially intertwined" with FirstEnergy, "joined at the hip," and "utterly incapable" of operating independently. (*Id.* ¶¶ 47, 50).

- <u>Defendant Schneider</u>, who served as CEO and Chairman of FES, is alleged to have "facilitated FES's part in the Bailout Scheme through his responsibilities for FES's lobbying and regulatory efforts, separation from FirstEnergy and efforts to find 'solutions' for the Nuclear Plants," to have directed the retention of lobbyist Mathew Borges "in close consultation with" other scheme participants, to have signed and certified FES's portion of the SEC filings at issue, and to have made other misstatements in news articles. (*Id.* ¶¶ 95–96, 102, 120, 125–26, 229). As with Defendant Judge, Defendant Schneider's employment by FES does not preclude his participation in the scheme.

\* \* \*

**\*17** The role of each participant is pled with particularity and "with enough specificity to put defendants on notice as to the nature of the claim." *Williams*, 681 F.3d at 803 (internal quotation

marks omitted). In summary, Plaintiffs have pled the requisite misrepresentations and fraudulent acts to proceed with their misstatement and scheme liability theories, in tandem.

## 2. Scienter

The second element of Plaintiffs' Section 10(b) claim is scienter, "a mental state embracing intent to deceive, manipulate or defraud." *Tellabs*, 551 U.S. at 319 (internal quotation marks omitted). The PSLRA requires that Plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). While the inference of scienter need not be the "most plausible of competing inferences," it "must be more than merely reasonable or permissible." *Tellabs*, 551 U.S. at 324 (internal quotation marks omitted). Rather, it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

Precedent cautions against "reviewing each allegation individually before reviewing them holistically," which "risks losing the forest for the trees." *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011). The proper test is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23 (emphasis in original). The Court first will address the parties' disputes on applicable legal standards, then turn to a comparison of inferences.

## a. Threshold Disputes

First, the parties dispute whether and when scienter requires actual knowledge, as opposed to recklessness. Where misstatement claims are "based on statements of present or historical fact ... scienter consists of knowledge *or* recklessness." *In re Cardinal Health Inc. Sec. Litigations*, 426 F. Supp. 2d 688, 717 (S.D. Ohio 2006) (emphasis added and removed) (citing *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004); and *Helwig*, 251 F.3d at 552). "Recklessness" in this context is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care" and "akin to conscious disregard." *Id.* (quoting *PR Diamonds*, 364 F.3d at 681). By contrast, where misstatement claims are based on "soft information," recklessness does not suffice, and "plaintiffs must plead facts showing that the defendants knowingly misrepresented or omitted facts to deceive, manipulate, or defraud the public." *Omnicare II*, 769 F.3d at 472. Finally, in the case of scheme liability, this Court follows *Aaron v. SEC* in concluding that " 'device,' 'scheme,' and 'artifice,' all connote knowing and intentional practices." 446 U.S. 680, 696 (1980). *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197 (1976) ("The words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that [Section] 10(b) was intended to proscribe knowing or intentional misconduct.").

Additionally, Defendants contend that Plaintiffs have taken a shortcut by relying on the "group pleading doctrine," rather than pleading scienter as to each individual. (ECF No. 161 at 36). The group pleading doctrine allows a plaintiff to " 'rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.' " *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 984 (S.D. Ohio 2008) (quoting *In re Solv–Ex Corp. Sec. Litig.*, 210 F. Supp. 2d 276, 283 (S.D.N.Y. 2000)). Courts in this Circuit are split as to whether the group pleading doctrine survived the passage of the PSLRA, and the Sixth Circuit has declined to reach the issue. *See id.* at 986 (discussing the split among district courts and taking the position that group pleading is incompatible with the PSLRA); *City of Monroe Emps. Ret. Sys.*, 399 F.3d at 690 ("This court [the Sixth Circuit] has not taken a position on whether such an exception exists .... We need not decide here [its] current viability"). This ultimately is a sideshow because Plaintiffs do not purport to rely on group pleading. As detailed in the next subsection, there are allegations specific to each Exchange Act Defendant.

**\*18** A third dispute emerges over whether Plaintiffs may invoke *PR Diamonds* for its proposition that "high-level executives can be presumed to be aware of matters central to their business's operation." 364 F.3d at 688, *abrogated in part on other grounds by Frank,* 646 F.3d at 961. Defendants argue that such a presumption would amount to pleading based on position alone. (ECF No. 193 at 30–31, 35). In fact, *PR Diamonds* harmonizes these ideas; before stating the central-matters presumption, it gives the caveat that "fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information." 364 F.3d at 688. Rather, "the Complaint must allege specific facts or circumstances suggestive of their knowledge." *Id.*

This Court views the *PR Diamonds* presumption as aiding, but not alone determining, an inference of scienter. *Cf. Cardinal Health,* 426 F. Supp. 2d at 723–26 (allegations of "access to information" deemed conclusory; but other factors did raise strong inference of scienter, such as the fact that manipulation occurred in "analysts' and investors' primary area of focus"); *Jackson Cty. Emps. Ret. Sys. v. Ghosn,* 510 F. Supp. 3d 583, 617–18 (M.D. Tenn. 2020) (applying *PR Diamonds* presumption and also finding that the competing inference of "ignorance" actually "supports [plaintiff's] allegation of recklessness"). Like in *Cardinal Health*, Plaintiffs have alleged that FirstEnergy's nuclear liabilities and political activity were "analysts' and investors' primary area[s] of focus," 426 F. Supp. 2d at 726, which supports scienter for the executives charged with overseeing said operations. *See* ECF No. 72 ¶¶ 44, 110. As Plaintiffs state in their briefing: "It simply makes no sense that the members of a massive corruption scheme would entrust critical aspects of the scheme to some innocent bystander." (ECF No. 176 at 47). Thus, where Plaintiffs engage the central-matters presumption, it is not based on mere titles and positions, but rather on the intersection between the executive's responsibilities and the scheme's critical aspects. In this

way, the allegations about executive roles join the set of facts that, "taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323.

b. Inferences Compared

In *Helwig*, the Sixth Circuit laid out a non-exhaustive list of nine factors relevant to a court's scienter determination:

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

251 F.3d at 552 (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999)). These factors merely assist the Court's scienter analysis; they are not a checklist of required showings. *See, e.g.*, *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 981 (6th Cir. 2018) (scienter inferred where only three *Helwig* factors shown).

**\*19** Mindful of *Frank* and *Tellabs*, the Court must begin with a holistic view and evaluate each *Helwig* factor in that context. Plaintiffs' overarching case for scienter is that Defendants "bankrolled one of the largest corruption and bribery schemes in U.S. history" (ECF No. 72 ¶ 3), "personally overseen and facilitated by the senior echelon of Company management" (*Id.* ¶ 4), "as the key to unlocking $2 billion in critical subsidies and overcoming the Company's most pressing operational challenges ... [*i.e.*,] its two failing nuclear plants" (*Id.* ¶¶ 4–5), while "concealing any mention of the monumental risks" from investors (*Id.* ¶ 6). To borrow more succinctly from their

opposition brief: "It is impossible for all this corruption to occur by happenstance." (ECF No. 176 at 31). Defendants, and FirstEnergy especially, counter with the opposing inference that "the Exchange Act Defendants at all times believed they were engaging in the political process by legal means." (ECF No. 161 at 2). The *Helwig* factors will be assessed for their consistency with either of these narratives.

The first factor, insider trading, favors Plaintiffs' narrative, albeit slightly. Defendants Jones, Pearson, Vespoli, and Chack are alleged to have "reaped nearly $14 million in insider trading proceeds" through the sale of over 375,000 shares of stock "while the price ... was artificially inflated as a result of their fraudulent scheme." (ECF No. 72 ¶ 250). Plaintiffs allege that each of these Defendants traded in substantially higher volumes than their pre-Class Period baseline: Defendants Pearson and Chack sold no shares in the preceding 45 months, and Defendants Vespoli and Jones increased their sales by approximately 350% and 700%, respectively. (*Id.* ¶ 251). Defendants raise some valid countervailing points. Despite their sales, Defendants Jones, Pearson, Vespoli, and Chack all ended the Class Period as net acquirers; and Defendants Taylor and Strah, for whom no sales are alleged, each "substantially increased their shareholdings." (ECF No. 161 at 47). What tips this factor, ultimately, is the difference between Class Period and pre-Class Period trading. Defendant Jones avers that his Class Period sales "coincided with his equity awards vesting" (ECF No. 174 at 11), as does Defendant Vespoli for hers (ECF No. 173 at 8); but the drastic increase in volume is unaddressed. Defendant Chack raises conflicting evidence about the regularity of his trading, which at most creates an evidentiary dispute.[21] Defendant Pearson cites his impending retirement as plausibly explaining the timing of his sale (ECF No. 194 at 14–15); but that opposing theory is no *more* compelling than scienter, which could have been a dual consideration in how much to sell. Though this factor would be stronger if more Defendants had sold shares and ended the Class Period as net sellers,[22] the change in trading volume by several senior executives is consistent with scienter.

[21] *Compare* ECF No. 169 at 6, 27 (Defendant Chack claims his SEC forms show a "pattern" of sales every year on March 1), *with* ECF No. 176 at 46 (Plaintiffs counter that Thompson Reuters reporting shows "significant" Class Period sales, but "none ... in the 45 months prior").

[22] The incompleteness or absence of suspicious stock sales by other Officer Defendants does not negate their scienter. *See* *PR Diamonds, 364 F.3d at 691* ("[W]e have never held that the absence of insider trading defeats an inference of scienter.... We also reject the Individual Defendants' contention that their purchase of shares during the class period refutes any inference that they knowingly or recklessly misled the market to increase the stock's price."); *see also* *Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1117 (S.D. Ohio 2007) (suspicious stock sales "substantiate[d] a strong inference of scienter" even where "Defendants retained the majority of their holdings"); *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 801 (Del. Ch. 2009) ("There are any number of reasons why they might have chosen to keep their insider trading to a limit, not least of which is that they wanted to avoid getting caught or tipping off the market as to the fraud that prompted them to sell their stock.").

**\*20** The second *Helwig* factor, "divergence between internal reports and external statements on the same subject," is premature. Plaintiffs would need discovery to discern the contents of internal reports as compared to external statements. The absence of this element certainly is not fatal. To

have knowledge of internal documents at this pre-discovery stage, Plaintiffs would need either a whistleblower or omniscience, and the pleading standards demand neither. Because the Company's internal reports remain an unknown, this factor favors neither party.

The third factor, "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information," favors Plaintiffs. In particular, Defendant Jones is alleged to have made a series of statements falsely claiming ignorance after the criminal complaint was filed, which prompted "clarifications" "the very next business day." (ECF No. 72 ¶¶ 234–35).

The fourth factor, "evidence of bribery by a top company official," favors Plaintiffs.[23] As is discussed in the preceding Section, Plaintiffs convincingly have alleged a wide-reaching bribery scheme, overseen personally by the upper echelon of Company management. FirstEnergy terminated several top executives for their roles in the scheme (ECF No. 72 ¶ 216) and also admitted in the DPA that, "through the acts of its officers, employees, and agents," the Company "conspired with public officials and other individuals and entities to pay millions of dollars to and for the benefit of public officials in exchange for specific official action for FirstEnergy Corp.'s benefit." DPA at 17.[24] The DPA's statement of facts discusses extensive meetings and contacts between two FirstEnergy executives, "Public Official A" (implied to be Householder), and "Public Official B" (implied to be Randazzo). *Id.* at 15–17, 20–34, 34–43. Bribery and conspiracy necessarily involve knowledge, so the Company's willingness to make such admissions reinforces an inference of scienter.

[23] Defendant Reffner argues that the "bribery" in this factor is specific to "efforts by an official to bribe *another employee* to conceal improper accounting or other undisclosed conduct, when the act of bribing reflects an official's recognition of the problem." (ECF No. 163 at 14 n.3 (emphasis added)). *Helwig* did not include such a qualifier, and Defendant Reffner's cited authority only shows that the factor *can* apply to bribery by another employee, not that it *must. See* *In re Ferro Corp.*, 2007 WL 1691358, at *17 (N.D. Ohio June 11, 2007). The Court sees no reason why the evidence of external bribery in this case would be excluded from a scienter analysis, given that bribery is an intentional act.

[24] *See supra* note 11 for discussion of judicial notice and the role the DPA plays in the Court's analysis. *see also* *Tellabs*, 551 U.S. at 322 (in analyzing scienter, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, *and matters of which a court may take judicial notice*" (emphasis added)).

The fifth factor, "existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit," favors Plaintiffs. The case *United States v. FirstEnergy Corp.*, filed on July 22, 2021, alleged conspiracy to commit honest services wire fraud. FirstEnergy promptly settled that suit by entering the DPA and agreeing to pay a $230 million monetary penalty. Reason dictates that the Company would not enter such a quick and expensive settlement were there not a substantial likelihood of liability.[25]

[25] Additionally, FirstEnergy and many of the Individual Defendants in this case recently announced their intention to enter a global settlement of the shareholder derivative suits. *Emps. Ret. Sys. of City of St. Louis v. Jones*, ECF No. 166. The preliminary terms

include a $180 million payment, departures by six Directors, and adoption of governance reforms related to political spending and lobbying. *Id.* ¶¶ 4, 6. The Court gives minimal (but nonzero) consideration to this settlement announcement, as it is not final, comes less quickly in the case than the DPA did, and includes no express admissions. Defendants' willingness to agree to such terms does have some tendency, however, to corroborate the scienter inference in this case. Judicial notice is appropriate for the same reasons discussed *supra* note 11.

**\*21** The sixth factor, "disregard of the most current factual information before making statements," favors Plaintiffs. Plaintiffs allege that Defendants "knew or recklessly disregarded" the "true facts" of their scheme when making external statements (ECF No. 72 ¶¶ 135–36), which resembles allegations upheld by this Court in the shareholder derivative action. *SeeEmps. Ret. Sys. of City of St. Louis*, 2021 WL 1890490, at \*20 ("This Court finds Plaintiffs have alleged by clear and convincing evidence that Defendants[ ] knew or recklessly disregarded reports and red flags that FirstEnergy was paying massive amounts of illicit bribes to Householder and other public officials to ensure passage of legislation and took affirmative steps to conceal the scheme." (internal quotation marks omitted)). Here, the withholding of current factual information is alleged to have furthered the scheme, which relied on shareholders and the public being misled about the nature of the Company's political activity. (ECF No. 72 ¶ 6).

The seventh and eighth factors are inapplicable. The seventh assumes a complete but convoluted accounting disclosure, whereas Plaintiffs allege that information about the bribery scheme was withheld entirely. The eighth assumes a scheme perpetrated by certain directors and concealed from others, whereas Plaintiffs allege a widespread scheme implicating nearly all the Company's senior management. These factors favor neither party.

The ninth factor, "the self-interested motivation of defendants in the form of saving their salaries or jobs," favors Plaintiffs. Defendants argue that the Complaint alleges nothing more than "motives common to corporations and executives generally," which "do[ ] not comprise a motive for fraud." *PR Diamonds*, 364 F.3d at 690; *see alsoEveryWare*, 175 F. Supp. 3d at 859–60. Yet, the Complaint alleges that Defendants had unusually strong incentives to perpetrate the alleged scheme. Defendants Jones, Pearson, Strah, Reffner, and Vespoli each earned the vast majority of their total compensation—between 78% and 98%—as performance-based pay. (*Id.* ¶ 248). Additionally, the nuclear liabilities were a subject of intense scrutiny by shareholders and analysts, being among "the Company's most pressing operational challenges." (*Id.* ¶¶ 4, 44). The passage of HB6, with its $2 billion in direct bailouts, provided "concrete benefits that could be realized" through bribery and concealment. *PR Diamonds*, 364 F.3d at 690. These facts distance Plaintiffs' allegations from motives of generally applicability, and instead demonstrate a motive to commit fraud. The unique confluence of need and greed tips this factor in favor of scienter.

A related factor raised in the Complaint is the series of executive terminations in October and November 2020, following the criminal complaint. FirstEnergy terminated Defendants Jones, Chack, and Dowling for "violat[ing] certain FirstEnergy policies and its code of conduct" and for failing to "maintain and promote a control environment with an appropriate tone of compliance in

certain areas of FirstEnergy's business." (ECF No. 72 ¶ 216). Defendant Reffner was terminated for "inaction and conduct that the Board determined was influenced by the improper tone at the top." (*Id.* ¶ 191). Moreover, the Company confirmed that these terminations related to the criminal complaint and ensuing investigations—even making specific reference to the Randazzo payment. (*Id.* ¶ 216). Defendants counter that these stated reasons suggest merely "violations of aspirational internal policies," and do not indicate knowledge of illegality. (ECF No. 161 at 37). Yet, terminations need not include a direct confession of scienter to be relevant. Addressing a similar executive reprimand (a "suspension for likely violating company policy"), the court in *Chamberlain* agreed "that the import of this disclosure is that the company suspended one of its top executives for likely doing exactly what the [complaint] alleges [the company] lied about." 757 F. Supp. 2d at 718. *see also* *In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at *58 (M.D. Tenn. Mar. 31, 2009) (" 'Such house-cleaning and reforms do not follow innocent mistakes. Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls.' " (quoting *In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005))). This Court concurs with *Chamberlain* and *America Service Group* and tallies the executive terminations on the side of scienter.[26]

[26] Defendants' chief case on this issue is *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786 (S.D.N.Y. 2018). *Das* declined to infer scienter from "abrupt" executive terminations because it found "[t]he more plausible inference is that Rio Tinto became aware of misconduct around 2016 and subsequently initiated appropriate disciplinary action." *Id.* at 815. No other factor analyzed by the court supported scienter, and "terminations *alone* are insufficient." *Id.* (emphasis added). Thus, *Das* states no categorical rule against the relevance of executive discipline when paired with other facts.

**\*22** Returning from the trees to the forest, the Court must consider these *Helwig* factors in the context of an alleged scheme that reached the core of FirstEnergy's business model, providing "the key to unlocking $2 billion in critical subsidies and overcoming the Company's most pressing operational challenges." (ECF No. 72 ¶ 4). It is difficult to imagine such a scheme emerging without scienter; indeed, Plaintiffs argue that the magnitude of the fraud and the direct and personal involvement of senior leadership are even more reason to find scienter. (*Id.* ¶¶ 219, 236–37).[27] The theory permeating the Complaint is that Defendants intentionally concocted the bailout scheme to solve their nuclear liabilities. The *Helwig* factors fit that overarching narrative by adding motive (factors one and nine), cover-up (factor three), and corroboration (factors four, five, and six). Accordingly, the Court finds that a "reasonable person," taking these allegations "collectively," would "deem the inference of scienter at least as strong as any opposing inference." *Tellabs*, 551 U.S. at 326. The competing inference of innocent political participation pales in comparison.

[27] Plaintiffs' cited authorities confirm that these elements can support an inference of scienter when in combination with other factors. *See* *PR Diamonds*, 364 F.3d at 684–86 (discussing *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000), for the proposition that "the 'magnitude,' 'pervasiveness,' and 'repetitiveness' " of violations can " 'amplify,' " but cannot alone create, a strong inference of scienter); *Cardinal Health*, 426 F. Supp. 2d at 723 n.49 ("magnitude of fraud," "when combined with Plaintiffs' other allegations," may be considered in scienter analysis of company's own officers); *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *23 (M.D. Tenn. Apr. 26, 2011) (executives' repeated assurances that "they had their eyes on" allegedly problematic loans counseled in favor of scienter), *report and recommendation approved*, 2012 WL 214635 (M.D. Tenn. Jan. 24,

2022 WL 681320, Fed. Sec. L. Rep. P 101,335

> 2012). Defendants' cases on the probative value of "magnitude" follow from *Fidel v. Farley*, 392 F.3d 220 (6th Cir. 2004), which is discussed and distinguished in *Cardinal Health* as concerning "scienter on the part of an outside auditor, not the company or the company's executive officers." 426 F. Supp. 2d at 723 n.49 (emphasis removed).

Finally, and contrary to the Officer Defendants' objections, the discussion in this subsection implicates each of them.[28] To summarize by Defendant:

- Defendant Jones is alleged to have engaged in suspicious stock trading (ECF No. 72 ¶¶ 250–51), to have made false statements in the wake of the criminal complaint that were retracted almost immediately by the Company (*Id.* ¶¶ 234–35), to have been implicated in bribery via the criminal complaint (*Id.* ¶ 234), to have possessed an unusually strong financial motive through his lucrative performance pay to commit fraud (*Id.* ¶¶ 248–49), and to have been terminated for "violat[ing] certain FirstEnergy policies and its code of conduct" and for failing to "maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business," including in relation to the Randazzo payment (*Id.* ¶¶ 216, 221). Additionally, Defendant Jones's act of certifying FirstEnergy's SEC filings (*Id.* ¶¶ 98, 102) "provide[s] evidence either that he knew about the [improprieties] or, alternatively, knew that the controls he attested to were inadequate." *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007).[29] All of these allegations are viewed against a backdrop of Defendant Jones's significant personal involvement in the scheme and the fact that it occurred in an area of FirstEnergy's business that was not only of keen interest to investors, but also Defendant Jones's stated "top priority." (ECF No. 72 ¶ 220).

- Defendant Pearson is alleged to have engaged in suspicious stock trading (ECF No. 72 ¶¶ 250–51), to have possessed an unusually strong financial motive through his lucrative performance pay to commit fraud (*Id.* ¶¶ 248–49), and to have certified SEC filings that served to deceive shareholders. (*Id.* ¶ 102). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to investors and to which Defendant Pearson had devoted his "utmost attention." (*Id.* ¶ 225).

**\*23**  • Defendant Strah is alleged to have possessed an unusually strong financial motive through his lucrative performance pay to commit fraud (*Id.* ¶¶ 248–49) and to have certified SEC filings that served to deceive shareholders and which the Company later had to correct to disclose deficient internal controls. (*Id.* ¶¶ 98, 102, 189). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to investors and over which Defendant Strah had direct responsibility in his senior financial and operational roles. (*Id.* ¶ 226).

- Defendant Taylor is alleged to have signed SEC filings that served to deceive shareholders. (*Id.* ¶¶ 95–96). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to investors and over which Defendant Taylor had direct responsibility. Defendant Taylor's progression of senior financial

and operational roles stands out in that it gave him oversight, at some point or another, of multiple business units involved in different aspects of the scheme. (*Id.* ¶ 31).

• <u>Defendant Dowling</u> is alleged to have been terminated for "violat[ing] certain FirstEnergy policies and its code of conduct" and for failing to "maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business," including in relation to the Randazzo payment. (*Id.* ¶¶ 216, 222). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to investors and over which Defendant Dowling had direct responsibility in his senior external affairs role. (*Id.* ¶ 222). Moreover, Defendant Dowling's alleged conduct in furtherance of the scheme—which includes contacts with Householder and Longstreth in close proximity to wire payments—is more suggestive of knowing participation than of unwitting coincidence. (*Id.*).

• <u>Defendant Chack</u> is alleged to have engaged in suspicious stock trading (*Id.* ¶¶ 250–51), and to have been terminated for "violat[ing] certain FirstEnergy policies and its code of conduct" and for failing to "maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business," including in relation to the Randazzo payment (*Id.* ¶¶ 216, 224).

• <u>Defendant Pine</u> contests scienter on the ground that he "merely check[ed] the boxes for the duties of a lobbyist[ ] consistent with Ohio law." (ECF No. 167 at 11). However, Defendant Pine's alleged conduct in furtherance of the scheme—which includes contacts with Householder and Longstreth in close proximity to wire payments, as well as extensive work with corrupt lawmakers to draft HB6—is more suggestive of knowing participation than of unwitting coincidence. (ECF No. 72 ¶ 223). These actions support Plaintiffs' positioning of Defendant Pine as a "central liaison" to Householder, Longstreth, and other public officials. (*Id.*).

• <u>Defendant Reffner</u> is alleged to have possessed an unusually strong financial motive through his lucrative performance pay to commit fraud (*Id.* ¶¶ 248–49), and to have been terminated, in connection with the criminal case and ensuing investigations, for failure to prevent wrongdoing and for "conduct that the Board determined was influenced by the improper tone at the top." (*Id.* ¶ 216). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to investors and which Defendant Reffner had a duty to monitor in his senior legal roles. (*Id.* ¶ 227).

**\*24** • <u>Defendant Vespoli</u> is alleged to have engaged in suspicious stock trading (*Id.* ¶¶ 250–51) and to have possessed an unusually strong financial motive through her lucrative performance pay to commit fraud (*Id.* ¶¶ 248–49). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's business, of keen interest to

investors and which Defendant Vespoli had a duty to monitor in her senior legal roles. (*Id.* ¶ 228). Defendant Vespoli's arguments against scienter rest heavily on her retirement from the Company before key stages of the scheme (ECF No. 173 at 7–9); but Defendant Vespoli's retirement does not preclude knowing participation in the planning stages.

• <u>Defendant Judge</u> contests scienter chiefly on the basis of free-speech arguments that this Court has debunked. (ECF No. 164 at 10–12). Defendant Judge's alleged conduct in furtherance of the scheme—which includes meetings and phone contacts with Householder and Cespedes, a leading role on the Energy Harbor side, and close coordination with other scheme participants—is more suggestive of knowing participation than of innocent First Amendment activity. (ECF No. 72 ¶ 230). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FirstEnergy's and FES's business, of keen interest to FirstEnergy investors and over which Defendant Judge had direct responsibility in his senior compliance and Energy Harbor leadership roles. (*Id.*).

• <u>Defendant Schneider</u> is alleged to have played a leading role on the FES side, including through the retention of Borges "in close consultation" with other scheme participants (*Id.* ¶ 229), and to have certified SEC filings that served to deceive shareholders (*Id.* ¶ 102). The inference of scienter is strengthened by the fact that the scheme occurred in a central area of FES's business, of keen interest to FirstEnergy investors and over which Defendant Schneider had direct responsibility in his FES leadership role. (*Id.* ¶ 229).

28 "Because Plaintiffs have adequately pleaded scienter as to [corporate officers,] they have also pleaded scienter as to [the company]." *Frank*, 646 U.S. at 963; *see also City of Monroe Emps. Ret. Sys.*, 399 F.3d at 688 ("knowledge of a corporate officer or agent acting within the scope of his authority is attributable to the corporation" (internal quotation marks omitted)).

29 Certifications are probative at least when in combination with other facts suggestive of scienter. *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 972 n.10 (S.D. Ohio 2009) (citing *Ley v. Visteon Corp.*, 543 F.3d 801, 812 (6th Cir. 2008)). Signers are not, however, "strictly liable" for their certifications. *Ley*, 543 F.3d at 812 (internal quotation marks omitted), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48–50 (2011).

Viewing these allegations collectively and holistically, the Court finds that Plaintiffs have supported a strong inference of scienter as to each Exchange Act Defendant. The strength of that inference varies with the extensiveness of the allegations against each Defendant, as would be expected for non-omniscient parties at an early stage of litigation. In each case, however, the inference is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Plaintiffs have made a sufficient threshold showing to warrant discovery, wherein they may attempt to verify their inferences. The scienter element therefore is satisfied.

*3. Connection with Purchase or Sale of Securities*

The third element of Plaintiffs' Section 10(b) claim is that the misleading statements or fraudulent acts occur in "connection with the purchase or sale of a security." *EveryWare*, 175 F. Supp. 3d at 851. Most Defendants do not challenge this element under the misstatement theory;[30] but they do argue that the purported scheme did not involve "market activity" and therefore was too attenuated from the purchase or sale of a security. (ECF No. 161 at 49–52).

[30]   Defendant Judge does assert that the statements in his press release, made on behalf of Energy Harbor, could not have been in connection with investors' purchase or sale of FirstEnergy securities. (ECF No. 164 at 12). Again, this argument rests on corporate separateness that is alleged to be fiction. (ECF No. 72 ¶¶ 47–50). FirstEnergy investors paid close attention to the nuclear liabilities (*Id.* ¶ 44) because FirstEnergy never obtained its "sweeping releases from any and all future claims asserted against FES" (*Id.* ¶¶ 51, 62), and thus, "any actual or potential FES liabilities were also potential liabilities for FirstEnergy, including the billions of dollars needed to decommission the Nuclear Plants" (*Id.* ¶ 50). Reasonable investors *would*, therefore, view statements by Energy Harbor on the topic of its nuclear plants as "material to a decision ... to buy or sell a covered security," which satisfies the connection element. *SEC v. Crowe*, 216 F. Supp. 3d 852, 863 (S.D. Ohio 2016) (internal quotation marks omitted).

 **\*25** This Court does not take such a constrained view of market activity. "Deception related to the value or merit of the securities in question has sufficient connection to securities transactions to bring the fraud within the scope of § 10(b)." *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999). The Complaint abounds with allegations of precisely how FirstEnergy's nuclear liabilities, and the scheme to address them, related directly to investors' valuations and purchases of securities. Plaintiffs plead that "[t]he Nuclear Plants grew to dominate FirstEnergy earnings calls and analyst coverage, as investors grew increasingly concerned about the potential liabilities" (ECF No. 72 ¶ 44, 237), that the legislative effort culminating in HB6 continued to feature prominently in investor calls (*Id.* ¶¶ 103, 113, 115, 117–18, 121, 124, 127, 129, 132), that the passage of HB6 "allowed the Officer Defendants to deliver on their highest strategic priority" (*Id.* ¶ 213), that Defendants thus avoided "a serious risk of FirstEnergy's credit rating being downgraded" and in fact significantly improved the Company's credit rating and cost of capital (*Id.* ¶¶ 245–46), and that the Officer Defendants "took advantage of the inflated prices for FirstEnergy securities to conduct $5 billion worth of debt and equity sales" hailed as " 'transformational' " (*Id.* ¶¶ 7, 213). Under this narrative arc, Plaintiffs have pled that the Exchange Act Defendants' fraudulent acts in furtherance of the scheme were sufficiently connected to the purchase or sale of FirstEnergy securities.

Defendants' authorities differ noticeably from this case, as they describe scheme allegations in search of any acts. In *Menaldi*, the Southern District of New York viewed bribery that had "occurred *years before* the class period" as "far too remote to be in connection with the purchase or sale of any security." *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 518 (S.D.N.Y. 2017) (emphasis added) (internal quotation marks omitted). In *National Century I*, when the court rejected allegations of "a scheme to inflate the market price of [the company's] common stock," it was because the "*sole* basis" for scheme liability was "alleged misrepresentations or omissions," which the plaintiffs had "merely repeat[ed]" from their misstatement theory. 2006 WL 469468, at \*21 (emphasis added) (internal quotation marks omitted).[31] Here, Plaintiffs' alleged

scheme involves bribery and deceit pervading the Class Period, accomplished through fraudulent acts in addition to the alleged misstatements and omissions. The cases cited by Defendants stand more for the necessity of fraudulent acts to support a scheme theory than for the narrow definition of market activity that they urge upon the Court.

31    The same defect also controlled in three other cited cases: *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 250 (S.D.N.Y. 2018) (court concluded that plaintiffs "have not pled a market manipulation claim" because they "have not pled facts demonstrating misconduct *beyond* misstatements and omissions" (emphasis added)); *SEC v. Narayan*, 2017 WL 4652063, at \*10 (N.D. Tex. Aug. 28, 2017) (court found no "independently actionable activity outside of the context of [defendant's] misrepresentations and omissions"); *La. Mun. Police Emps. Ret. Sys. v. KPMG, LLP*, 2012 WL 3903335, at \*4 (N.D. Ohio Aug. 31, 2012) ("Plaintiffs do not sufficiently allege [defendant] engaged in conduct other than falsifying statements").

Defendants cite no authority to support the dismissal of a scheme liability claim for lack of market activity where there are well-pled allegations of fraudulent acts in the Class Period, designed to affect securities offerings and valuations. Their arguments therefore are rejected, and element three is satisfied.

*4. Reliance*

The fourth factor requires Plaintiffs to show reliance on Defendants' deceptive acts or statements. *Stoneridge*, 552 U.S. at 159. Scheme liability claims fail on reliance where the deceptive acts are "too remote" to the injury and have only an "attenuated" effect on the price of a security. *Id.* at 161–62. The reliance element is "tied to causation," and thus related to the requirement that the deceptive act or statement be "in connection with the purchase or sale of any security." *Id.* at 160 (internal quotation marks omitted). Resting on the *Stoneridge* line of cases, Defendants argue that the scheme liability theory lacks reliance and therefore cannot proceed. (ECF No. 161 at 52–55).[32] Plaintiffs contend that reliance should be presumed at this stage. (ECF No. 72 ¶¶ 254–56).

32    Aside from the argument by Defendant Judge discussed *supra* note 30, Defendants do not challenge reliance under the misstatement theory. As will be discussed, *Stoneridge* creates a presumption of reliance on the types of misstatements Plaintiffs have alleged. *See* 552 U.S. at 159.

a. Applicability of Presumptions

**\*26** An initial flaw is Defendants' neglect for the role of misstatements and omissions in the scheme. Importantly, "a rebuttable presumption of reliance" arises "in two different circumstances": first, when "there is an omission of a material fact by one with a duty to disclose," and second, "when the statements at issue become public [and] [t]he public information is reflected in the market price of the security." *Stoneridge*, 552 U.S. at 159. The former derives from *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and the latter from *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Both are pled in the Complaint. (ECF No. 72 ¶¶ 254–56).

As the Supreme Court recognized in *Lorenzo*, scheme liability is "sufficiently broad to include within [its] scope the dissemination of false or misleading information with the intent to defraud." *Lorenzo*, 139 S. Ct. at 1101; *see also* *id.* at 1102 (recognizing "considerable overlap among the subsections" of Rule 10b–5). Consequently, Defendants' misrepresentations and omissions—and the presumptions that attach to them—are relevant for scheme liability.

*Basic*'s "fraud-on-the-market theory," 485 U.S. at 241, applies here because the Court has found that Defendants made material misrepresentations in their public statements. Efficient markets rapidly factor public information into pricing; thus, "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." *Id.* at 246–47. Moreover, those misrepresentations had a purposeful role in the alleged scheme: they sold the "cover" that Defendants were lobbying for, and eventually obtained, the HB6 bailout through legitimate political advocacy. For years the market factored that material information into its pricing of FirstEnergy securities, and Plaintiffs purchased securities under that inflated pricing.

The *Affiliated Ute* presumption likewise appears appropriate because the Court has found that Defendants made omissions of material fact. Under these circumstances, "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision [to purchase or sell]." 406 U.S. at 153–54.[33]

[33] It is unsettled whether a plaintiff alleging both misrepresentations and omissions can engage the *Basic* and *Affiliated Ute* presumptions simultaneously. *Compare* *Burges v. Bancorpsouth, Inc.*, 2017 WL 2772122, at *10 (M.D. Tenn. June 26, 2017) (applying *Basic* to misrepresentations and *Affiliated Ute* to omissions in mixed case); *with* *Grae v. Corrs. Corp. of Am.*, 329 F.R.D. 570, 583–85 (M.D. Tenn. Jan. 18, 2019) (*Affiliated Ute* inapplicable where case was "primarily about" misleading statements, as opposed to nondisclosures; thus, only *Basic* was analyzed). Both cases were at the class certification stage, which implies that this issue is premature on a motion to dismiss.

The *Basic* and *Affiliated Ute* presumptions resolve this element for all Exchange Act Defendants who are alleged to have made misrepresentations or omissions as part of the scheme: Defendants Jones, Pearson, Strah, Taylor, Judge, and Schneider (and through them, FirstEnergy). Five other Defendants, however, have no misstatements or omissions alleged and are proceeding on scheme liability independently: Defendants Reffner, Dowling, Pine, Chack, and Vespoli. (ECF No. 176 at 65 n.20). For these Defendants, additional analysis is required.

b. Necessity of Public Knowledge

**\*27** Each of these remaining Defendants joins or expands upon FirstEnergy's contention that "[w]here the alleged scheme is not publicly disclosed, there can be no reliance." (ECF No. 161

at 53). Yet, for the scheme to succeed, it had to be concealed from the shareholders; otherwise, it would have unraveled, and "Plaintiffs and the Class would not have purchased FirstEnergy securities at the prices they paid, or at all." (ECF No. 72 ¶ 271). The illogical import of Defendants' stance is that FirstEnergy could be liable for securities fraud only if it willingly put its fraud into broad daylight. *See* ECF No. 161 at 54 (arguing no reliance because "[n]ot a single one of the allegedly false and misleading statements Plaintiffs point to mention anything about *purported bribery*." (emphasis added)).

A more apt inquiry is whether Defendants presented a deceptive public-facing "cover" that would be reflected in share prices and relied on by investors.[34] Such was the case in *Medtronic*, where the company's "deceptive conduct directly caused the production of the information on which the market relied." *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 394 (8th Cir. 2016). The court did not require the defendants to have disclosed their scheme to falsify clinical trials, nor their fraudulent payments to the trials' physician-authors. *See id.* Reliance could be had on the public-facing product of Medtronic's scheme—the clinical trial results that investors presumed to be valid. Here too, HB6 was a public-facing product of Defendants' scheme, and its pursuit and passage factored prominently into FirstEnergy's share price. FirstEnergy's support for HB6 was no secret, but its fraudulent means necessarily were. As in *Medtronic*, Defendants "cannot instruct individuals"—here, Householder and associates—"to take a certain action"—here, pass HB6—"pay to induce them to do it, and then claim any causal connection is too remote when they follow through." *Id*. When a scheme has no public-facing cover, and there is no information for the market to digest, *then* it fairly can be said that the scheme fails to engender any reliance by investors.[35]

[34] This is analogous to typical misstatement liability, where the investor hears or knows of the statement but does not know its falsehood at the time.

[35] Continuing the analogy to misstatement liability, see *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("A plaintiff unaware of the relevant statement, on the other hand, could not establish reliance on that basis."). *Compare id. with Menaldi, 277 F. Supp. 3d at 519* (reliance rejected in scheme liability case where the "Complaint fails to allege that investors *knew of*, or relied upon, [defendant's] *attempt to cover up* his alleged self-dealing" (emphasis added)).

In reaching their overinclusive disclosure theory, Defendants have attributed too great a meaning to *Stoneridge* and other authorities, which speak to the concerns about presuming reliance upon remote and indirect actors. In *Stoneridge*, the respondents were suppliers and customers external to the company, who "had no duty to disclose; and their deceptive acts were not communicated to the public." 552 U.S. at 152, 159. The Supreme Court found reliance lacking because these external parties were connected to the company's fraudulent financial statements only by "an indirect chain that we find too remote for liability." *Id*. The theme of delineating liability for parties with only remote involvement is one that recurs in Defendants' cited authorities.[36]

36    *See, e.g.*, *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 148–49, 159 (2d Cir. 2010), (no scheme liability for "a secondary actor," specifically a law firm that facilitated the company's allegedly fraudulent loan transactions, where plaintiffs " 'did not rely on [ ] any of [the firm's] work' " (quoting and affirming *In re Refco, Inc. Sec. Litig.*, 609 F. Supp. 2d 304, 315 (S.D.N.Y. 2009))); *Cosby v. KPMG, LLP*, 2018 WL 3723712, at *10 (E.D. Tenn. Aug. 2, 2018) (independent auditor was "only [a] secondary actor[ ]" and could not be considered the " 'maker' " of statements in the auditee's public filings on which "the shareholders claimed to have relied" (quoting *Janus*, 564 U.S. at 142)); *Siegmund v. Xuelian Bian*, 2018 WL 1611197, at *9 (S.D. Fla. Apr. 2, 2018) (outside law firm sued under scheme theory for its involvement in company's merger).

**\*28** Some courts have applied *Stoneridge* against internal executives, including in *Hawaii Ironworkers Annuity Trust Fund v. Cole*, 296 F.R.D. 549 (N.D. Ohio 2013).[37] The court acknowledged the difference between internal and external actors but ultimately concluded that, "absent public disclosure of a defendant['s] own deceptive conduct, the market cannot have taken that conduct into account when pricing the company's securities." *Id.* at 558. In that case, however, "[t]he only evidence the [plaintiff] cite[d] to show public disclosure of these acts [were] three [company] press releases," which reported high-level profits and gave no indication of underlying transactions. *Id.* at 557. The analogy to this case would be if investors suddenly saw additional revenue in FirstEnergy's bottom line but never knew of the source (HB6) or that the Company had lobbied for it. Furthermore, the *Hawaii Ironworkers* decision came on a motion for class certification, not a motion to dismiss. The claims survived a motion to dismiss, with the court reasoning as follows:

> The information defendants gave to [the company] played a major role in falsely inflating public reports of the company's overall and (remarkable) financial success during a very challenging period. These circumstances, and the direct nexus they show between the defendants' fraudulent conduct and the publication of false information to the investing public differentiates this case from *Stoneridge*.

*Id.* at 556 (quoting prior decision, 2011 WL 1257756, at *8).

37    Several other cited authorities concerning internal executives continued the theme of limiting liability for remote actors. *See, e.g.*, *Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.*, 625 F.3d 185, 192 (5th Cir. 2010) ("Without direct attribution to [defendant] of its role in the tax scheme, reliance on [defendant's] participation in the scheme is too indirect for liability."); *Pugh v. Trib. Co.*, 521 F.3d 686, 697 (7th Cir. 2008) (reliance lacking because "*Stoneridge* indicates that an indirect chain to the contents of false public statements is too remote to establish primary liability"); *Gordon v. Elite Consulting Grp. L.L.C.*, 2009 WL 4042911, at *5–6 (E.D. Mich. Nov. 19, 2009) (no fraudulent statements or deceptive acts alleged by moving defendant; at most, defendant aided and abetted others). By contrast, all Defendants here are alleged to have engaged directly and substantially in the scheme. *See supra* Section III.A.1.b.

As is discussed more fully in the preceding Sections, the Complaint alleges that FirstEnergy's own officers committed fraudulent acts that created misleading information about the nature and propriety of the Company's political activity, and later culminated in HB6. That information was publicized by the Company and factored efficiently into share prices. Defendants have raised no controlling authority that would compel the dismissal of such claims. The Court finds that this direct causal chain supports reliance, even for the non-speaking Defendants.

## 5. *Economic Loss*

The fifth element, economic loss, is not contested by any Defendant. Plaintiffs satisfy this element by pleading that they purchased securities at prices "artificially inflated" by Defendants, which "plummeted" once the scheme was unveiled. (ECF No. 72 ¶¶ 257–67). FirstEnergy investors collectively suffered billions of dollars in losses. (*Id.* ¶ 9, 13). Clearly, Plaintiffs have alleged an economic loss.

## 6. *Loss Causation*

The final element in Plaintiffs' Section 10(b) claim is loss causation, meaning "a causal connection between the material misrepresentation [or deceptive act] and the loss." *Dura Pharms.*, 544 U.S. at 342. The main challenge to this element is brought by Defendant Jones, who contests it as to the $4.3 million payment made to ex-PUCO Chairman Sam Randazzo. (ECF No. 174 at 26–27).[38]

[38] Defendant Judge adds a short loss causation argument concerning the lack of a corrective disclosure on his own statements. (ECF No. 164 at 13–14). Corrective disclosures are one way to show loss causation, but they are not exclusive. *See, e.g.*, *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) ("Put more simply, proof of loss causation requires demonstrating that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered. If the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant ... is sufficiently direct, loss causation is established." (internal quotation marks and citations omitted) (emphasis in original)); *Omnicare I*, 583 F.3d at 944 (loss causation lacking where no allegations "explain[ed] how the statements were revealed to be false and thereby caused a drop in the stock price"). Here, the largest single drop in share value came in response to the criminal complaint filing, which allegedly revealed the falsehood of most, if not all, of Defendants' statements about HB6.

**\*29** Jones reasons that the Randazzo payment, which was revealed approximately four months after the Class Period ended, "cannot retroactively cause class period losses." (*Id.* at 27). Perhaps that would be true if the Randazzo revelation had been the inflection point at which the market first learned of Defendants' fraudulent scheme. Details of the payment were not known, however, when the Department of Justice filed its criminal complaint; those facts emerged later, in the course of ensuing investigations.

In a scheme of this breadth, it is illogical to expect that the truth would emerge in "a singular, unitary disclosure," as opposed to "a series of disclosing events." *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828–29 (D.N.J. 2006) (finding loss causation satisfied where a corrective disclosure occurred one month after the close of the class period, and rejecting "Defendants' rigid and dogmatic interpretation of *Dura*"). To adopt Jones's argument, the Court would need to analyze the Randazzo payment in isolation. "The market would not consider these [disclosures] in a vacuum and neither does the Court." *Chamberlain*, 757 F. Supp. 2d at 718. Upon

learning of the criminal complaint, any reasonable investor would anticipate a series of revelations as the case progressed and would factor that expectation into their appraisals.

The Court therefore rejects Jones's loss causation logic, which " 'would allow wrongdoers to immunize themselves with a protracted series of partial disclosures.' " *Cardinal Health*, 426 F. Supp. 2d at 761 n.75 (compiling cases and quoting *Parker Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006)). Tellingly, Jones's cited authorities find loss causation lacking where plaintiffs' *first* concrete knowledge of the scheme or misstatement postdates the class period.[39] Where, as here, details of wrongdoing emerge in the Class Period and a series of disclosures continues beyond it, no rule prohibits loss causation as to the later events. *SeeIn re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1023 (S.D. Cal. 2006) (district court, on remand from *Dura*, explained "the Supreme Court could have held that as a matter of law Plaintiffs cannot establish loss causation because the corrective disclosures ... were made several months after the Class Period," but it "did not so hold"). Loss causation is established, even as to the Randazzo payment.

[39]  *SeeLighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 2013 WL 4405538, at *10 (S.D.N.Y. Aug. 5, 2013) ("Plaintiffs only allege that the truth about [defendant's] exposure to subprime securities came out in [defendant's] 2008 annual report," released "more than a month after the close of the proposed class period," and "do not allege that the market became aware [of the scheme] at any previous point" (emphasis removed)); *Lloyd v. CVB Fin. Corp.*, 2012 WL 12883517, at *26 (C.D. Cal. Aug. 21, 2012) (class period disclosure revealed "the mere risk of future loss," and "clearly did not reveal the existence of fraud, or expose [defendant's] alleged misrepresentations to the public"); *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 243 (S.D.N.Y. 2006) (complaint "does not allege facts showing that, during the class period, the market became aware" of the scheme; "[o]n the contrary, plaintiffs acknowledge that [defendants' wrongdoing] did not become public knowledge during the class period").

\* \* \*

In summary, Plaintiffs have pled every element of their Section 10(b) claims adequately and have satisfied heightened pleading standards where applicable. Their extensive and detailed allegations set out a plausible, persuasive case for securities fraud under theories of both misstatement liability and scheme liability. Count I stands as pled.

## B. Exchange Act Section 20(a) (Count II)

**\*30** Section 20(a) of the Exchange Act provides joint and several liability for "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder," including Section 10(b) and Rule 10b–5. 15 U.S.C. § 78t(a). Defendants' chief argument against this Count is premised on a dismissal of Count I. *See* ECF No. 161 at 66 (reasoning no secondary liability absent primary liability); No. 165-1 at 6 (same); No. 174 at 29 (same). Because the Court has sustained Plaintiffs' allegations in Count I that Defendants

committed primary violations of Section 10(b) and Rule 10b–5, Defendants' corollary arguments must fail. The only issue to resolve in Count II is the control element.

The standard for control under Section 20(a) is the subject of considerable debate. In *National Century III*, the court summarized several competing approaches as follows:

> The most rigorous standard is that the controlling person "was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998). Other courts have declined to impose a requirement of culpability, but do require allegations that the controlling person both had the capacity to control the primary violator and actually exercised that control. *See Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 85 (1st Cir.2002); *Metge v. Baehler,* 762 F.2d 621 (8th Cir.1985). Finally, other courts apply a more lenient standard yet, requiring only that the controlling person be alleged to have had the capacity to control the primary violator; the "actual exercise of that control need not be alleged." *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 258 F.Supp.2d 576, 642 (S.D.Tex.2003) (citing Fifth Circuit cases) ....

*Nat'l Century III*, 553 F. Supp. 2d 902, 911 (S.D. Ohio 2008).

The Sixth Circuit in *PR Diamonds* made no mention of a culpability requirement and defined control as " 'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.' " 364 F.3d 671, 696–97 (6th Cir. 2004) (quoting 17 C.F.R. § 230.405).[40] Stated differently, it is "the practical ability to direct the actions of the people who committed the violation." *In re Nat'l Century Fin. Enters., Inc.*, 504 F. Supp. 2d 287, 300 (S.D. Ohio 2007) ("*Nat'l Century II*") (internal quotation marks omitted). "Position as an officer or director ... and the direction of employees within the scope of their duties, although not dispositive of the question, is evidence that may establish the exercise of 'control.' " *JAC Holding Enters., Inc. v. Atrium Cap. Partners, LLC*, 997 F. Supp. 2d 710, 738 (E.D. Mich. 2014) (finding control where principals "instructed [others] in carrying out specific elements of the plan, and in several cases ... came up with elements of the scheme themselves"). *But see Lansing Automakers' Fed. Credit Union v. MCF Portfolio Mgmt. Corp.*, 1991 WL 238974, at *3 (W.D. Mich. Sept. 12, 1991) ("A director or officer is not, simply by virtue of his position, a 'controlling person' under the federal securities laws." (citing *Herm v. Stafford*, 663 F.2d 669, 684 (6th Cir. 1981))).

---

40   In a prior decision, *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, the Sixth Circuit observed that the standard of control is an open question. 973 F.2d 474, 486 (6th Cir. 1992) ("Our circuit has not adopted a test for liability as a 'controlling person' under the securities laws"). *PR Diamonds* did not claim to settle the law of the Circuit. Because the court found no primary violation, it did not need to analyze the control allegations. 364 F.3d at 697–98.

**\*31** This Court need not resolve the control standard. If a culpability requirement applies, the scienter findings are sufficient to meet it. Those allegations were tested against the PSLRA's heightened pleading standards, and the requirements for Count II are lower. *See Nat'l Century II,*

504 F. Supp. 2d at 300 (" 'Allegations of control are not averments of fraud and therefore need not be pleaded with particularity. They need satisfy only the less stringent requirements of Fed.R.Civ.P. 8.' " (quoting *In re Parmalat Sec. Litig.,* 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006))).

Only six Defendants contest the control element on grounds other than culpability or the absence of primary liability—those being Defendants Reffner, Judge, Pine, Chack, Schneider, and Vespoli. As to each, except for Defendant Pine, the Court finds that Plaintiffs have satisfied their burden under basic pleading standards.

- Defendant Reffner rests his argument on his less-senior role in the Legal Department, at least until his May 2020 promotion to Chief Legal Officer. (ECF No. 163 at 18). Defendant Reffner does not contest that he had direct or indirect control for the portion of the Class Period after he became Chief Legal Officer, nor does he contest that the scheme was underway at that time. The Complaint also supports an inference that, during his preceding term as General Counsel, Defendant Reffner influenced and participated in the deficient operation of internal controls. (ECF No. 72 ¶ 227).

- Defendant Judge rests his argument on the corporate separateness of Energy Harbor (ECF No. 164 at 18), which avoids the allegations of FES's functional intertwinement with FirstEnergy (ECF No. 72 ¶ 45) and of his control over FES employees involved in the media campaign against HB6's repeal (*Id.* ¶ 230). Moreover, Defendant Judge's argument on corporate separateness does not suggest a lack of control during his preceding term as FirstEnergy's Chief Risk Officer. The Complaint supports an inference that Defendant Judge possessed power, direct or indirect, to control predicate acts on both sides of the purported corporate divide.

- Defendant Pine prompted Plaintiffs to clarify in their response brief that they are *not* pursuing control person claims against him. (ECF No. 176 at 71 n.23). This is not apparent from the Complaint; Count II is styled against "the Exchange Act Defendants," which definitionally includes Defendant Pine. (ECF No. 72 ¶¶ 34, 39, 272–75). Defendant Pine therefore will be dismissed from Count II. He is not terminated from the litigation, however, as he remains implicated in Count I.

- Defendant Chack rests his argument on the lack of attributed misstatements (ECF No. 169 at 19–20), but he overlooks the allegations about his leading role in the media campaign against HB6's repeal (ECF No. 72 ¶ 224). Furthermore, Defendant Chack's termination reportedly related to his failure to "maintain and promote a control environment with an appropriate tone of compliance" and to his role in the Randazzo payment. (*Id.* ¶ 216). The Complaint supports an inference that Defendant Chack possessed power, direct or indirect, to control predicate acts, including the media campaign and the Randazzo payment.

- Defendant Schneider, like Defendant Judge, rests his argument on the purported corporate separateness of FES. (ECF No. 170-1 at 14–15). Again, this neglects the allegations of FES's functional intertwinement with FirstEnergy (ECF No. 72 ¶ 45) and of his acts to facilitate FES's part in the scheme (*Id.* ¶ 229). The Complaint supports an inference that Defendant Schneider possessed power, direct or indirect, to control predicate acts, even from the FES side of the purported corporate divide.

**\*32** • Defendant Vespoli rests her argument on her retirement from FirstEnergy in April 2019 and on a mistakenly heightened pleading standard of "particularity." (ECF No. 173 at 10–11). As stated above in the scienter analysis, Defendant Vespoli's retirement does not preclude her involvement in the scheme's planning stages. Defendant Vespoli's participation on the "Restructuring Working Group" and her "direct oversight and responsibility for the Company's lobbying activities and political contributions" support an inference of power, direct or indirect, to control predicate acts. (ECF No. 72 ¶ 228).

Defendant Vespoli raises a separate argument deserving of brief discussion: that she cannot be liable simultaneously as a primary actor under Section 10(b) and a control person under Section 20(a). (ECF No. 173 at 11 n.6). Defendant Vespoli refers to a footnote in *PR Diamonds*, where the Sixth Circuit stated:

Without deciding the question, we note that some [out-of-Circuit] authority suggests that a plaintiff may not be able simultaneously to assert both Section 10(b) and Rule 10b–5 claims and Section 20(a) claims against the same defendant. "Arguably, a § 20(a) claim cannot be asserted against a defendant who is also charged with primary violation of § 10(b) and Rule 10b–5; that is, secondary liability under § 20(a) is an alternative, not a supplement, to primary liability under § 10(b) and Rule 10b–5."

364 F. 3d at 697 n.4 (quoting *Lemmer v. Nu–Kote Holding, Inc.*, 2001 WL 1112577, at \*12 (N.D. Tex. Sept. 6, 2001)). It might become necessary to resolve this issue later in the case, but the Court will leave it open at this juncture for two reasons. First, the *PR Diamonds* dicta is, as it says, arguable. To state the counterpoint, nothing in the plain text of Section 20(a) makes it mutually exclusive with other theories of liability, and nothing logically prevents a person from violating Section 10(b) themselves while controlling others who also violate it. Second, even if Plaintiffs ultimately can prevail against each Exchange Act Defendant on only one theory, a motion to dismiss is not the correct time to determine which. At the pleadings stage, "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). *see also* *Nat'l Century I*, 2006 WL 469468, at \*24 (S.D. Ohio Feb. 27, 2006) (on a motion to dismiss, citing the same principle and "allow[ing] [plaintiffs] to pursue both their § 10(b) and their § 20(a) claims against [defendant] at this time").

Apart from Defendant Pine, who is dismissed from this Count only, Count II stands as pled.

## C. Securities Act Section 11 (Count III)

Plaintiffs' remaining claims are brought under a separate statute, the Securities Act, and against a different set of Defendants.[41] They relate to FirstEnergy's bond offerings in February and June 2020, which raised a combined $2.5 billion. (ECF No. 72 ¶¶ 285–90).

[41]   The "Securities Act Defendants" are FirstEnergy's non-management directors, three FirstEnergy officers (Defendants Jones, Strah, and Lisowski), and 16 banking and finance firms that served as underwriters for FirstEnergy's bond offerings. *See supra* notes 13–14 and accompanying text.

Count III sounds under Section 11 of the Securities Act, which provides a cause of action to "any person acquiring [a] security" when it is shown that "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). As relevant here, the cause of action runs against:

  **\*33**  (1) every person who signed the registration statement;

(2) every person who was a director of ... the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director ... [and]

(5) every underwriter with respect to such security.

*Id.* Plaintiffs' required showing under Section 11 is as follows:

(1) he purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under Section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

*Loc. 295/Loc. 851 IBT Emp'r Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 704 (S.D. Ohio 2010) ("*Local 295*").

Compared with Section 10(b) of the Exchange Act, "Section 11 [of the Securities Act] places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). "The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered

offering. If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case." *Id.* at 381–82.

The Securities Act Defendants contest the third element (a misstatement or omission) by reference to the briefing on misstatement liability reviewed under Count I. (ECF No. 161 at 59, 62; No. 171 at 4; No. 174 at 27). They implicitly concede that their arguments rise or fall with the Court's determination on Count I. As discussed above, the Court has found the misstatement allegations sufficient and allowed Count I to proceed as pled.

The only other argument raised as to Count III concerns the appropriate pleading standard. The Securities Act Defendants aver that Plaintiffs' allegations "sound in fraud" and therefore must satisfy the heightened pleading standards of Rule 9(b). (ECF No. 161 at 8 n.3). As a general principle, "fraud is not an element or requisite to a claim under § 11," meaning "the claims are not subject to Rule 9(b)." *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 602 (N.D. Ohio 2004). An exception occurs "[a]s to claims that sound in fraud," where "Plaintiffs must also satisfy the particularity requirements of Rule 9(b)." *In re EveryWare, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 869 (S.D. Ohio 2016) (citing *Omnicare I*, 583 F.3d 935, 948 (6th Cir. 2009)). Plaintiffs contend that they carefully have separated their Securities Act claims from any allegations of fraud elsewhere in the Complaint. (ECF No. 176 at 78). To that end, the Complaint declines to incorporate Exchange Act allegations into the Securities Act section and "expressly disavows all averments of fraud contained [t]herein for the purposes of pleading claims under the Securities Act as such claims do not require a showing of fraud or scienter." (ECF No. 72 ¶ 276).

**\*34** The Court finds that Plaintiffs have not separated their claims against the Securities Act Defendants who served in management roles (Defendants Jones, Strah, and Lisowski), nor against FirstEnergy. The Complaint pleads that the registration statements were false or misleading because they "failed to disclose that FirstEnergy and several of the Company's most senior executives had carried out an illegal bribery scheme" (*Id.* ¶ 292), which ties the Securities Act claims to the fraud allegations against "the senior echelon of Company management, including [Defendant] Jones and numerous other executives" (*Id.* ¶ 4). The quoted passage from paragraph 276 is a "blanket disavowal ... insufficient to rescue [Plaintiffs] from the requirements of Rule 9(b)." *Local 295*, 731 F. Supp. 2d at 709 (noting also that "Plaintiffs' allegation that their Securities Act claims do not sound in fraud is a legal conclusion that the Court does not have to accept as being true").[42]

42    Furthermore, the scheme allegations in paragraphs 3–6 *are* incorporated by reference into the Securities Act claims. (ECF No. 72 ¶ 276 ("This section incorporates solely ¶¶1-6, 14-26")).

The non-management Director Defendants[43] and the Underwriter Defendants are different. No allegations in the Complaint suggest that they knew of or participated in the scheme in a way that would be fraudulent, as opposed to reckless or negligent.[44] *Cf.EveryWare*, 175 F. Supp. 3d at 869

("Defendants' argument [for applying heightened pleading standards] mainly relies on Plaintiffs' allegations of fraud against *other* Defendants, and therefore ... fails." (emphasis in original)). For that reason, the Court finds that the allegations against the non-management Director Defendants and the Underwriter Defendants are separated properly from averments of fraud. The pleading standard therefore is a hybrid: basic pleading under Rule 8(a) for allegations concerning the non-management Director Defendants and the Underwriter Defendants, and heightened pleading under Rule 9(b) for allegations concerning FirstEnergy and Defendants Jones, Strah, and Lisowski.

43    The "non-management" qualifier is added to exclude Defendant Jones. As CEO, Defendant Jones was both an officer and a director. (ECF No. 72 ¶ 28).

44    This Court did allow the derivative action to proceed against the same directors on allegations that "Defendants[ ] knew or recklessly disregarded reports and red flags ... and took affirmative steps to conceal the scheme." *Emps. Ret. Sys. of City of St. Louis*, 2021 WL 1890490, at *20 (S.D. Ohio May 11, 2021) (internal quotation marks omitted). There are not, however, sufficient allegations in *this* Complaint to support a finding of knowledge or participation, largely due to Plaintiffs' efforts to avoid averments of fraud in their Securities Act claims.

Even against heightened pleading standards, as applicable, Plaintiffs' allegations suffice. The SEC Form 10-K for Fiscal Year 2019 and Form 10-Q for Q1 2020, which were incorporated into the registration statements at issue (ECF No. 72 ¶ 290), are among the same forms alleged to be misleading in Count I; and the Court found those allegations to withstand Rule 9(b). As was true in Count I, Plaintiffs have pled the " 'time, place and contents of the misrepresentations upon which they relied.' " *In re Regions Morgan Keegan Sec., Derivative, & Erisa Litig.*, 743 F. Supp. 2d 744, 759–60 (W.D. Tenn. 2010) (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)). Plaintiffs quote specific passages from the registration statements concerning the Company's compliance and internal controls, highlight omissions about the extraordinary risks associated with HB6, explain how and why those statements and omissions were materially false and misleading, and juxtapose them against the Company's own subsequent admissions. (ECF No. 72 ¶¶ 291–301). Count III stands as pled.

## D. Securities Act Section 12(a)(2) (Count IV)

**\*35** Section 12(a)(2) of the Securities Act creates civil liability for "[a]ny person who ... offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading ...." 15 U.S.C. § 77*l*(a)(2). It is "similar to Section 11," but it "only imposes liability on 'statutory sellers' of securities." *Local 295*, 731 F. Supp. 2d 689, 704–05 (S.D. Ohio 2010).

Plaintiffs' required showing under Section 12(a)(2) can be summarized as follows:

(1) the defendant is a "statutory seller"; (2) the sale was effectuated by means of a prospectus or oral communication; and (3) the prospectus or oral communication included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

*Id.* at 705 (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010)).

The Underwriter Defendants bring a standing challenge (ECF No. 171 at 4–7); the non-management Director Defendants and Defendant Jones challenge their "statutory seller" status (ECF No. 161 at 65–66; No. 174 at 27–28); and all Securities Act Defendants extend their challenges from Count III about misstatements and heightened pleading standards. (ECF No. 161 at 8 n.3, 65; No. 171 at 4; No. 174 at 27). These latter arguments can be dispensed with swiftly. They concern the same underlying misstatements discussed in Count I, which were restated in the registration statements and prospectuses at issue in Counts III and IV. (ECF No. 72 ¶¶ 286, 88, 90). In Count I, and again in Count III, the Court found those allegations well-pled and sufficient for Rule 9(b); there is no need to belabor the point a third time. This leaves only two arguments for discussion: standing and the "statutory seller" element.

## 1. Standing

The Underwriter Defendants challenge Plaintiffs' standing to pursue their Section 12(a)(2) claims "because Plaintiffs have not alleged that they purchased FirstEnergy securities in the Offerings from any of the Underwriter Defendants," "as opposed to the secondary market." (ECF No. 171 at 4). Since "Section 12(a)(2) applies only to purchases made through initial offerings and not to aftermarket trading," most courts hold "that purchasers who buy their shares on the secondary market lack standing to assert Section 12(a)(2) claims." *Local 295*, 731 F. Supp. 2d at 713 (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)).[45]

[45] Purchasers through aftermarket trading may have claims under Section 11, but not Section 12. *See id.* at 704 (first element of a Section 11 claim is that the plaintiff "purchased a registered security, either directly from the issuer or in the aftermarket following the offering").

To indulge the Underwriter Defendants' argument, however, requires the Court to draw reasonable inferences *against* Plaintiffs, which is backwards on a motion to dismiss. Plaintiffs allege that they "purchased FirstEnergy notes *directly in* and traceable to" the Offerings (ECF No. 72 ¶ 307 (emphasis added)); and that "the Securities Act Defendants issued, promoted, and sold FirstEnergy notes *to Plaintiffs*" (*Id.* ¶ 313 (emphasis added)). The Complaint also refers to Plaintiffs' "purchases of the FirstEnergy notes *issued in* the Offerings." (*Id.* ¶ 317 (emphasis added)). This is hardly the "coy choice of words" that gave "pause" to the court in *Yates*, one of the Underwriter Defendants' main authorities. *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874,

900 (4th Cir. 2014). *Yates* considered purchases alleged to be " 'pursuant *and/or* traceable to' " an offering. *Id.* (emphasis added). Ambiguous slash-mark aside, the court held that if "coupled with sufficient supporting facts," such claims "can give rise to a plausible inference of standing in certain circumstances." *Id.* (discussing *Plumbers' Union Loc.No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 776 (1st Cir. 2011)).[46]

[46] The pleading in the other case cited by the Underwriter Defendants was weaker still. *SeeIn re Regions Morgan Keegan Sec., Derivative & Erisa Litig.*, 166 F. Supp. 3d 948, 968 (W.D. Tenn. 2014) (plaintiffs alleged they had " 'purchased shares issued pursuant *or* traceable to the misleading registration statements' " (emphasis added)). That formulation was deemed insufficient to plead direct purchases, at least where aftermarket trading remained a possibility. *Id.* at 968–69.

**\*36** Furthermore, Plaintiffs do couple their comparatively firm pleading with supporting certifications, incorporated into the Complaint (ECF No. 72 ¶¶ 23–26), that show large bond purchases by each Plaintiff aligned in timing and series with either or both Offerings.[47] The certifications also align with each other. Plaintiffs LACERA and Wisconsin Laborers' Pension Fund each made large purchases on February 18, 2020. *See supra* note 47. Likewise, Plaintiffs LACERA and Amalgamated Bank each made large purchases on June 3, 2020. These latter purchases were of the same series of notes (1.6% due 2026), which allows for a unit-price comparison that matches to the penny: $99.85. *Id.*; *compare* ECF No. 33-4 *with* ECF No. 72 PAGEID # 1666. The Underwriter Defendants propose no explanation for how the various named Plaintiffs, who had no affiliation prior to this case, could have synchronized in so many respects. A reasonable explanation is that they independently purchased from the same initial offerings. At this stage of the litigation, reasonable inferences go to Plaintiffs.

[47] Plaintiff LACERA reports acquisitions on February 18 and 26, 2020, of 2.65% notes due 2030 (ECF No. 33-4), which align with Series B notes in the February Offering (ECF No. 72 ¶ 286). LACERA further reports acquisitions on June 3, 2020, of 1.6% notes due 2026 (ECF No. 33-4), which align with Series A notes in the June Offering (ECF No. 72 ¶ 288). Plaintiff Amalgamated Bank reports acquisitions on June 3, 2020, of 1.6% notes due 2026 (*Id.* PAGEID # 1666), which align with Series A notes in the June Offering (*Id.* ¶ 288). Plaintiff Wisconsin Laborers' Pension Fund reports acquisitions on February 18, 2020, of 3.4% notes due 2050 (*Id.* PAGEID # 1668), which align with Series C notes in the February Offering (*Id.* ¶ 286). Plaintiff City of Irving Supplemental Benefit Plan reports acquisitions on June 23, 2020, of 2.25% notes due 2030 (*Id.* PAGEID # 1671), which align with Series B notes in the June Offering (*Id.* ¶ 288).

The Court also rejects the corollary argument that Plaintiffs should be required to allege purchases from "particular Underwriter Defendant[s]." (ECF No. 171 at 6). The Underwriter Defendants cite two cases for this proposition, but neither dismissed any claims over a failure to identify particular underwriters. *Regions Morgan Keegan* rebuffed an attempt to import the aftermarket purchaser standing from Section 11; thus, when the court wrote that plaintiffs "d[id] not allege with particularity that [they] purchased their shares from [defendant fund] directly," the operative word was "directly." 166 F. Supp. 3d at 968–69. The second case, *In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*, considered lead plaintiffs who "concede[d]" that none of them alleged purchases from a group of individual defendants and attempted to rest their standing on other purchases by "potential members of the proposed class." 2012 WL 12893520, at \*5 (C.D. Cal. Feb. 16, 2012). The court rejected that attempt because the lead plaintiffs suffered no injury and

no class had been certified. *Id.* Meanwhile, Plaintiffs direct the Court's attention to multiple cases from the Southern District of New York that found Section 12(a)(2) allegations well-pled despite not identifying particular underwriters. *See, e.g.*, *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 404 (S.D.N.Y. 2020) ("[T]he fact that Plaintiffs did not identify which Underwriter Defendant they purchased shares from does not defeat their claim at this stage."); *Perry v. Duoyuan Printing, Inc.*, 2013 WL 4505199, at *12 (S.D.N.Y. Aug. 22, 2013) ("courts within the Second Circuit do not require that the putative class representative identify the specific underwriter from which it purchased shares as long as the allegations are sufficient"). This Court will decline to impose such a requirement in the first instance and against the weight of the cited authority. Plaintiffs' standing allegations are sufficient, as measured against basic pleading standards, to obtain discovery.

*2. Statutory Seller*

**\*37** For purposes of Section 12(a)(2), statutory sellers are those who have "(1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner.' " *Morgan Stanley*, 592 F.3d at 359 (alterations in original) (quoting *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988)). The non-management Director Defendants and Defendant Jones urge the Court to dismiss Count IV because "the mere signing of a registration statement" is insufficient to establish "statutory-seller status." (ECF No. 161 at 66 n.19; No. 174 at 28).

This Court considered the same question in *EveryWare*. After surveying the First, Third, and Fifth Circuits, this Court dismissed Section 12(a)(2) claims against director defendants who merely had signed the registration statement:

In *Shaw v. Digital Equipment Corp.*, the First Circuit dismissed for lack of standing the plaintiffs' Section 12(a)(2) claims against individual directors, applying the Supreme Court's decision in *Pinter v. Dahl*, 486 U.S. 622, 651 n. 27, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), to conclude that "neither involvement in preparation of a registration statement or prospectus..., standing alone, demonstrates the kind of *relationship between defendant and plaintiff* that could establish statutory seller status." 82 F.3d 1194, 1216 (1st Cir.1996), *superseded on other grounds by* 15 U.S.C. 78u–4(b)(2). The First Circuit held that a "bald assertion" that the individual officers "solicited" the purchases by signing and participating in the preparation of the registration statement was insufficient to confer standing. *Id*. In *Rosenzweig v. Azurix Corp.*, also applying *Pinter*, the Fifth Circuit found that signing the registration statement was insufficient in itself to constitute solicitation, asserting that "[t]o count as 'solicitation,' the seller must, at a minimum directly communicate with the buyer," and that an issuer, rather than an underwriter, "may only be liable under § 12(a)(2) if the plaintiff alleges 'that an issuer's role was not the

usual one; that it went farther and became a vendor's agent.' " *332 F.3d 854, 871 (5th Cir.2003)* (quoting *Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 636 (3d Cir.1989)* and *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 370 (5th Cir.2001)). *see also Pinter*, 486 U.S. at 648–49, 108 S.Ct. 2063 (rejecting the "substantial factor" test, which would impose liability on a non-transferor seller "whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place."). In *Craftmatic*, the Third Circuit found that an issuer was not liable "solely on the basis of his involvement in preparing the prospectus."890 F.2d at 636. The Sixth Circuit has not yet considered this issue, but the Court finds the reasoning of the other three circuits persuasive and holds that Plaintiffs lack standing to bring a Section 12(a)(2) claim against the Non-Management Director Defendants because they have not alleged any facts to indicate that the Directors' roles were "not the usual one." *Rosenzweig, 332 F.3d at 871.* *In re EveryWare, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 868–69 (S.D. Ohio 2016) (Marbley, J.) (footnotes omitted) (emphasis in original), *aff'd sub nom. IBEW Loc.No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017).[48]

[48]    The Sixth Circuit did not state an opinion on the quoted passage. *See id.* at 328 n.3 ("We need not, and accordingly do not, address the district court's discussions of the statute of limitations and standing."). It affirmed only on the absence of plausibly pleaded material misrepresentations. *Id.* at 328. The question of whether the mere signing of a registration statement suffices for statutory-seller status remains an open one in the Sixth Circuit.

**\*38** Despite appearing multiple times in Plaintiffs' briefing (ECF No. 176 at 28, 78, 81), *EveryWare* is conspicuously absent in their discussion of the statutory-seller element (*Id.* at 83–85). This Court sees no occasion to reconsider its holding in *EveryWare* that directors are not liable under Section 12(a)(2) merely for having signed the registration statements.

As to the non-management Director Defendants in Count IV, the Complaint states no other specific allegations of solicitation; Plaintiffs appear to rest on the signatures. *See* ECF No. 72 ¶ 281 ("Each of the Director Defendants signed the registration statement for the Offerings, and/or were named as directors in the registration statements for the Offerings"). Absent other allegations of how the non-management Director Defendants solicited the purchase of securities, the statutory-seller element is not met.

By contrast, Count IV states many allegations about Defendant Jones's soliciting role. Defendant Jones was among the "senior echelon of Company management ... responsible for FirstEnergy's ... investor disclosures," who are alleged to have "personally overseen and facilitated" the scheme, including by "repeatedly affirmatively reassur[ing] investors that the Company was not engaged in any illicit activities and 'compl[ied]' with all laws and regulations applicable to its regulatory affairs and investor disclosure obligations." (*Id.* ¶¶ 3–6 (emphasis removed) (incorporated by reference in ¶ 310); *see also id.* ¶¶ 291–301 (connecting misstatements to scheme)). From these allegations, it cannot fairly be said that Defendant Jones "merely signed the registration statement" (ECF No. 174 at 28); rather, he is alleged to have reassured and deceived investors, actively and intentionally, into purchasing the securities at issue. The Court must take these

allegations as pled and find that Defendant Jones was a "person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter*, 486 U.S. at 647.[49]

49    Defendant Jones also states a corollary argument on "privity," *i.e.*, whether Plaintiffs purchased securities " 'from him.' " (ECF No. 174 at 28–29 (quoting 15 U.S.C. § 77*l*(a)(2))). Defendant Jones cites no cases from this Circuit and seemingly overlooks an important passage in *Pinter*: "Congress' express definition of 'sells' in the original Securities Act to include solicitation suggests that the class of those from whom the buyer 'purchases' extended to persons who solicit him."486 U.S. at 645 (noting also that subsequent amendments "intended to preserve existing law" and not "to narrow the meaning of 'purchased from' ").

In conclusion, the Complaint does not state a claim under Section 12(a)(2) against the non-management Director Defendants in this Count (Defendants Addison, Anderson, Demetriou, Johnson, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, Smart, Thornton, and Turner). These Defendants are not released from the litigation, however, as they remain implicated in Counts III and V. Count IV may proceed against the other Securities Act Defendants: FirstEnergy, Jones, Lisowski, Strah, and the Underwriter Defendants.

## E. Securities Act Section 15 (Count V)

Section 15 of the Securities Act establishes joint and several liability for "[e]very person who ... controls any person liable under" Sections 11 or 12. 15 U.S.C. § 77*o*(a). Control under Section 15 is analyzed "using the same legal standards" as under Section 20(a).*Pullins v. Klimley*, 2008 WL 85871, at *27 (S.D. Ohio Jan. 7, 2008).

**\*39** The only basis on which Defendants move to dismiss this Count is the absence of a primary violation. *See* ECF No. 161 at 66 (reasoning no secondary liability absent primary liability); No. 174 at 29 (same). Because the Court has found primary violations in Counts III and IV, the premise of Defendants' argument is defeated, and no further analysis is required. Count V stands as pled.

## F. Whether *Nickerson v. AEP* Controls

In a final effort, Defendants ask the Court to take notice of the recent decision in *Nickerson v. American Electric Power Co.*, Case No. 2:20-cv-4243-SDM-EPD (S.D. Ohio), dismissing securities fraud claims related to AEP's involvement in HB6. (ECF No. 209). That case only underscores the reasons why Plaintiffs' claims here should proceed. The *Nickerson* complaint presented no coherent scheme theory; only at oral argument did any bribery allegations emerge. 2021 WL 5998536, at *12–13 (S.D. Ohio Dec. 20, 2021). Nor were there shareholder proposals for lobbying transparency that would make the "vague, generic, and innocuous" misstatements at issue, *Id.* at *16, material to reasonable investors.[50] The roles of the companies differed in

kind: AEP was alleged to have contributed $900,000 to Householder's enterprise, *Id.* at *5, which FirstEnergy outmatched *67-to-1*. FirstEnergy undoubtedly played the dominant role in passing HB6 and stood to gain the bulk of the benefits, valued at $2 billion. Unlike FirstEnergy, AEP has not been charged with any criminal wrongdoing. The market, too, recognized the difference: the AEP lawsuit was precipitated by a 5% drop in share price, *Id.* at *12, while FirstEnergy's losses reached 35% in the first of three major selloffs. (ECF No. 72 ¶ 259). Simply stated, if there is a strike suit between the two, this is not it.

50      Because the *Nickerson* plaintiffs did not state actionable misstatements, the court never reached their allegations on scienter, connection, reliance, or loss causation. *Id.* at *14. Nor did the court analyze any Securities Act claims, as none were not brought.

## IV. CONCLUSION

The Court finds Plaintiffs' allegations meritorious and compelling and determines that the Complaint may proceed as pled, with minor exceptions as noted. To dismiss this Complaint, as Defendants urge, would be to adopt a severely strained view of bribery laws, pleading requirements, and the facts of the case. Absent literal omniscience, it is difficult to envision a securities fraud complaint that would *not* falter on the unrealistic expectations Defendants seek to impose as law. This Court will not do such a great disservice to the statutory rights of shareholders and investors to recover against those who defraud them.

For the reasons stated above, the Motion to Dismiss filed by Defendant FirstEnergy Corp. (ECF No. 160) is **GRANTED IN PART** as to the non-management Director Defendants in Count IV only and is **DENIED** in all other respects. Defendant Pine's Motion to Dismiss (ECF No. 166) is **GRANTED IN PART** as to Count II and is **DENIED IN PART** as to Count I. The remaining Motions to Dismiss filed by Defendant Reffner (ECF No. 162), Defendant Judge (ECF No. 164), Defendant Dowling (ECF No. 165), Defendant Chack (ECF No. 168), Defendant Schneider (ECF No. 170), the Underwriter Defendants (ECF No. 171), Defendant Vespoli (ECF No. 172), and Defendant Jones (ECF No. 174) each are **DENIED**. The partial dismissals are without prejudice.

 **\*40 IT IS SO ORDERED.**

## All Citations

Slip Copy, 2022 WL 681320, Fed. Sec. L. Rep. P 101,335

---

**End of Document**                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# ATTACHMENT C

2022 WL 269105
United States District Court, E.D. Texas, Sherman Division.

U.S. SECURITIES AND EXCHANGE COMMISSION
v.
Sebastian SILEA, et al.

Civil No. 4:20-CV-737-SDJ
|
Signed 01/27/2022

**Attorneys and Law Firms**

Nikolay V. Vydashenko, US Securities & Exchange Commission, Fort Worth, TX, for U.S. Securities and Exchange Commission.

Sebastian Silea, Waco, TX, Pro Se.

Brett Willis Rector, Thompson & Knight LLP, Jessica B. Magee, Holland & Knight LLP, Dallas, TX, for Sebastian Silea, et al.

**MEMORANDUM OPINION AND ORDER**

SEAN D. JORDAN, UNITED STATES DISTRICT JUDGE

**\*1** The U.S. Securities and Exchange Commission ("Commission") brought this action against Defendants Sebastian Silea, Christian Kranenberg, and KS Cartel LLC ("KS Cartel") pursuant to the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). The case arises from Silea and Kranenberg's establishment of an entity through which they operated an investment scam that is, in large part, a Ponzi scheme—one that has caused several investors tens of thousands of dollars in losses.

Before the Court is the Commission's Motion for Summary Judgment Against Defendants Sebastian Silea and Christian Kranenberg and for Default Judgment Against Defendant KS Cartel LLC, (Dkt. #62). For the reasons that follow, the Court **GRANTS** the motion.

**I. Background**

**A. Procedural Background**

On September 29, 2020, the Commission brought suit against Defendants. (Dkt. #1). On November 5, 2020, the Commission filed its amended complaint against Defendants, stating claims for violations of: Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); and Sections 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e(a) & (c). (Dkt. #9). Defendants, then represented by counsel, filed their answer on December 9, 2020. (Dkt. #11).

On May 28, 2021, Defendants' counsel moved to withdraw, citing Defendants' failure to pay legal fees. (Dkt. #19). After a hearing on the motion, (Dkt. #26), the Court granted counsel's motion on June 30, 2021, and ordered KS Cartel to obtain new counsel within thirty days, cautioning that entities are not permitted to proceed pro se in federal court. (Dkt. #27 at 2 (citing *Donovan v. Road Rangers Country Junction, Inc.*, 736 F.2d 1004, 1005 (5th Cir. 1984)). The Court further warned KS Cartel that if it failed to secure new counsel by the Court-ordered deadline, its defenses may be struck and it may be subject to default judgment. (Dkt. #27 at 2). The Court also ordered Silea and Kranenberg to obtain new counsel or inform the Court that they intended to proceed pro se by the same deadline. (Dkt. #27 at 2).

By September 1, 2021, no defendant had complied with the order. *See* (Dkt. #30). The Commission thus moved to strike the portion of Defendants' answer attributable to KS Cartel, (Dkt. #33), and for default judgment against KS Cartel, (Dkt. #34), both of which the Court granted, (Dkt. #55). The Court further ordered the Clerk to enter default against KS Cartel pursuant to Federal Rule of Civil Procedure 55(a), (Dkt. #55), and such default was entered on November 22, 2021, (Dkt. #60). Additionally, the Court construed Silea and Kranenberg's failure to obtain new counsel as notice that they intend to proceed pro se. (Dkt. #55 at 2).

During the same time frame, Defendants filed purported motions "to dismiss" and for "summary judgment," (Dkt. #41, #47),[1] which the Court denied, (Dkt. #56, #57).

[1] On November 19, 2021, the Court held a hearing on Defendants' motions, (Dkt. #54), during which the Court reminded Silea and Kranenberg that KS Cartel, as an entity, cannot proceed pro se in federal court, and that while Silea and Kranenberg can proceed pro se, the Court did not recommend it.

**\*2** On November 23, 2021, the Commission filed the instant Motion for Summary Judgment Against Defendants Sebastian Silea and Christian Kranenberg and for Default Judgment Against Defendant KS Cartel LLC, (Dkt. #62). Silea alone has filed documents that the Court construes liberally as his response to the motion. *See* (Dkt. #65, #66, #67). Neither KS Cartel nor Kranenberg responded.[2] The Commission filed a reply in support of its motion. (Dkt. #68). The Court will grant the Commission's motion.

Fed. Sec. L. Rep. P 101,314

2  Defendants have, however, filed a slew of incoherent motions in the interim. (Dkt. #69, #70, #71, #74, #75, #76). The Court will address those motions under separate order.

## B. Factual Background

### i. Defendants' offers and sales of unregistered securities of KS Cartel

As set out in the KS Cartel "Confidential Private Placement Memorandum" ("PPM"), in July 2017, Silea and Kranenberg formed KS Cartel as a Texas limited liability company. (APP at 7).[3] From KS Cartel's inception through at least February of 2020 (the "Relevant Time Period"), KS Cartel's principal place of business was in Waco, Texas. (APP at 7). Silea and Kranenberg appointed themselves as Managing Members of KS Cartel; Kranenberg was the Chief Executive Officer and Silea was the Chief Financial Officer. (APP at 7, 14). In these roles, Kranenberg and Silea each exercised control over KS Cartel.

3  The Commission filed an appendix via several exhibits attached to its motion. For consistency, the Court refers to the exhibits in the appendix with the "APP" designation.

From October 2017 through July 2020, Silea and Kranenberg raised approximately $1,044,918.52 from investors by offering and selling membership interests—"Units"—in KS Cartel for cash. The offers and sales of these Units were not registered with the Commission. (APP at 6).

Silea solicited investors by, among other means, approaching people he did not know in store parking lots and other locations. Kranenberg solicited investors by, among other means, communicating with people he did not know via the LinkedIn and Shapr networking platforms. Silea and Kranenberg also personally met with prospective investors to solicit their investments. Defendants offered and sold Units to investors in Texas, New Mexico, California, New York, and New Jersey, among other states. Many KS Cartel investors were not accredited.

Units of KS Cartel were a passive investment because investors relied solely on Defendants' efforts to obtain the investment returns that Silea and Kranenberg promised—investors had no right to participate in managing KS Cartel.

Silea and Kranenberg offered Units in KS Cartel pursuant to, among other means, the PPM, which Silea and Kranenberg provided to prospective investors when soliciting investments. According to the PPM, KS Cartel would use investor funds to, at the investor's election, either day-trade funds pooled from multiple investors through a so-called "mutual fund" or manage separate "private stock portfolios" for individual investors. (APP at 8). KS Cartel and the investors would then split any profits from the trading, based on a percentage individually negotiated between KS Cartel and each investor.

### ii. Silea and Kranenberg controlled bank and brokerage accounts through which they operated KS Cartel

To operate KS Cartel, Silea and Kranenberg used bank and brokerage accounts. Silea and Kranenberg had access to and control over two bank accounts (the "KS Cartel Bank Accounts"), and they traded KS Cartel investor funds in at least four accounts (the "KS Cartel Brokerage Accounts"). (APP at 23, 29). Silea and Kranenberg traded securities in the KS Cartel Brokerage Accounts and transacted in the KS Cartel Bank Accounts.

### iii. Defendants' securities trading

**\*3** The Commission's expert, Commission Financial Economist Judy Gia Tran, analyzed Defendants' trading in the KS Cartel Brokerage Accounts and in other accounts controlled by Defendants, for the period of March 2017 through June 2020.[4] Tran determined that trading in all of Defendants' brokerage accounts, including the KS Cartel Brokerage Accounts, generated gross realized losses of $72,811, or an overall return of -0.9%. (APP at 161–162).[5] In short, Defendants' overall trading was not profitable. In most weeks and months, it resulted in small gains or small losses. Any small gains Defendants achieved from time to time were not sufficient for Defendants to distribute purported "profits" to investors.

[4]    Tran's findings, which are based on generally accepted methodologies, are presented in detail in her Expert Report, dated April 21, 2021. (APP at 153–226). Tran analyzed brokerage statements and trade blotters produced to the Commission by brokerage firms at which Defendants maintained accounts to develop her report.

[5]    The KS Cartel Brokerage Accounts account for 84% of Defendants' trading. (APP at 151). Defendants controlled two additional brokerage accounts, which are accounted for in the above calculation of returns. The returns were similar when only the KS Cartel Brokerage Accounts are considered. The KS Cartel Brokerage Accounts generated gross realized losses of $58,563, or an overall return of -0.8%. (APP at 151).

### iv. Defendants' use of investor funds

Defendants raised approximately $1,044,918.52 in investor funds. (APP at 246). When investors invested money in KS Cartel, their funds were deposited into the KS Cartel Bank Accounts. During the Relevant Time Period, Defendants transferred $329,301 of investor funds from the KS Cartel Bank Accounts to the KS Cartel Brokerage Accounts—that is, Defendants deployed only 32% of investor funds toward trading in securities. (APP at 251).

Also during the Relevant Time Period, Defendants transferred from the KS Cartel Brokerage Accounts to the KS Cartel Bank Accounts $280,203.48. (APP at 251). By May 2020, all KS Cartel Brokerage Accounts had a zero, negative, or negligible balance. (APP at 245–46).

Between October 2017 and July 2020, Defendants transferred $978,735.51 from the KS Cartel Bank Accounts to investors. (APP at 246). A significant amount of the money that Silea and

Kranenberg transferred to investors, which, as described below they represented were profits, was the principal invested by other investors—Ponzi payments. (APP 251–52). In fact, on several occasions,[6] Defendants had a negligible balance in the KS Cartel Bank Accounts, then deposited an investor's investment into the account, and immediately used a portion of that investment to pay purported profits to other investors. For example, on January 6, 2019, one KS Cartel Bank Account had a balance of $255.44. (APP at 248–49, 255). On January 7, 2019, an investor wired a $5,000 investment into this account. On that date, there were no other credits into this account, except a non-investment related credit of $2,000. The same day, Defendants transferred a total of $3,100 from this account to two other KS Cartel investors. Without the $5,000 investment, Defendants would not have been able to make the $3,100 in payments to other investors.

[6]     Many such instances are described in detail at (APP at 248 ¶ 19).

Silea and Kranenberg spent over $300,000 on expenses for their personal benefit during the Relevant Time Period, including the purchase of a luxury vehicle and purchases at retail stores. (APP at 251). Silea and Kranenberg used investor funds to pay for at least some of these expenses. (APP at 251).

### v. Defendants' materially false and misleading statements and deceptive conduct

### a. Material misstatements about targeted and actual returns

**\*4**  Defendants represented in the PPM that returns on KS Cartel's "mutual fund" day-trading strategy "should be no less than 20% of total assets and investments a month," and that the returns on its "private stock portfolio" long-term trading strategy "should be maintained at 30% a month." (APP at 15).

Throughout the time that Defendants solicited investors via the PPM, they lacked a factual basis to project returns of 20-30% per month. During this time period, Defendants' average monthly return, when considering trading in all of their brokerage accounts, was -8.8%, and the median monthly return was -0.5%. (APP at 161–62). Defendants never achieved a monthly return that was higher than 6.5%, except for a monthly return of 27.7% in April 2020, but this return generated a gain of only $323. (APP at 161–62, 180). Both of these monthly returns were outliers. Defendants never disclosed their actual returns. When considering trading in only the KS Cartel Brokerage Accounts, the results are nearly identical. *See* (APP at 151).

Kranenberg falsely represented KS Cartel's prior performance to prospective investors. In November 2017, Kranenberg told prospective investors that KS Cartel's "ROI is averaging 70-90% monthly." *See, e.g.*, (APP at 126, 128). In April 2018, Kranenberg told prospective investors that KS Cartel's "ROI averages 30-60% monthly depending on the amount of risk." (APP at 130). And

in August 2019, Kranenberg told prospective investors that KS Cartel's "ROI can average from 20-30% a month depending on the amount of risk." (APP at 132).

All of these representations were false. As set forth above, Defendants did not achieve or average the stated trading returns.

**b. Material misstatements about, and deceptive conduct related to, the performance of the investments**

Silea and Kranenberg deceived KS Cartel investors about the nature of the purported profits that KS Cartel paid out to investors and about the performance and profitability of KS Cartel's securities trading, both at the time they solicited investments and after investors made their initial investments.

The PPM represented that "[p]rofit after investment and trade of equities ... will be redistributed as discussed with clients in negotiations." (APP at 8). Silea and Kranenberg similarly confirmed to investors that money distributed to investors represented profits from trading activities. (APP at 229–231, 236).

As set forth above, KS Cartel did not achieve profits from trading. Nevertheless, Silea and Kranenberg caused KS Cartel to distribute money to investors on a regular basis. As explained above, these distributions to investors represented not KS Cartel's profits from trading, but rather, in many cases, the transfer of principal invested by certain investors to other investors.

Investors in KS Cartel have stated that if they knew that the money that KS Cartel distributed to them as supposed profits was money invested by other investors or was otherwise not sourced from trading activities, or that their own investments would be used for purposes other than trading in securities, they would not have invested. (APP at 230, 236).

Silea and Kranenberg also systematically deceived KS Cartel investors about the profitability of KS Cartel by providing investors with fictitious account balances. This conduct was pervasive and directed at nearly every investor in KS Cartel. For example, Kevin Volkert invested a total of $35,000 between April 2018 and June 2018. (APP at 237). In September 2018, Volkert withdrew $20,000 from his account. (APP at 237). By the end of 2018, Silea reported to Volkert that his account balance had grown to $136,874.22, which was the balance only for the high-risk trading strategy. (APP at 139). This balance reflected a six-month gain (July through December 2018) of $121,874 or a return of 812.495%. (APP at 252). Based on the 55-45 profit split in favor of Volkert, (APP at 235), KS Cartel would have had to achieve an even higher return over six months to deliver the stated return. Thus, the actual investment gain implied by the account balance Silea provided

is even larger. In truth, in the two KS Cartel Brokerage Accounts in which trading occurred in that period, the total loss was $14,194. (APP at 189, 191).[7]

---

[7]    This is just one illustrative example of Silea and Kranenberg's deceptive statements to KS Cartel investors regarding fictitious account balances. The Commission provides several additional examples in their motion, detailing Silea and Kranenberg's use of email, text messages, and the KS Cartel website to convey fictitious account balances. (Dkt. #62 at 9–14).

**\*5** Silea and Kranenberg did not keep accurate records of the account balances of KS Cartel investors. Because Silea and Kranenberg comingled all investor funds in the KS Cartel Brokerage Accounts and KS Cartel Bank Accounts, without any segregation, (APP at 88–89), and because they continued to accept new investments while at the same time paying out purported investment returns to existing investors, keeping track of each investor's personalized account balance would have required very sophisticated record keeping and partnership accounting practices to take into account, among other things, dilution and the allocation of the fund's profits and losses to each investor based on when such an investor joined the fund. Defendants have not produced any records that reflect they kept track of anything other than the money investors put in and took out. When Defendants were represented by counsel and were afforded time to construct their best response to the Commission's interrogatory asking Defendants to explain "how you accounted for gains, losses, distributions, and contributions attributable to each KS Cartel investor, including such investors' capital account balances and changes thereto," Defendants provided only the following response:

> On behalf of the company, Defendant Silea maintained mental and written records of funds received by KS Cartel LLC and/or deposited, and took the percentage of the fund that an individual bought units for and formulated that as their total ownership percentage. Defendant Silea accounted for this percentage by the stocks held over a long period of time and the remainder that were traded based upon an individual's wishes.

(APP at 30).

Investors in KS Cartel have stated that if they had known that Silea and Kranenberg were providing fictitious performance figures that bore no relation to the results of KS Cartel's actual trading activity, they would not have invested additional funds with KS Cartel. (APP at 231–32, 237, 241).

The record shows that investors suffered significant harm when they were deceived by the investment performance information Silea and Kranenberg provided. For example, after seeing KS Cartel supposedly outperform his retirement investments for several months, investor Craig Muirhead made early withdrawals of tens of thousands of dollars from his 401K retirement account, after paying a significant early withdrawal penalty—on Kranenberg's advice—and invested the withdrawn cash with KS Cartel. (APP at 241). Muirhead ultimately suffered a loss of at least $50,000. (APP at 247–248). Similarly, investor Constantin Ispas invested $50,000 from his retirement savings after seeing several months of supposedly high returns on his initial investment. (APP at 231). He also suffered a loss of more than $50,000. (APP at 247–248).

### c. Material misstatements about the safety of investing in KS Cartel

Defendants represented in the PPM that KS Cartel offered investors a "50% return safety net other firms do not." (APP at 10). The PPM went on to explain that KS Cartel offered "a new and faster approach to making money at KS Cartel and a safety net guaranteed return on initial investment, making the company competitive." (APP at 10). Silea confirmed that these statements meant that the PPM provided a guarantee that KS Cartel would return at least 50% of an investor's initial investment. (APP at 108).

Silea and Kranenberg took no action to ensure that KS Cartel could make good on this guarantee. (APP at 103–105). When asked about what steps he took to ensure KS Cartel could deliver on this guarantee, Silea responded that it was "basically just not making bad investments." (APP at 103). Later, both Silea and Kranenberg asserted the Fifth Amendment privilege against self-incrimination when responding to questions on this topic. (APP at 49, 67–68).

Ultimately, many investors lost more than 50% of their principal investments. (APP at 247–48).

### d. Material misstatements about Silea and Kranenberg's qualifications

Defendants represented in the PPM that they were "highly qualified business and industry professionals." (APP at 13). They also touted their "expertise" as something that "set[s] the Company apart from its Competitors." (APP at 10).

Silea and Kranenberg were neither "highly qualified" nor "industry professionals." The also lacked expertise in securities trading. Prior to forming KS Cartel, Silea had completed one semester at Baylor University before dropping out, while Kranenberg had completed two semesters at a community college.

### vi. Silea and Kranenberg declined to testify, citing the Fifth Amendment

**\*6** In 2020, during the Commission's investigation that preceded the filing of this lawsuit, Silea provided on-the-record testimony and at certain times refused to testify, citing the Fifth Amendment privilege. (APP at 90–91, 106–07).

During the course of the litigation, the Commission took Silea's and Kranenberg's depositions. At their depositions, both Silea and Kranenberg refused to answer nearly every substantive question

asked of them on the basis of the Fifth Amendment privilege against self-incrimination. (APP at 41–52, 62–79).

## II. Summary Judgment Against Silea and Kranenberg

### A. Legal Standard

Summary judgment is only appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). If the moving party presents a motion for summary judgment that is properly supported by evidence, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).

Because Federal Rule of Civil Procedure 56 requires that there be no "*genuine* issue of *material* fact" to succeed on a motion for summary judgment, "the mere existence of *some* alleged factual dispute" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" when, under the relevant substantive law, its resolution might govern the outcome of the suit. *Id.* at 248. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton*, 232 F.3d at 476.

"Courts consider the evidence in the light most favorable to the nonmovant, yet the nonmovant may not rely on mere allegations in the pleading; rather, the nonmovant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial." *Int'l Ass'n of Machinists & Aerospace Workers v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000). If, when considering the entire record, the court concludes that no rational jury could find for the nonmoving party, the movant is entitled to summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

When ruling on a motion for summary judgment, the Court "will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy"—except when the facts are refuted in the opposing party's brief in opposition to the motion, "as supported by proper summary judgment evidence." Local Rule CV-56(d). The Court "will not scour the record in an attempt to unearth an undesignated genuine issue of material fact." *Id.*

## B. Discussion[8]

[8]     As discussed in Section III.B *infra*, whether there is a genuine issue of material fact as to KS Cartel's liability is relevant to the Court's default-judgment analysis. The Court will thus conduct the summary-judgment analysis as to all three defendants, although the Commission's summary-judgment motion, and the Court's grant of summary judgment, is only directed as to the two individual defendants.

### i. No genuine dispute as to any material fact

**\*7**  Defendants have failed to meaningfully respond to the Commission's motion. Silea individually filed three documents that the Court will liberally construe as responses to the Commission's summary-judgment motion. Silea filed a "Motion in opposition of default Judgment and Summary Judgement cease and desist," (Dkt. #65), a "Cease and Desist dismissal with prejudice," (Dkt. #66), and a "Silea Affidavi[t]," (Dkt. #67). Each filing is signed by Silea alone. All are largely unintelligible. And, unquestionably, none meets the requirements for a response to a summary-judgment motion. *See* Local Rule CV-56(b) ("Any response to a summary-judgment motion must include a response to the statement of issues and a response to the 'Statement of Undisputed Material Facts.' " ... The response should be "supported by appropriate citations to proper summary judgment evidence.").

To the extent Silea intended these filings to be construed as motions seeking dismissal of this action on some basis, the motions, (Dkt. #65, #66), will be denied, as the Court has already denied Defendants' purported motion for summary judgment and their purported motion dismiss, (Dkt. #56, #57).

The filings do not address the summary-judgment record, cite to any evidence, or identify any genuine issue of material fact.[9] Silea's "affidavit" is the only filing of the three that could be construed as summary-judgment evidence. *See* Local Rule CV-56(d). A single sentence therein relates to the Commission's claims: Silea asserts that KS Cartel investors "knew the risks," and "when I took money from anyone I made sure they could bear the entire loss and fully agreed to my trust." (Dkt. #67 at 1). "Needless to say, [these] unsubstantiated assertions are not competent summary judgment evidence." *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir. 1994) (citation omitted).

[9]     In the two filings termed "motions," Silea appears to re-argue irrelevant and incoherent assertions the Court addressed in previous orders. *See* (Dkt. #56, #57, #65, #66).

Similarly, neither Kranenberg nor KS Cartel filed a response addressing the Commission's summary-judgment motion.[10]

[10]     The Court does not construe Silea's purported opposition filings on behalf of either Kranenberg or KS Cartel. *See SEC v. Meta 1 Coin Tr.*, No. 1:20-CV-273-RP, 2020 WL 1931852, at \*3 n.4 (W.D. Tex. Apr. 21, 2020) (citing *Martin v. City of Alexandria*, 198 F. App'x 344, 346 (5th Cir. 2006)) ("While nonlawyer individual defendants may represent themselves in certain circumstances, they

may not represent or assist in the self-representation of their codefendants."); *Donovan*, 736 F.2d at 1005 (entities are not permitted to proceed pro se in federal court).

The Commission's motion is extensively supported by evidence. Silea and Kranenberg have plainly failed to meet their burden to "show with significant probative evidence that there exists a genuine issue of material fact." *Hamilton*, 232 F.3d at 477 (cleaned up). There is therefore no genuine dispute regarding any material fact as to the Commission's claims against Silea, Kranenberg, or KS Cartel, and the Court will look solely to the facts listed in support of the motion, along with the record, when determining whether summary judgment is appropriate. *See Danos v. Union Carbide Corp.*, 541 F. App'x 464, 466 (5th Cir. 2013) (citations omitted) ("If a party fails to oppose a motion for summary judgment, then the district court is permitted to consider the facts listed in support of the motion as undisputed and grant summary judgment if those facts would entitle the movant to judgment as a matter of law."); *see also Eversley v. MBank Dall.*, 843 F.2d 172, 174 (5th Cir. 1988) (concluding that the district court properly accepted as undisputed the facts listed in a summary-judgment motion where the non-movant failed to submit any response to the motion); Local Rule CV-7(d) ("A party's failure to oppose a motion ... creates a presumption that the party does not controvert the facts set out by movant and has no evidence to offer in opposition to the motion.").

### ii. Defendants offered and sold unregistered securities

**\*8** Defendants' actions violated Sections 5(a) and 5(c) of the Securities Act because they raised more than one million dollars by selling securities without registering those securities offerings with the Commission. *See* 15 U.S.C. §§ 77e(a), (c). Because there is no genuine issue of material fact regarding these violations, the Court will grant summary judgment as to Silea and Kranenberg on the Commission's claims under Sections 5(a) and 5(c) of the Securities Act.

Under Section 5 of the Securities Act, it is "unlawful for any person, directly or indirectly" to use interstate commerce to offer to sell "any security" unless the person has filed a "registration statement" for the security. 15 U.S.C. § 77e(c). To establish a prima facie violation of Sections 5(a) and 5(c) of the Securities Act, the Commission must show that "(1) no registration statement was in effect as to the securities, (2) the defendant sold or offered to sell these securities, and (3) interstate transportation or communication and the mails were used in connection with the sale or offer of sale." *SEC v. Cont'l Tobacco Co.*, 463 F.2d 137, 155 (5th Cir.1972). Section 5 violations are strict liability offenses that do not require proof of scienter. *Swenson v. Engelstad*, 626 F.2d 421, 424–25 (5th Cir.1980) ("The Securities Act of 1933 imposes strict liability on offerors and sellers of unregistered securities .... regardless of ... any degree of fault, negligent or intentional, on the seller's part." (cleaned up)).

Once the Commission establishes its prima facie case, "the burden shifts to Defendant[s] to prove that the offer or sale falls under an exemption to the registration requirements." *SEC v. Kahlon*, 141 F.Supp.3d 675, 678–79 (E.D. Tex. 2015), *aff'd*, 873 F.3d 500 (5th Cir. 2017) (citing *Cont'l Tobacco Co.*, 463 F.2d at 156).

### a. No registration statement was in effect

First, it is undisputed that KS Cartel's securities were not registered with the Commission. The PPM itself stated that "[t]he securities offered hereby have not been registered under the Securities Act of 1933." (APP at 6).

### b. Defendants sold or offered securities

Second, it is undisputed that Defendants offered and sold Units in KS Cartel to investors. The "Units" are securities, which the Securities Act broadly defines "to include a long list of financial instruments, including 'investment contracts.' " *SEC v. Arcturus Corp.*, 928 F.3d 400, 409 (5th Cir. 2019) (citing 15 U.S.C. § 77b(a)(1)).

The Supreme Court in *Howey* articulated a test for determining whether an investment contract qualifies as a security, and the Fifth Circuit has recognized that the test requires three elements: "(1) an investment of money; (2) in a common enterprise; and (3) on an expectation of profits to be derived solely from the efforts of individuals other than the investor." *Arcturus*, 928 F.3d at 409 (citing *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) and quoting *Williamson v. Tucker*, 645 F.2d 404, 417 (5th Cir. 1981)). Courts disregard "legal formalisms" when considering this test and instead "focus on the substance of the deal." *Id.* (citing *Reves v. Ernst & Young*, 494 U.S. 56, 61, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990)). Even where contracts "superficially resemble private commercial transactions" and lack "the formal attributes of a security," they can still qualify as securities. *Id.* (quoting *Youmans v. Simon*, 791 F.2d 341, 345 (5th Cir. 1986)).

**\*9** All of the *Howey* factors are met. There was an "investment of money" because KS Cartel investors paid cash to receive Units. And "commonality is evidenced by the fact that the fortunes of all investors [were] inextricably tied to the efficacy of" Defendants' efforts. *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974). The Commission has established that commonality exists because Defendants pooled investors' money and used the funds to, among other things, trade securities, and the investors' returns depended on the success of Defendants' trading, which they explained to potential investors and in the PPM. (APP at 9, 11). And investors had no right to participate in managing KS Cartel. Thus, the third requirement is also met, as investors had a reasonable expectation that profits would be derived solely from the efforts of individuals other than themselves.

Finally, it is beyond dispute that Defendants offered and sold the Units. Silea and Kranenberg, on behalf of KS Cartel, personally solicited investors to invest in KS Cartel. And, as stated in the PPM, KS Cartel itself "offer[ed] ... Units." (APP at 8).

### c. Defendants offered and sold securities through interstate commerce

Third, Defendants used online networking platforms, email, and other means to solicit and communicate with potential investors. (APP at 112–15, 126–35). KS Cartel sold Units to investors in Texas, California, New Mexico, New York, New Jersey, and other states. (APP at 96). Therefore, it is beyond dispute that the Units were offered and sold through interstate commerce. *See SEC v. Carter*, No. 4:19-CV-100-SDJ, 2020 WL 6304889, at *4 (E.D. Tex. Oct. 28, 2020) (concluding that communicating with potential investors through email, obtaining investment from at least one out-of-state investor, and obtaining funds from investors through wire transfer constituted offering and selling securities through interstate commerce).

### d. Defendants have not established that an exemption from registration applies

Because the record before the Court establishes a prima facie Section 5 violation as asserted by the Commission, the burden of proof shifts to Defendants to establish that an exemption from registration applies. *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 124–26, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). Defendants have failed to demonstrate that any exception or exemption applies here.

The PPM states that KS Cartel securities are not registered with the Commission, "in reliance upon the exemptions from registration provided by the [Securities] Act and Regulation D[,] Rule 506 promulgated thereunder," (APP at 6), referring to statutory exemptions to registration under the Securities Act ("Regulation D"). *See* 17 C.F.R. § 230.506; *see also* 15 U.S.C. § 77d(a)(2). In Silea's "motion" to "Cease and Desist Dismissal with Prejudice," Silea mentions a "Form D exception," but does not explain the exception or any reason that KS Cartel securities would be subject to it. (Dkt. #66). In Defendants' nine identical and largely incoherent documents filed more than a month after the Commission replied in support of its summary-judgment and default-judgment motion, Defendants state the following:

> Regulation D of Securities Act of 1933, Rule 506[:] This provides two distinct exemptions from registration. Rule 506(B) a "safe harbor" under Section 4(a)(2) this was never contested by the plaintiff, because we "satisfy certain requirements" of Rule 506(B) or (C), giving the same protections offered to corispondants [sic] by the Securities Act of 1[9]33.

*See, e.g.*, (Dkt. #76 at 5). Even construing this statement liberally as (1) responsive to the Commission's summary-judgment motion and (2) an argument that Rule 506 of Regulation D, 17

C.F.R. § 230.506, exempts KS Cartel securities from registration, Defendants have not come close to meeting their burden of proof that the exemption applies.[11]

11    The Court also notes that Defendants' apparent contention that the Commission does not contest that an exemption applies is plainly wrong.

**\*10** Regulation D "exempts an issuer who offers and sells restricted securities without general solicitation to a limited number of investors, as long as those investors are sophisticated enough to understand the merits and risks of the offering, and certain information is furnished to the investors." *SEC v. Stack*, No. 1:21-CV-00051-LY, 2021 WL 4777588, at \*9 n.5 (W.D. Tex. Oct. 13, 2021) (citing *SEC v. Rose*, No. CV H-04-2799, 2007 WL 9826042, at \*20 (S.D. Tex. Sept. 5, 2007)).

There are numerous requirements an issuer must meet to qualify for an exemption from registration pursuant to Regulation D under Rule 506(b) or 506(c). *See* 17 C.F.R. § 230.506. Any proof Defendants may have offered for this argument would had to have been "explicit, exact, and not built on conclusory statements." *Cont'l Tobacco*, 463 F.2d at 156 (5th Cir. 1972) (cleaned up). Nowhere in the record, much less in response to the Commission's motion, have Defendants offered any facts or proof to support an argument that a Regulation D exemption applies.

\* \* \* \*

For all of these reasons, the Commission is entitled to summary judgment on its claim that Silea and Kranenberg's actions violated Sections 5(a) and 5(c) of the Securities Act.

### iii. Defendants defrauded investors

Defendants made material misstatements and omissions to further a deceptive scheme that raised more than one million dollars from unwitting investors. Because there is no genuine issue of material fact regarding Silea and Kranenberg's fraud, the Court will grant summary judgment on the Commission's claims under Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### a. Defendants' liability under Section 10(b), Rule 10b-5(b) thereunder, and Section 17(a)(2)

Rule 10b-5(b) of the Exchange Act prohibits any person from making "any untrue statement of a material fact" or omitting "to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b).

For purposes of Rule 10b-5(b), "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011). Section 17(a)(2) of the Securities Act prohibits any person, in the offer or sale of a security, from "obtain[ing] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading[.]" 15 U.S.C. § 77q(a)(2). Proof of scienter is required for Rule 10b-5(b), whereas negligence is sufficient for Section 17(a)(2). *Aaron v. SEC*, 446 U.S. 680, 691, 697, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980).

The record shows that Silea and Kranenberg personally made multiple material misstatements to investors and prospective investors regarding each of their professional and educational backgrounds, the targeted and actual returns resulting from KS Cartel trading, the performance of the investments, and their use of investor funds. Specifically, their material misstatements include: Defendants' statement in the PPM that returns using their trading strategy "should be" 20-30% per month, (APP at 15); Kranenberg's misrepresentations to prospective investors that KS Cartel was "averaging" a monthly return on investment ranging from 20-90%, (APP at 126, 128), though he knew KS Cartel was operating at a loss; Defendants' statement in the PPM, and verbal statements Silea and Kranenberg made to investors, that money that KS Cartel distributed to investors represented profits from Defendants' trading activity, (APP at 8, 229–231, 236), though many of the distributions were Ponzi payments; the fictitious account balances that Silea and Kranenberg provided to investors that far exceeded the accounts' actual values, *see, e.g.*, (APP at 252 ¶ 28 (Defendants falsely represented to an investor that his six-month account balance reflected an 812% gain)); Defendants' statement in the PPM that they would guarantee investors a "safety net" that protected 50% of an investor's principal investment under any circumstances, (APP at 10); and Defendants' misrepresentation in the PPM that Silea and Kranenberg were "highly qualified business and industry professionals" who had "expertise" that set KS Cartel apart from competition, (APP at 10, 13), though both were college drop-outs and neither had industry expertise.

**\*11** Silea and Kranenberg, together with KS Cartel, were the makers of the misstatements in KS Cartel's PPM because they had ultimate authority over its content. (APP at 23, 24, 29, 32). With respect to the misstatements made specifically by either Silea or Kranenberg, KS Cartel is also a maker of each of those misstatements because Silea and Kranenberg made these misstatements in their capacity as control persons of KS Cartel. *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) ("Statements attributed to individual defendants are also treated as having been made by [the company], as all of them appear... to have been made pursuant to their positions of authority within the company.").

Defendants thus violated Rule 10b-5(b). As a result of this conduct, Defendants received investor funds and went on to misappropriate a significant portion of them. In so doing, Silea and Kranenberg obtained money by means of their misrepresentations in violation of Section 17(a)(2).

The standard for misrepresentation is "whether the information disclosed, understood as a whole, would mislead a reasonable potential investor," and a "statement or omitted fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *SEC v. Provident Royalties, LLC*, No. 3:09-CV-01238-L, 2013 WL 5314354, at *4 (N.D. Tex. Sept. 23, 2013) (quoting *SEC v. Seghers*, 298 F.App'x 319, 328 (5th Cir. 2008)). As the Supreme Court has explained, an omitted fact is material if "disclosure of the omitted fact would have ... significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citation omitted). Thus, the antifraud provisions of the securities statutes and regulations impose a " 'duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading.' " *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992)).

All of the misstatements identified above were material to investors, as the Commission has presented uncontroverted evidence that investors would not have invested if Silea and Kranenberg had told them: what KS Cartel's actual and projected returns were; whether the purported profits they were receiving actually came from trading activity; whether KS Cartel in fact offered a "safety net" for investors; that Silea and Kranenberg used some investor funds for personal spending; and that Silea and Kranenberg lied to them about their professional and educational accomplishments. *See* (APP at 230, 236). At a minimum, such misstatements and omissions would have "significantly altered the total mix of information" available to any reasonable investor and were therefore material. *Levinson*, 485 U.S. at 232.

As to the remaining elements of the Commission's antifraud claims against Defendants, the record establishes that all of Defendants' misstatements, omissions, and deceptive conduct had the same goal: to obtain capital from investors. Accordingly, this element of securities fraud has been satisfied in this case.

The scienter element is also met. Scienter is defined as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In the Fifth Circuit, scienter is established by showing that a defendant acted intentionally or with severe recklessness. *See Southland*, 365 F.3d at 366 (citation omitted) (concluding that scienter is an " 'intent to deceive, manipulate, or defraud' or 'that severe recklessness' in which the 'danger of misleading buyers or sellers ... is either known to the defendant or so obvious that the defendant must have been aware of it' "). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations" involving an "extreme

departure from the standards of ordinary care[.]" *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001) (citation omitted).

**\*12** Here, Silea and Kranenberg repeated known untruths and omitted critical information about the investments and intentionally defrauded investors, raising more than one million dollars as a result. Such conduct, on its face, was intentional, or, at the very least, severely reckless. And the evidence of scienter against Silea and Kranenberg is reinforced by the adverse inference to be drawn from their repeated invocation of the Fifth Amendment right against self-incrimination during their depositions. *See* (APP at 41–52, 62–79); *Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 210 (5th Cir. 1983) (citation omitted) (explaining that, "while a person may refuse to testify during civil proceedings on the ground that his testimony might incriminate him ... his refusal to testify may be used against him in a civil proceeding").

**b. Defendants' liability under Rules 10b-5(a), (c) and Sections 17(a)(1), (3)**

Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) prohibit any person from employing "any device, scheme, or artifice to defraud" or engaging in any "act, practice, or course of business" which operates as a fraud or deceit, in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a), (c). Similarly, Sections 17(a)(1) and 17(a)(3) of the Securities Act prohibit any person, in the offer or sale of a security, from employing "any device, scheme, or artifice to defraud" or engaging in any "transaction, practice, or course of business" which operates as a fraud or deceit. 15 U.S.C. § 77q(a)(1), (a)(3). Proof of scienter is required for Rules 10b-5(a) and (c) and Section 17(a)(1), whereas at least negligence is sufficient for Section 17(a)(3). *Aaron*, 446 U.S. at 691, 697.

Defendants' actions demonstrate a course of conduct designed to deceive and defraud investors. This course of conduct included, among other things, making the material misrepresentations set forth above, which, in addition to violating Section 17(a)(2) and Rule 10b-5(b), also constitute violations of Section 17(a)(1) and (3) and Rule 10b-5(a) and (c). *See Lorenzo v. SEC*, 139 S.Ct. 1094, 1100, 1101–02, 203 L.Ed.2d 484 (2019) (holding that knowing dissemination of misrepresentations with an intent to deceive violates Rule 10b-5(a) and (c) and Section 17(a)(1)); *see also Malouf v. SEC*, 933 F.3d 1248, 1260 (10th Cir. 2019) (applying *Lorenzo* to Section 17(a)(3) because it "is virtually identical to Rule 10b-5(c)").

As described herein, the account statements Defendants sent to investors were steeped in deception —as were Defendants' Ponzi payments to earlier investors that used money received from new investors, rather than from returns from the underlying investments.

In short, Defendants intentionally made and disseminated various materially false statements and conducted deceptive business practices. In so doing, Defendants employed a "device, scheme, or artifice to defraud," in violation of Rule 10b-5(a) and Section 17(a)(1), and engaged in an "act, practice, or course of business" that "operated as a fraud or deceit" on investors under Rule 10b-5(c) and Section 17(a)(3).

\* \* \* \*

For all of these reasons, the Commission is entitled to summary judgment on its claims that Silea and Kranenberg's actions violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

## III. Default Judgment

### A. Legal Standard
Federal Rule of Civil Procedure 55 sets forth certain conditions under which default may be entered against a party, as well as the procedure to seek the entry of default judgment. FED. R. CIV. P. 55. The Fifth Circuit requires a three-step process for securing a default judgment. *New York Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996). First, a default occurs when a defendant has failed to plead or otherwise respond to the complaint within the time required by the Federal Rules of Civil Procedure. FED. R. CIV. P. 55(a); *New York Life Ins.*, 84 F.3d at 141. Next, an entry of default may be entered by the clerk when the default is established. FED. R. CIV. P. 55(a); *New York Life Ins.*, 84 F.3d at 141. Third, a plaintiff may then apply to the clerk or the court for a default judgment after an entry of default. FED. R. CIV. P. 55(b); *New York Life Ins.*, 84 F.3d at 141.

 **\*13** Rule 55(b)(2) grants a district court "wide latitude," and the entry of default judgment is left to the sound discretion of the trial court. *James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993); *see also Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998). A defendant, by his default, admits a plaintiff's well pleaded allegations of fact. *Nishimatsu Constr. Co., Ltd. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) (citation omitted).

In determining whether to enter a default judgment, courts utilize a three-part analysis: "1) whether the entry of default judgment is procedurally warranted, 2) whether a sufficient basis in the pleadings based on the substantive merits for judgment exists, and 3) what form of relief, if any, a plaintiff should receive." *Graham v. Coconut LLC*, No. 4:16-CV-606, 2017 WL 2600318, at \*1 (E.D. Tex. June 15, 2017) (citing, among others, *Lindsey*, 161 F.3d at 893).

U.S. Securities and Exchange Commission v. Silea, Slip Copy (2022)

Fed. Sec. L. Rep. P 101,314

## B. Discussion

On November 19, 2021, the Court concluded that KS Cartel was in default and ordered the Clerk to enter default against it due to KS Cartel's failure to obtain counsel after being so ordered, resulting in its pleadings and defenses being stricken, and thus its failure to defend. (Dkt. #55 (citing *Henderson v. Fenwick Protective Inc.*, No. 3:14-CV-505-M-BN, 2015 WL 3439166, at *1 (N.D. Tex. May 28, 2015) (concluding that a defendant-entity not represented by counsel was in default, striking the answer of the entity, ordering entry of default against the entity, and ordering the plaintiff to move for default judgment against the entity))). On November 22, 2021, the Clerk entered default against KS Cartel. (Dkt. #60).

The Court must first consider whether the entry of default judgment is appropriate. *See Lindsey*, 161 F.3d at 893. Factors relevant to this inquiry include:

> [i] whether material issues of fact are at issue, [ii] whether there has been substantial prejudice, [iii] whether the grounds for default are clearly established, [iv] whether the default was caused by a good faith mistake or excusable neglect, [v] the harshness of a default judgment, and [vi] whether the court would think itself obliged to set aside the default on the defendant's motion. *Id.*

As established herein, there are no material issues of fact regarding KS Cartel's violation of Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, Section 17(a) of the Securities Act, and Sections 5(a) and (c) of the Securities Act.[12] There is therefore no question that the Commission has a claim for relief. The grounds for default against KS Cartel are clearly established: the entity failed to retain counsel after being ordered to do so by the Court and after being clearly warned that should it not retain counsel, its filings were subject to being stricken and it would be subject to default. (Dkt. #27, #55). Therefore, KS Cartel's failure to obtain counsel—and thus its default—was not caused by a good faith mistake or excusable neglect, and there has been no "substantial prejudice" to KS Cartel in these proceedings. As a result of KS Cartel's violations of the Securities Act and the Exchange Act and the grounds for default against KS Cartel being clearly established, granting default judgment is not unduly harsh, and the Court would not think itself obliged to set aside the default on the defendant's motion. *See Manion v. Green*, No. 4:12-CV-222, 2014 WL 261203, at *4 (E.D. Tex. Jan. 23, 2014), *report and recommendation adopted*, 2014 WL 12585771 (E.D. Tex. March 28, 2014) (recommending default judgment be entered against entity-defendant that failed to retain counsel).

12      KS Cartel's violations of these provisions are clear based on the Court's analysis of all Defendants' actions as described in Sections I–II *supra.*

**\*14** Second, the uncontroverted allegations in the First Amended Complaint, (Dkt. #9), as well as the facts conclusively established and set forth in Sections I–II *supra*, establish that KS Cartel is liable for violating Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, Section 17(a) of

the Securities Act, and Sections 5(a) and (c) of the Securities Act. There is thus a sufficient basis in the pleadings to enter default judgment.

Third, the Commission explained in its motion that if the Court grants the motion, the Commission will move for remedies against Defendants. (Dkt. #62 at 30 n.6). The Commission is thus directed to submit its proposed form of default judgment against KS Cartel within fourteen days of this Order for the Court's consideration and entry.

## IV. Conclusion

For the foregoing reasons, the Court **ORDERS** that the Commission's Motion for Summary Judgment Against Defendants Sebastian Silea and Christian Kranenberg, (Dkt. #62), is **GRANTED**. The Court further **ORDERS** that the Commission's Motion for Default Judgment Against Defendant KS Cartel LLC, (Dkt. #62), is **GRANTED**.

The Commission is **ORDERED** to move for its proposed remedies against Silea and Kranenberg and for its proposed form of default judgment against KS Cartel within **fourteen days** of this Order for the Court's consideration and entry.

Additionally, Defendant Silea's motions purportedly filed in response to the Commission's motion, (Dkt. #65, #66), are **DENIED**.

**So ORDERED and SIGNED this 27th day of January, 2022.**

## All Citations

Slip Copy, 2022 WL 269105, Fed. Sec. L. Rep. P 101,314

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# ATTACHMENT D

2022 WL 902784
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

MIMEDX GROUP, INC., Parker H. Petit, William
C. Taylor, and Michael J. Senken, Defendants.

19 Civ. 10927 (NRB)
|
Signed 03/28/2022

**Attorneys and Law Firms**

Mark Lander Williams, Stephen C. McKenna, U.S. Securities and Exchange Commission, Denver, CO, for Plaintiff.

Daniel Jonathan O'Neill, Jonathan Bach, Shapiro Arato Bach LLP, Altin Herbert Sila, Freshfields Bruckhaus Deringer US LLP, Amanda Nicole Tuminelli, Matthew I. Menchel, Kobre & Kim LLP, New York, NY, Eric Brendan Bruce, Freshfields Bruckhaus Deringer US LLP, Washington D.C., DC, for Defendant Parker H. Petit.

William Anthony Burck, Michael Ethan Liftik, Quinn Emmanuel Urquhart & Sullivan, LLP, Washington, DC, Michael Barry Carlinsky, Quinn Emanuel, New York, NY, Michael Thomas Packard, William Weinreb, Quinn Emanuel, Boston, MA, for Defendant William C. Taylor.

Christian R. Everdell, Joanna Ka Wai Chan, Mark Stewart Cohen, Nathaniel P. T. Read, Scott Douglas Thomson, Sharon L. Barbour, Sri Kuehnlenz, Cohen & Gresser LLP, New York, NY, for Defendant Michael J. Senken.

**MEMORANDUM AND ORDER**

NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE

**\*1** The Securities and Exchange Commission ("SEC") has brought this action against MiMedx Group, Inc. ("MiMedx"), Parker H. Petit ("Petit"), William C. Taylor ("Taylor"), and Michael J. Senken ("Senken"). The SEC's complaint (the "Complaint"), filed on November 26, 2019, asserts the following claims: securities fraud claims against all defendants under Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act"), and Rule 10b-5 promulgated thereunder; books and records claims against all individual defendants for violations of Exchange Act Section 13(b)(5) and of Rules 13b2-1 and 13b2-2; books and records claims against MiMedx for violations of Section 13(b)(2) of the Exchange Act; false certifications claims against Petit and Senken for violations of Rule 13a-14 of the Exchange Act; false SEC filings claims against MiMedx for violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13; aiding and abetting claims against all individual defendants for violation of Exchange Act Sections 10(b), 13(a), 13(b)(2), 17(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13; control person liability against Petit and Taylor under Section 20(a) of the Exchange Act; and violation of Section 304(a) of the Sarbanes-Oxley Act of 2002 by Petit and Senken. Before the Court is Senken's motion to dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Oral argument was held on March 23, 2022.

## BACKGROUND

### I. Factual Background

While the allegations in the Complaint concern activity related to Petit, Taylor, Senken, and MiMedx, we focus on those facts that are primarily relevant to the instant motion.[1]

---

[1] Petit and Taylor were charged in a parallel criminal action, No. 19 Crim. 850, and were both convicted on November 19, 2020. See ECF No. 68. Petit was found guilty of securities fraud and Taylor was found guilty of conspiracy to commit securities fraud. Id. Petit and Taylor were each sentenced to a one-year term of imprisonment and were fined $1,000,000 and $250,000 respectively. See 19 Crim. 850, ECF Nos. 153, 154. Petit and Taylor have appealed their sentences. See 19 Crim. 850, ECF Nos. 155, 156.

---

*a. The Defendants*

MiMedx is a "regenerative medicine biotechnology company" headquartered in Marietta, Georgia that "sells a variety of products derived from human placental, amniotic, and umbilical tissues." See Compl. ¶¶ 13, 17. These products include "wound care and surgical allografts (tissue grafts transplanted between unrelated individuals) ... and an injectable amniotic liquid product." Id. ¶ 18. MiMedx's securities traded on the Nasdaq Global Market until 2018, including during the relevant period from 2013 until the third quarter of 2017. Id. ¶ 13. Currently, they are traded on OTC Link. Id. On July 3, 2013, MiMedx raised $34 million in an offering, filing a Form S-3 to register an offering of new shares of stock. Id.

Petit was MiMedx's chairman and CEO from February 2009 to June 2018, with "control over the management, general operations, sales personnel, and related policies of MiMedx." Id. ¶ 14. Taylor was MiMedx's president and COO from 2011 to June 2018, served on the board of directors, and exercised control over the management, general operations, sales personnel, and related policies of

MiMedx. Id. ¶ 15. Senken served as MiMedx's CFO from 2011 to June 2018 and, along with Petit, signed and certified each of MiMedx's Forms 10-K and 10-Q filed between 2013 and November 2017. Id. ¶ 16. Senken also signed management letters provided to MiMedx's auditors from 2013 through the second quarter of 2017 (to Auditor A) and for the third quarterly review of 2017 (to Auditor B). Id. Senken had previously passed the certified public accountant examination and worked as CFO of multiple companies. Id.

**\*2** MiMedx followed two different sales models with its customers. For its "direct sales" customers, MiMedx would recognize revenue at the time that product was shipped to the customer. Id. ¶ 19. For other customers, MiMedx would consign products, which entailed shipping product to the customer with no expectation of payment until the product was used or implanted. Id. Revenue for this latter category of customer was recognized at the time product was used or implanted. Id. This revenue recognition approach is required by U.S. Generally Accepted Accounting Principles ("GAAP"). Pursuant to GAAP, companies cannot recognize revenue until the revenue was "realized or realizable and earned, which occurs only when each of the following conditions is met (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred or services have been rendered; (iii) the seller's price to the buyer is fixed or determinable; and (iv) collectability is reasonably assured." Id. ¶ 21. MiMedx disclosed its revenue recognition policy in its annual and quarterly financial filings during the relevant period. Id. ¶ 22.

### b. Distributor E Side Agreement

From approximately 2012-2017, Distributor E sold MiMedx products to the U.S. Department of Veterans Affairs and the U.S. Department of Defense (collectively, the "VA"). Id. ¶ 134. Distributor E represented 56% of MiMedx's total reported revenue in 2013, 34% of total reported revenue in 2014, 24% of total reported revenue in 2015, and "a declining percentage thereafter." Id. ¶ 135. MiMedx's relationship with Distributor E commenced in April 2012, when the two companies entered into a written distribution agreement. Id. ¶ 137. Under the terms of the agreement, MiMedx made "direct sales" to Distributor E, and payment was due within a specific period of time after invoice. Revenue was recognized based on when the product had been shipped to Distributor E. Id. ¶¶ 137, 138. However, "[b]y at least January 1, 2013," contrary to the terms of MiMedx and Distributor E's written agreement, Petit and Taylor entered into a side arrangement with Distributor E that changed the sales model into a "consignment model" whereby Distributor E would not pay for product until it received payment from the VA. Id. ¶ 139. Taylor further memorialized the terms of the side agreement in an email to Distributor E on March 8, 2013, which he did not disclose to MiMedx accounting staff, attorneys, or auditors, writing that despite the distribution agreement "stat[ing] our legal terms and obligations ... we need flexibility that meets both our business needs," and therefore payment would operate, as it had for the first six months of 2013, "slightly different than the way the contract is written." Id. ¶ 170. Petit and Taylor also agreed to

"credit" Distributor E for any product that was dropped, damaged, or lost, and allowed Distributor E to return product that the VA did not want to use. Id. ¶ 145-46. Thus, under the side agreement to be consistent with GAAP, MiMedx should have recognized revenue at the time of Distributor E's payment, rather than at the time of shipment. Id. ¶ 139.

In order to implement the side agreement, Distributor E would send a daily report to MiMedx that listed products for which it had received a purchase order from the VA, including the price charged and the patient for whom the product was used. Id. ¶ 151. This report was sent to the Reconciliation Group within MiMedx, which was located outside of MiMedx's accounting staff, was allegedly created for the purpose of managing Distributor E's product and sales, and reported directly to Executive Vice President 1, a direct report to Taylor. Id. ¶ 152. No group similar to the Reconciliation Group existed for any other MiMedx customer. Id. ¶ 160. Executive Vice President 1 would occasionally forward emails to Petit, Taylor, and Senken that reported the total dollar value of VA purchase orders received by Distributor E. Id. ¶ 153. The Reconciliation Group would also create "Weekly Revenue" tables that compiled the daily purchase order totals. Id. ¶ 154. These tables were circulated on a weekly basis to Executive Vice President 1, Controller 1, who was one of Senken's direct reports, and another accounting employee, and were occasionally forwarded to Petit, Taylor, and Senken. Id. Controller 1 sent an email to Senken in September 2013 regarding the Weekly Revenue table, stating:

> **\*3** This may not be the first time that you are seeing this, but it is the first time that I am seeing this. It looks like we tell them what to pay based on their weekly revenue? So our 75-80 days for payment is only a coincidence.

Id. ¶ 157. According to the SEC, Distributor E would pay MiMedx the total amount identified in the Weekly Revenue tables "to the penny." Id. ¶ 155. This payment arrangement continued from at least January 2013 until the end of the relationship in 2017. Id. ¶ 156.

In addition to managing and tracking the VA purchase orders that Distributor E received, MiMedx also managed the inventory stocked at the VA, despite the fact that under the terms of the distribution agreement the product was owned by Distributor E. Id. ¶ 161. MiMedx sales staff would conduct physical counts of VA product, determine whether product had been used, and would work with the VA to generate purchase orders in situations in which a purchase order had not been sent to Distributor E. Id. ¶¶ 162-165.

### c. MiMedx Financial Statements

According to the SEC, MiMedx improperly recognized revenue, causing its financial statements to be materially misstated for every period from the first quarter 2013 to the third quarter 2017. Id. ¶ 178. Petit and Senken signed and certified MiMedx's public filings during this period, including

Forms 10-Q, 10-K, and 8-K, which misstated MiMedx's revenue and contained misstatements with respect to revenue recognition. Id. ¶¶ 180-216. These financial statements were later restated in June 2018. Id. ¶ 27.

### d. Concealment from MiMedx Auditors and Audit Committee

In addition to alleging that the defendants misled the public, the SEC further alleges that the defendants actively concealed their actions from company auditors and the Audit Committee of the Board of Directors. Specifically, the SEC alleges that on January 28, 2016, Senken received an email from one of his direct reports, Controller 2, "complaining that certain transactions involving ... Distributor A, Distributor C, Distributor D, and Distributor E failed to satisfy GAAP criteria that would allow MiMedx to recognize revenue at the time of shipment."[2] Id. ¶ 220. "Controller 2 also alleged internal control deficiencies related to sales personnel extending payment terms and other incentives that were not disclosed to accounting staff." Id. Senken worked with Petit and Taylor to prepare a draft response to Controller 2's email, which he then forwarded to MiMedx's Audit Committee Chair along with the email. Id. ¶ 221. When Senken informed Auditor A about Controller 2's email, he provided a memo in line with the response letter that he sent to the Audit Committee Chair. Id. ¶ 229. After MiMedx's Audit Committee commenced an investigation into Controller 2's complaints, Petit, Taylor, and Senken allegedly concealed information related to the Distributor E side arrangement. Id. ¶ 224. Petit, Taylor, and Senken also caused MiMedx to reassign Controller 2 to a new position where he would not need to sign a management representation letter in connection with MiMedx's annual audit. Id. ¶ 226. A few weeks later, in mid-February 2016, Controller 2 left MiMedx and was provided a negotiated severance package. Id. ¶ 226. The Audit Committee subsequently "concluded that Controller 2's allegations were without merit." Id. ¶ 227.

[2]   Schemes related to Distributor A, Distributor B, Distributor C, and Distributor D are not alleged to have involved Senken and the SEC "is not pursuing charges against Senken related to these distributors." SEC Memorandum of Law in Opposition to Michael J. Senken's Motion to Dismiss ("Opp'n") at 7. Therefore, they not discussed in this opinion.

**\*4** Further, starting from the first quarter of 2013 and through the second quarter of 2017, Petit and Senken signed management representations to Auditor A, which included, among other representations, that MiMedx's financial statements were prepared in accordance with GAAP, that they had no knowledge of fraud or suspected fraud involving management, and that there were no undisclosed side agreements. Id. ¶¶ 176-77. Petit and Senken also signed a management representation letter containing similar representations to Auditor B in connection with the third quarter of 2017 review. Id. ¶ 177. The SEC alleges that in relation to audits during this time period and a separate Audit Committee investigation, Petit, Taylor, and Senken actively concealed information related to, among other things, the Distributor E side agreement and the Reconciliation Group, and provided "false representation about payment practices." Id. ¶¶ 236-261.

*e. Announcement of Restatements and Termination of Petit, Taylor, and Senken*

In the first quarter of 2018, Auditor B requested additional information regarding revenue recognition for Distributor E and the two Audit Committee investigations. Id. ¶ 26. MiMedx subsequently announced that it would delay filing a 2017 Form 10-K and that an investigation by outside counsel would be conducted into its revenue recognition practices. Id. In June 2018, Petit, Taylor, and Senken separated from MiMedx, later characterized as a separation "for cause," and the company announced that it would restate its financial statements for fiscal years 2012-2016. Id. ¶ 27. "During [this] time period, MiMedx's stock price fell by approximately 73% ... eliminating over $1 billion of MiMedx's shareholder value." Id. ¶ 9.

**II. Procedural Posture**

On November 26, 2019, the SEC filed its 15-claim Complaint against MiMedx, Petit, Taylor, and Senken. See ECF No. 1. As is relevant to the instant motion, the SEC charged Senken with securities fraud claims, books and records violations, deceit of auditors, aiding and abetting violations, and violation of Section 304(a) of the Sarbanes-Oxley Act of 2002. See Compl. ¶¶ 300-05, 309-324, 328-330, 337-339, 343-37.

On December 4, 2019, the Court entered a final judgment on consent as to MiMedx, with MiMedx neither agreeing to nor denying the allegations in the Complaint. See ECF No. 18. Pursuant to the final judgment, MiMedx was required to pay a civil penalty of $1,500,000 to the SEC and was permanently enjoined from violating Sections 10(b), 13(a), and 13(b)(2) of the Exchange Act of 1934 and Section 17(a)of the Securities Act. Id.

On February 5, 2020, the Court granted a motion to intervene filed by the United States Attorney's Office for the Southern District of New York. See ECF No. 48. The U.S. Attorney's Office informed the Court that it intended to move for a stay pending conclusion of a parallel criminal case involving Petit and Taylor, filed on November 25, 2019 and charging Petit and Taylor with securities fraud and with conspiracy to commit securities fraud, to make false filings with the SEC, and to improperly influence the conduct of audits. Id.; see U.S. v. Petit, et al., No. 19 Crim. 850, ECF No. 1. On March 11, as modified on April 1, 2020, the Court ordered a stay of discovery, with certain exceptions, pending resolution of the criminal case. See ECF Nos. 59, 64.

On November 19, 2020, the jury in the criminal action found Petit guilty of securities fraud and Taylor guilty of conspiracy to commit securities fraud. See ECF No. 68. Both Petit and Taylor have appealed their convictions. See No. 19 Crim. 850, ECF Nos. 155, 156.

On June 21, 2021, Senken filed the instant motion to dismiss. See ECF No. 80.

## STANDARD OF REVIEW

### I. Motion to Dismiss

"In considering a motion to dismiss ... the court is to accept as true all facts alleged in the complaint," and it must "draw all reasonable inferences in favor of the plaintiff." Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007). In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). A claim is considered plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991).

### II. Fraud Pleading

*5 "It is well-settled in this Circuit that a complaint alleging securities fraud must satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure." Ganino v. Citizens Utils. Co., 228 F.3d 154, 168 (2d Cir. 2000). Therefore, the plaintiff "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A plaintiff relying on false or misleading public statements must identify the statements in question, identify the speaker, state when they were issued, and explain why the statements were fraudulent. See Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). Scienter may be "averred generally," although plaintiffs are required to allege facts that give rise to an inference of fraudulent intent. Id. However, the stricter standards of the Private Securities Litigation Reform Act ("PSLRA") do not govern SEC enforcement actions. See SEC v. Dunn, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008) ("Any argument that Congress intended to apply the provisions of the PSLRA to SEC enforcement actions ignores the statute's plain language.").

## DISCUSSION

### I. Applicable Securities Laws

Case 21-2042, Document 139, 04/29/2022, 3306599, Page95 of 106

### a. *Fraud Claims*

Section 10(b) of the Exchange Act states that it is unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 implements Section 10(b) by making it unlawful, in connection with the purchase or sale of a security, "(a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or ... omit ... a material fact necessary in order to make the statements made ... not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5. Under Section 17(a), it is "unlawful for any person in the offer or sale of any securities" to: "(1) employ any device, scheme, or artifice to defraud; or (2) to obtain money or property by means of any untrue statement of material fact or any omission to state material fact necessary in order to make the statements made ... not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).

To establish liability under Section 10(b), the SEC "is required to prove that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device." S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996). The elements of a claim under Section 17(a)(1) are "[e]ssentially the same" as under Section 10(b) and Rule 10b-5. S.E.C. v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999). However, scienter is not an element under subsections (2) and (3) of Section 17(a). Id.; see Aaron v. S.E.C., 446 U.S. 680, 695-96 (1980).

### b. *Deceit of Auditors*

Rule 13b2-2 states that "[n]o director or officer of an issuer shall, directly or indirectly: (1)[m]ake or cause to be made a materially false or misleading statement to an accountant in connection with ... [a]ny audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart." 17 C.F.R. § 240.13b2-2. Claims made under Rule 13b2-2 do not require a showing of scienter. See S.E.C. v. Stanard, No. 06 Civ. 7736 (GEL), 2009 WL 196023, at *29 (S.D.N.Y. Jan. 27, 2009).

### c. Books and Records Violations

Section 13(b)(5) of the Exchange Act states that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" of an issuer required to file reports. 15 U.S.C. § 78m(b)(5). Rule 13b2-1 provides that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act." 17 C.F.R. § 240.13b2-1. While Section 13(b)(5) requires a showing of scienter, it is not an element of a claim under Rule 13b2-1. See S.E.C. v. Stanard, 2009 WL 196023, at *29-30; S.E.C. v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998) ("[N]o scienter requirement inserted in SEC Rule 13b2-1, 17 C.F.R. § 240.13b2-1, because § 13(b) of the 1934 Act contains no words indicating that Congress intended to impose a scienter requirement.")(internal quotation marks and citation omitted).

### d. Aiding and Abetting Liability

**\*6** Section 20(e) of the Exchange Act provides that "any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." 15 U.S.C. § 78t(e). To state an aiding and abetting claim under Section 20(e), the SEC must plead "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." S.E.C. v. Apuzzo, 689 F.3d 204, 211 (2d Cir. 2012).

### e. False Certifications and Section 304 of the Sarbanes-Oxley Act

Rule 13a-14 promulgated under the Exchange Act requires "[e]ach principal executive and principal financial officer of the issuer ... at the time of filing of [certain public financial reports] ... sign a certification." 17 C.F.R. § 240.13a-14. The officers must represent that "the report does not contain any untrue statement of material fact" and the information included in the report "fairly present[s] in all material respects in the financial condition, results of operations and cash flows." Id.; see also 15 U.S.C. § 7241. Under Section 304 of the Sarbanes-Oxley Act, when an issuer restates its financial statements due to misconduct, the CEO and CFO are required to "reimburse the issuer" for any bonus or incentive-based compensation from the issuer during the 12-month

period following the first issuance or filing, as well as any profits realized from sale of securities during that 12-month period. 15 U.S.C. § 7243.

## II. The SEC Pleads Facts That Raise a Strong Inference That Senken Acted With Scienter

Senken primarily focuses his motion on attacking the scienter element of the SEC's claims.[3] Thus, the central question that we must address in evaluating his motion to dismiss is whether the SEC has plead facts that plausibly raise a strong inference of scienter, as required by the SEC's 10(b), 10b-5, 17(a)(1), 13(b)(5), 13a-14, and aiding and abetting claims.

[3]     Not all of the SEC's charges against Senken require a showing of scienter. Scienter is not a required element of the Section 17(a)(2) and (3) and Section 13(b)(2) claims. Thus, even if Senken were successful in his argument regarding scienter, it would not necessarily dispose of these claims.

Scienter is the "intent to deceive, manipulate, or defraud." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co. ("ECA"), 553 F.3d 187, 198 (2d Cir. 2009) (internal quotation marks and citation omitted). In order to plead a strong inference of scienter, a complaint must allege facts "showing either [(1)] a motive and opportunity to commit the fraud, or [(2)] strong circumstantial evidence of conscious misbehavior or recklessness." Emps.' Ret. Sys. Of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 306 (2d Cir. 2015) (internal quotation marks and citation omitted). "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." Id. (internal quotation marks and citation omitted).

*a. Motive and Opportunity*

The SEC alleges that Senken "obtained salary, bonus cash payments, and equity compensation from MiMedx ... influenced by MiMedx's misstated financial performance, including revenue." See Compl. ¶ 264. These incentives are not sufficient to establish motive and opportunity, as they are "no different from [those of] any other corporate executive whose compensation is tied to stock price." S.E.C. v. Espuelas, 698 F. Supp. 2d 415, 427 (S.D.N.Y. 2010). "[T]he existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter." Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995); S.E.C. v. China Northeast Petroleum Holdings Ltd., 27 F. Supp. 3d 379, 388 (S.D.N.Y. 2014) ("[T]he desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation do not constitute motive for purposes of this inquiry.") (internal quotation marks and citation omitted). Thus, the Complaint fails to adequately allege motive and opportunity as to Senken.[4]

4     This discussion of Senken's executive compensation and bonus payments is in contrast to the discussion of Section 17(a)(2) liability, see Section IV infra.

### b. Conscious Misbehavior or Recklessness

**\*7**  The second means of establishing scienter requires a showing by circumstantial evidence of conscious misbehavior and recklessness. See ECA, 553 F.3d at 198-99. In order to show conscious misbehavior and recklessness, a plaintiff must show, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000). The Court concludes that the SEC has sufficiently alleged scienter through a showing of conscious misbehavior and recklessness.

As an initial matter, Senken was the CFO of Mimedx from 2011 to June 2018, had prior experience as the CFO of multiple other companies, and had passed the certified public accountant examination. See Compl. ¶ 16. As part of his job responsibility, Senken supervised MiMedx's accounting group. See Memorandum of Law in Support of Michael J. Senken's Motion to Dismiss the Complaint ("MTD") at 3; Compl. ¶¶ 154, 220. In this capacity, Senken was forwarded emails from both the Reconciliation Group reporting "the total dollar value of VA [Purchase Orders] Distributor E had received," as well as "Weekly Revenue" tables that compiled daily totals of Distributor E's daily reports. See Compl. ¶¶ 153-54. Given that these reports were created solely for the purpose of tracking Distributor E's product and would not have been needed under the terms of payment of the original Distributor E agreement, and given that Distributor E would pay "MiMedx the total cash amount identified in the Weekly Revenue table, to the penny," an individual in Senken's position and with his background would have been aware that Distributor E was not following the terms of the written agreement. Senken therefore "knew facts or had access to information suggesting that [MiMedx's] public statements were not accurate[ ] or [ ] failed to check information [he] had a duty to monitor." Blanford, 794 F.3d at 306. Further, no other distributor had an account that was managed in this manner. See Compl. ¶ 160.

Senken's arguments that he did not supervise the Reconciliation Group and was not copied on Taylor's March 2013 email to Distributor E regarding the side agreement are insufficient to negate his knowledge or recklessness. See Opp'n at 12. Regardless of whether Senken was involved in the initial discussions with Distributor E, he was clearly aware of the arrangement or reckless for not knowing of it. Senken's receipt of daily purchase order totals and weekly revenue tables generated by the Reconciliation Group also supports the inference that he was aware of the group's existence and the reason for its creation, again showing that he "knew facts or had information" that

suggested MiMedx's financial statements were false or that he "failed to check [that information]" even though he had a duty to monitor it as part of his job responsibilities. Blanford, 794 F.3d at 306.

Senken further argues that the SEC fails to explain why he "would have scrutinized the basis for the payments behind this cash flow information for indications of the alleged side agreement." See Opp'n at 15. Accepting this argument would require the Court to believe that the CFO of a publicly traded company with Senken's job history would not have understood the significance of this information. Further, this argument drastically downplays Distributor E's importance to MiMedx, as it represented 56% of MiMedx's total reported revenue in 2013; 34% of total reported revenue in 2014; 24% of total reported revenue in 2015; "and a declining annual percentage thereafter." Compl. ¶ 135. Between 2012 and 2017, MiMedx reported over $150 million in revenue from Distributor E, despite having not collected 8% of this reported revenue. Id. at 136. It is more than reasonable to infer that a CFO would have, and should have, paid attention to financial information regarding a customer as important as Distributor E.[5]

[5] Senken is correct that "a corporate officer or director by virtue of his status cannot, without more, be charged with knowledge of activities within the corporation." See MTD at 17 (quoting Matsumura v. Benihana Nat'l Corp., 542 F. Supp. 2d 245, 255-56 (S.D.N.Y. 2008)). There is ample "more" here, as Senken's knowledge is based on information that was sent directly to him regarding payments from Distributor E and MiMedx's monitoring of Distributor E product at the VA.

**\*8** Furthermore, the Complaint identifies two specific emails sent to Senken by direct reports that highlighted the unusual circumstances surrounding MiMedx's handling of Distributor E's account. See Compl. ¶¶ 157-58, 220-22. The first email was sent in September 2013 by one of Senken's subordinates, Controller 1. See Compl. ¶ 157. In the email, Controller 1 forwarded a weekly revenue table for Distributor E, stating:

> This may not be the first time that you are seeing this, but it is the first time that I am seeing this. It looks like we tell them to pay based on their weekly revenue? So our 75-80 days for payment is only a coincidence.

Id.[6] According to the complaint, Senken did not react to this email, and there is no indication that he conducted any further review in order to determine the reason that Distributor E was operating on a consignment basis, again "fail[ing] to check on information [he] had a duty to monitor."[7] Blanford, 794 F.3d at 306.

[6] According to Senken, since this email "does not reflect that Controller 1 knew of the alleged side agreement," and since weekly revenue tables had been circulated since January 2013, it is implausible that Senken would have known about the side agreement based on receiving emails containing the daily reports and weekly revenue tables. See Reply Memorandum of Law in Support of Michael J. Senken's Motion to Dismiss the Complaint at 9. However, it is clear from Controller 1's email that it was "the first time that [he was] seeing [the weekly revenue table.]" See Compl. ¶ 157. Therefore, it is reasonable that Controller 1 expressed surprise and notified Senken immediately. The effort to impute Controller 1's ignorance to Senken is illogical.

[7] Senken's citation to City of Brockton Retirement Sys. v. Avon Prods., Inc., No. 11 Civ. 4665 (PGG), 2014 WL 4832321 at \*24 (S.D.N.Y. Sept. 29, 2014) is inapposite. Senken neither conducted an investigation nor publicly disclosed Controller 1's email. Rather the allegations here involve a deliberate effort to avoid inquiry into the payment arrangement with Distributor E and to thwart the

disclosure of the facts. On the other hand, in Avon, the court found that an executive's receipt of a whistleblower letter did not raise an inference of corporate scienter even though the company did not disclose the allegations in the letter in its next financial disclosures, but rather commenced an internal investigation and thereafter disclosed the whistleblower letter in a subsequent public filing. Id.

On January 18, 2016, another of Senken's subordinates, Controller 2, emailed Senken regarding MiMedx's business practices with respect to Distributors A-E, expressing the belief that MiMedx was violating GAAP with respect to the timing of revenue recognition. See Compl. ¶ 220. As set out supra, pp. 8-9, Senken, along with Petit and Taylor, crafted a response to this email that was sent to the Audit Committee Chair and MiMedx's outside auditor, disputing Controller 2's allegations. Id. ¶ 221.

Further, Senken, working with Petit and Taylor, concealed material information regarding the Distributor E side agreement from investigations by both the Audit Committee and MiMedx's auditor, including by arranging for the transfer and subsequent dismissal of Controller 2. Id. ¶¶ 225-26, 228-35. These actions further support a finding of scienter, given that Senken was aware that Distributor E's account was being handled in a different manner than was being presented to the Audit Committee.[8]

[8]    Senken cites to Constr. Laborers Pension Tr. For S. California v. CBS, 433 F. Supp. 3d 515 (S.D.N.Y. 2020) and Slayton v. Am. Exp. Co., 604 F.3d 758 (2d Cir. 2010) to argue that his actions undercut scienter because he reported Controller 2's email to the Audit Committee and the Audit Committee later found Controller 2's concerns to be without merit. See MTD at 16. These cases are inapposite. In neither case did the defendant actively conceal material information from investigators, as Senken is alleged to have done.

**\*9**  Finally, in addition to pleading Senken's scienter with regards to Distributor E's consignment payment structure under the side agreement, the Complaint also establishes that Senken was aware, or reckless in not being aware, of Distributor E's right of return. As stated above, the emails that Senken received from Controller 1 and 2, in addition to the daily report and weekly revenue table emails, were sufficient to inform him that Distributor E was returning product in violation of the terms of the written contract.

### III. The Complaint Alleges Material Misstatements

Senken also raises multiple arguments that the SEC has failed to allege that MiMedx materially misstated its revenue. See MTD at 19. Specifically, he contends that the SEC fails to allege that MiMedx's reported revenue was materially false, that the Complaint fails to identify and specify the alleged misstatements to MiMedx's auditors, and that Senken's statements regarding MiMedx's financial results were "non-actionable statements of opinion." Id. at 19-24.

Senken maintains that the SEC's fraud and false certification claims must be dismissed because the SEC "did not allege any material misstatements concerning Distributor E." See MTD at 23. A statement is material for the purposes of Section 10(b) if a reasonable investor would consider it to be significant in making an investment decision. See Basic Inc. v. Levinson, 485 U.S. 224, 224

(1988). Issues of materiality "will rarely be dispositive in a motion to dismiss," unless "they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." In re Morgan Stanley Information Fund Sec. Litig., 592 F.3d 347, 360 (2d Cir. 2010) (internal quotation marks and citation omitted).

First, the alleged misstatements in this case concern MiMedx's reported revenue, which is the exact type of information that would be important to a reasonable investor. See Ganino v. Citizens Utilities Co., 228 F.3d 154, 164 (2d Cir. 2000) ("Misstatements of income could be material because 'earnings reports are among the pieces of data that investors find most relevant to their investment decision.' ") (quoting In re Burlington Coat Factory, 114 F.3d 1410, 1420 n.9 (3d Cir. 1997)); In re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398, 410 (S.D.N.Y. 1998) ("Profit statements generally will be of particular interest to investors."). MiMedx eventually restated four years of its financial statements to correct errors involving revenue recognition set forth in prior statements, which in and of itself shows that the misstatements were material. See Compl. ¶ 27. Pursuant to GAAP, financial statements "should be restated only to correct material accounting errors that existed at the time the statements were originally issued." In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004); S.E.C. v. Kelly, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009) ("[U]nder Generally Accepted Accounting Principles, a restatement issues only when errors are material.").

Second, as previously stated, Distributor E was MiMedx's largest customer and was responsible for substantial portions of MiMedx's total reported revenue during the period in question, including representing 56% of total reported revenue in 2013, 34% in 2014, and 24% in 2015. See Compl. ¶ 135. Third, following the disclosure of MiMedx's improper revenue recognition practices and the need for restatements of the company's financial statements, MiMedx's stock price fell by approximately 73%, indicating that investors found this information to be significant. See Compl. ¶ 9.

 **\*10** Senken's second argument is likewise without merit. The Complaint clearly specifies that Senken made alleged misstatements to Auditors A and B in the following manner: "[i]n connection with each Auditor A quarterly review and Auditor A annual audit from the first quarter of 2013 through the second quarter of 2017, Petit and Senken signed management representation letters to Auditor A." See Compl. ¶ 176. In addition, the Complaint states that "[o]n or about October 31, 2017, Petit and Senken signed a management representation letter to Auditor B in connection with Auditor B's third quarter of 2017 review." Id. ¶ 176. The Complaint alleges that these letters contained misstatements regarding, among other things, that MiMedx's financial statements were prepared in accordance with GAAP, that Petit and Senken had no knowledge of fraud or suspected fraud involving management, and that all side agreements and arrangements had been disclosed to the auditors. Id. ¶ 177.

Senken's third argument, that his statements regarding MiMedx's financial results are non-actionable opinions is, to be generous, borderline risible. MiMedx's reported revenue figures are not matters of opinion. See In re AmTrust Fin. Services, Inc. Sec. Litig., No. 17 Civ. 1545 (LAK), 2019 WL 4257110, at *14 (S.D.N.Y. Sept. 9, 2019) ("If the numbers underlying th[e] data [presented in public filings] consist only of figures that were then presently known, fixed, or definite ... then any resulting data would be a statement of fact.").[9] MiMedx's reported revenue represented "historical income metrics that [did] not involve any inherently subjective valuations," and application of the appropriate GAAP standard, and the terms of the side agreement, "called only for ... objective criteria." Id.

[9] Senken relies on Sjunde AP-Fonden v. Gen. Elec. Co., 417 F. Supp. 3d 379 (S.D.N.Y. 2019) and N. Collier Fire Control and Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc., No. 15 Civ 6034 (RJS), 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) to argue that MiMedx's revenue figures are statements of opinion. See MTD at 20-21. The financial metrics that were identified as opinions in these cases were not reported revenue figures. See Sjunde AP-Fonden, 417 F. Supp. at 404 (finding revenue and profit projections to be opinions); N. Collier Fire Control, 2016 WL 5794774, at *9 (finding goodwill balances to be opinions). Senken also cites Pearlstein v. BlackBerry Ltd., 93 F. Supp. 3d 233 (S.D.N.Y. 2015) to support his contention that MiMedx's revenue figures reflected subjective accounting judgments based on the fact that GAAP allows companies to recognize revenue early in certain situations. Id. at 242-43. However, unlike in Pearlstein, the side agreement created a consignment model with Distributor E, which removed any subjectivity as to when revenue could be recognized.

## IV. The Complaint Alleges That Senken Obtained Money or Property Through his Misstatement and Omissions

Senken argues that the Section 17(a)(2) claims against him should be dismissed on the basis that he is not alleged to have "personally obtained money or property." See MTD at 26. Both parties concede that there is a split of authority in this District as to whether a defendant must have personally gained money or property, or whether it is sufficient to have obtained money or property on behalf of an employer, in order to be liable under Section 17(a)(2). See id.; Opp'n at 25; compare S.E.C. v. Stoker, No. 11 Civ. 7388 (JSR), 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012) (Judge Rakoff "conclude[d] that it is sufficient under Section 17(a)(2) for the SEC to allege that Stoker obtained money or property for his employer while acting as its agent, or, alternatively, for the SEC to allege that Stoker personally obtained money indirectly from the fraud.") with S.E.C. v. Syron, No. 11 Civ. 9201 (RJS), 934 F. Supp. 2d 609, 640 (S.D.N.Y. 2013) (Judge Sullivan, then a district judge, found that a requirement "whereby the defendant personally gains money or property from the fraud, is essential, for otherwise the defendant may have fraudulently induced the victim to part with money or property, but he has not obtained that money or property himself.").

 *11  This Court adopts Judge Rakoff's reasoning in the Stoker case, finding that Senken "obtained money or property for his employer while acting as its agent" and "personally obtained money indirectly from the fraud." Stoker, 865 F. Supp. 2d at 463. The Complaint alleges that Senken "obtained salary, bonus cash payments, and equity compensation ... [that were allegedly] influenced by MiMedx's misstated financial performance, including revenue."[10] See Compl. ¶ 264. The SEC also alleges that "MiMedx filed Forms S-8 to register shares of stock, including

the most recent Form S-8, which was filed on or about June 7, 2016," and subsequently "MiMedx obtained money as a result of its fraudulent conduct through sales of stock upon option exercise." See id. ¶ 262.

10    This analysis is separate from our analysis of Senken's scienter based on motive and opportunity, supra Section II.a. Section 17(a) (2) does not require a finding of scienter. See Aaron v. S.E.C., 446 U.S. 680, 697 (1980). Rather, this analysis is solely focused on whether the SEC has pled the element of Section 17(a)(2) that requires a showing that a defendant "obtain money or property."

### V. The Complaint Alleges "Scheme Liability"

Senken argues that the SEC inadequately alleges "scheme liability" under Rule 10b-5 (a) and (c) and Section 17(a)(1) and (3) because the Complaint fails to allege a deceptive act by Senken distinct from the misstatements. See MTD at 25. Senken further argues that courts have dismissed scheme liability claims "where the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission." S.E.C. v. Kelly, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011).

The SEC argues that the Supreme Court's decision in Lorenzo v. S.E.C., 139 S.Ct. 1094 (2019) "reject[s] this very argument." See Opp'n at 23. However, there is a split in authority regarding Lorenzo's holding.

On the one hand, Senken cites to two cases in this Circuit in which courts found that Lorenzo did not change the requirement that a plaintiff plead additional deceptive acts beyond mere misstatements. See S.E.C. v. Rio Tinto plc, No. 17 Civ. 7994 (AT) (DCF), 2021 WL 818745 (S.D.N.Y. Mar. 3, 2021); In re Teva Sec. Litig., No. 17 Civ. 558 (SRU), 2021 WL 1197805 (D. Conn. Mar. 30, 2021).

On the other hand, the SEC also cites a number of post-Lorenzo cases to support its position. See S.E.C. v. SeeThruEquity, LLC, No. 18 Civ. 10374 (LLS), 2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019) ("The Court's holding in Lorenzo is clear: 'Those who disseminate false statements with intent to defraud are primarily liable under Rules 10b-5(a) and (c), § 10(b), and § 17(a)(1), even if they are secondarily liable under Rule 10b-5(b).' "); S.E.C. v. Winemaster, No. 19 Civ. 4843, 2021 WL 1172773, at *918 (N.D. Ill. Mar. 29, 2021) (finding that defendant's "claims that Rule 10b-5(a) and (c) require deceptive acts distinct from an alleged misstatement forming the basis of a Rule 10b-5(b) claim ... [are] no longer tenable" in light of Lorenzo); In re Cognizant Tech. Sols. Corp. Sec. Litig., No. 16 Civ. 6509, 2020 WL 3026564, at *17 (D.N.J. June 5, 2020) ("Thus under Lorenzo, unlike prior precedent, a plaintiff need not necessarily allege deceptive conduct that extends beyond the alleged misstatement itself.").

Ultimately, we need not endeavor to resolve this debate. Here, the Complaint adequately alleges that Senken engaged in deceptive acts beyond issuing misstatements, including his concealment of material facts from MiMedx's Audit Committee and auditors. See, e.g., Compl. ¶¶ 177, 224-28. Thus, the SEC has satisfied its burden in pleading "scheme liability" as to Senken.

## VI. The Complaint has Alleged Books and Records Violations

**\*12** Senken moves to dismiss the charges of books and records violations by arguing that "the Complaint fails to sufficiently allege that MiMedx's internal controls were inadequate under Section 13(b)(2)(B)." See MTD at 27. However, the SEC is not required to establish that MiMedx's internal controls were inadequate in order to succeed on its books and records claims. In order to prove a Section 13(b)(5) and Rule 13b2-1 violation, "the SEC must demonstrate that [Senken] knowingly circumvented or failed to create and maintain a system of internal accounting controls, or alternatively, that [he] knowingly falsified the books, records, or accounts of [MiMedx]." S.E.C. v. 800america.com, Inc., No. 02 Civ. 9046 (HB), 2006 WL 3422670, at \*11 (S.D.N.Y. Nov. 28, 2006). The SEC has alleged that Senken acted with scienter, and that he concealed material information from MiMedx's Audit Committee and auditors, thereby circumventing MiMedx's internal controls. See, e.g. Compl. ¶¶ 176-177, 229-30, 252, 272.

## VII. The Complaint Sufficiently Alleges Violations of Section 304 of the Sarbanes-Oxley Act

Senken's final argument, that the SEC has not sufficiently established violations of Section 304 of the Sarbanes-Oxley Act, is likewise without merit. Section 304 requires a CEO or CFO to disgorge bonuses, incentive-based compensation, or profits realized from sales of securities, to an issuer that has restated its financial statements due to misconduct. 15 U.S.C. § 7243. The disgorgement period is calculated as a 12-month period following the first improper filing. Id.

As an initial matter, we have concluded that the Complaint has adequately alleged misconduct by Senken. The SEC has also listed the first public filing relating to the misconduct in question. The Complaint states that "MiMedx filed reports that were in material non-compliance with its financial reporting requirements under the federal securities laws" and were later restated. See Compl. ¶ 344. The SEC has identified the Forms 10-K filed on March 13, 2015, February 29, 2016, and March 1, 2017, as having been restated. See Compl. ¶¶ 180(h), 205, 212(d); Opp'n Ex. A (ECF No. 85-1) at 28.[11] Further, given that these restatements were filed after November 26, 2014, the SEC's allegations are not time-barred.

[11] While the SEC alleges that MiMedx restated its Form 10-Qs for the first through third quarter of 2017, MiMedx's 2018 Form 10-K, which disclosed the various restatements, makes no reference to restating financial statements from 2017 and only references financial statements as of period ended December 31, 2016, 2015, 2014, 2013, and 2012. See Opp'n Ex. A (ECF No. 85-1) at 28.

## CONCLUSION

For the reasons stated above, Senken's motion to dismiss is denied in its entirety. The SEC has sufficiently pled scienter, materiality, Section 17(a)(2) liability, scheme liability under Rule 10b-5

(a) and (c) and Section 17(a)(1) and (3), books and records violations under Section 13(b)(2)(B), and violations of Section 304 of the Sarbanes-Oxley Act.

**SO ORDERED**.

**All Citations**

Slip Copy, 2022 WL 902784

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

## CERTIFICATE OF COMPLIANCE

This letter complies with the word limit of Federal Rule of Appellate Procedure 28(j) because it contains 349 words.

/s/*Emily True Parise*
Emily True Parise

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2022, I electronically filed the foregoing letter with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/*Emily True Parise*
Emily True Parise